**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:  MERRILL LYNCH & CO., INC.,
AUCTION RATE SECURITIES (ARS)
MARKETING LITIGATION

_____

This Document Relates To:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 1:09-cv-09887-LAP

LOUISIANA PACIFIC CORPORATION,

        Plaintiff,

        v.

MONEY MARKET 1 INSTITUTIONAL
INVESTMENT DEALER; MERRILL LYNCH
& CO., INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED; AND
DEUTSCHE BANK SECURITIES INC.,

        Defendants.

_____

)
)
)    1:09-md-02030-LAP
)    ECF CASE
)
)    **FIRST AMENDED COMPLAINT**
)
)
)
)
)
)
)
)
)
)
)
)
)
)

        Plaintiff Louisiana Pacific Corporation ("LP") brings this action against Money Market 1

Institutional Investment Dealer ("Money Market One"), Deutsche Bank Securities Inc.

("Deutsche Bank"), Merrill Lynch & Co., Inc. ("Merrill Lynch & Co."), and Merrill Lynch,

Pierce, Fenner & Smith Incorporated ("Merrill Lynch").[1]  The allegations set forth herein are

_____

[1] By Order dated December 1, 2009, the Judicial Panel on Multidistrict Litigation transferred
LP's claims against the Merrill Lynch Defendants and Money Market One related to the Merrill
Lynch-underwritten securities to the Southern District of New York for pre-trial purposes.
Because this action will return to the Northern District of California for trial, and because LP
reserves the right to pursue all of its claims (involving both the Merrill Lynch-underwritten and
Deutsche Bank-underwritten securities) in a single trial against all of the named Defendants, this
First Amended Complaint also includes LP's claims against Deutsche Bank and Money Market
One arising out of LP's acquisition of the Deutsche Bank-underwritten securities, as well as LP's

based on corporate knowledge and documents and information in LP's possession, and upon

information and belief developed through investigation by LP and by counsel that included a

review of publicly available documents, including administrative and legal actions brought

against Deutsche Bank and Merrill Lynch, trial testimony from *United States v. Butler*, No. 08-

CR-370 (JBW) (E.D.N.Y.), documents that appear to have been drafted in whole or in part by

each of the Defendants, Merrill Lynch & Co.'s press releases and filings with the Securities and

Exchange Commission ("SEC"), news articles, and other publicly available materials.

## PRELIMINARY STATEMENT

1.      LP is a supplier and distributor of building products throughout the United States.

Historically, LP has maintained significant working capital accounts that LP uses to fund its

ongoing operations.  Because these funds need to be readily accessible on short notice, and

because they are used to cover ongoing business expenses, LP has restricted its working capital

to what it understood to be the safest and most liquid of investments, including money market

instruments and other short-term cash equivalents that carried a "AAA" rating.

2.      For years, LP's broker-dealer and trusted financial advisor, Money Market One,

recommended that LP invest its working capital in what Money Market One represented were

highly liquid and safe cash equivalent instruments known as auction rate securities – long-term,

interest-bearing instruments that trade at periodic Dutch auctions (typically every 7, 28, or 35

days) – that provided returns that were slightly higher than other forms of cash management.

Money Market One consistently represented that auction rate securities posed virtually no risk of

principal loss, and were priced and sold through Dutch auctions that effectively never failed and

---

claims against Merrill Lynch and Money Market One arising out of LP's acquisition of the
Merrill Lynch-underwritten securities, and is being filed in both the Southern District of New
York and the Northern District of California.

therefore consistently provided liquidity.  Over time, and in reliance upon Money Market One's advice and recommendations, as well as the market impact of an extensive pattern of deceptive and manipulative activities by Merrill Lynch and Deutsche Bank, LP invested more than $300 million of its working capital with Money Market One in these purportedly safe securities.  Prior to August 2007, LP moved in and out of these securities as needed to fund its operational requirements, with no indication that there was not a ready and liquid market for such securities.

3.    It has now become apparent, however, that Money Market One's representations were false, and that the "market" for auction rate securities was a sham.  For years, Merrill Lynch and Deutsche Bank secretly propped up the auctions by placing support bids in 100 percent of the auctions in which they served as the sole or leading broker-dealer, thereby ensuring that all auctions would be successful and that investors seeking to sell their auction rate securities would seemingly be able to exit the market whenever they chose to do so.[2]  That manipulation served to create the false appearance of a liquid and efficient market, and the understanding that any prospective purchaser of auction rate securities could resell their holdings at par in the periodic auctions.  Without this undisclosed support by the investment banks,

---

[2] *See*, *e.g.*, Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶ 8, *In re Deutsche Bank Sec. Inc.* (N.Y. Att'y Gen. Inv. Prot. Bur. June 3, 2009), *available at* http://www.oag.state.ny.us/media_center/2009/july/pdfs/Deutsche Bank AOD.pdf (finding that in *all* auctions where it served as sole or lead manager, Deutsche Bank submitted support bids "for the entirety of [the] auction rate security issue"); Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶ 8, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, AOD No. 08-174 (N.Y. Att'y Gen. Inv. Prot. Bur. July 2, 2009) ("Merrill Lynch Assurance of Discontinuance"), *available at* http://www.oag.state.ny.us/media_center/2009/july/pdfs/Merrill Lynch AOD.pdf (finding that Merrill Lynch submitted "purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker"); Consent Agreement and Final Order ¶ 52, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. SEC-2009-29 (Mont. Auditor & Comm'r of Sec. June 2, 2009) ("Montana Order"), *available at* http://www.sao.mt.gov/legal/securities/S09_Merrill_ARS.pdf (finding that "[u]ntil August of 2007 Merrill Lynch had a policy of placing support bids into every auction for which it was sole or lead broker-dealer").

however, there was, in fact, no liquid market for auction rate securities, as there was insufficient, legitimate third-party demand for these securities. The absence of genuine demand for auction rate securities became readily apparent when banks like Merrill Lynch and Deutsche Bank decided to stop propping up the artificial market that they had manufactured. The moment they ceased to place support bids, the "market" collapsed. Tens of thousands of investors, large and small, were left holding unsalable securities. Meanwhile, the investment banks that had created the appearance of a functioning, liquid market through their deceptive and manipulative activities, and the broker-dealers that had advised their retail and institutional customers to invest in auction rate securities, fled the scene having already collected hundreds of millions of dollars in underwriting fees and commissions.

4.      In advising LP to invest significant amounts in auction rate securities, Money Market One affirmatively represented that these instruments were safe and liquid cash equivalents, analogous to money market instruments. Indeed, on multiple occasions, Money Market One specifically advised senior LP officials that auction rate securities were analogous to cash investments. The monthly account statements that Money Market One provided to LP characterized these investments as cash equivalents. In response to LP's inquiries, Money Market One repeatedly misrepresented the risks associated with auction rate securities, and falsely represented that these securities were consistent with LP's investment objectives and cash management needs. Likewise, Money Market One falsely represented that there was an active, liquid market for auction rate securities and that LP could trade out of them at any point in time through periodic auctions. Prior to the auction failures that began in August 2007, LP had no reason to doubt the representations of Money Market One, LP's trusted advisor, concerning the nature of these securities – statements that echoed the representations made by Merrill Lynch and

Deutsche Bank to their own retail customers. LP relied on Money Market One's representations in accepting the recommendation that it purchase such auction rate securities for its working capital account.

5.       LP has subsequently learned that the instruments recommended by Money Market One were not safe and liquid cash equivalents. Rather, they were high risk securities unsuitable to LP's conservative investment needs. As Money Market One was aware at the time it encouraged LP to invest its working capital in these instruments, there was no genuine liquid market for auction rate securities. Instead, the market had only an *appearance* of liquidity that was entirely dependent upon the willingness of participating broker-dealers like Merrill Lynch and Deutsche Bank to intervene in auctions in order to prevent auction failures.

6.       Merrill Lynch and Deutsche Bank withheld information from the investing public about the extent of their regular participation in auctions in order to perpetuate the myth of a well-functioning and liquid market. Unbeknownst to LP, Merrill Lynch and Deutsche Bank were engaged in an elaborate scheme to deceive investors about their involvement in the auction rate market. At all relevant times, Merrill Lynch and Deutsche Bank were secretly manipulating the auction process for the securities they underwrote by, among other things, submitting bids to control the interest rates that the securities would pay and to ensure that the auctions did not fail. With every bid that Merrill Lynch and Deutsche Bank submitted for their own accounts in the auctions for the securities they underwrote, Merrill Lynch and Deutsche Bank represented to the marketplace and to actual and prospective investors, including LP, that there was sufficient, legitimate demand for the Merrill Lynch and Deutsche Bank auction rate securities for each auction to be successful. They thereby injected false information into the marketplace for these

securities, creating the false impression that legitimate demand for these securities created a well-functioning, stable, and liquid market.

7.      Merrill Lynch and Deutsche Bank entered into re-marketing agreements with broker-dealers like Money Market One to create a distribution channel for auction rate securities, and paid commissions to these distribution partners in return for placing the Merrill Lynch-underwritten and Deutsche Bank-underwritten securities with their own customers.  Merrill Lynch and Deutsche Bank also made extraordinary upfront payments in order to incentivize members of the distribution channels to encourage their own clients to participate in the initial placement of the Merrill Lynch- and Deutsche Bank-underwritten securities.  Neither Merrill Lynch nor Deutsche Bank ever disclosed these financial arrangements to the ultimate purchasers of the securities they underwrote.  Investment managers such as Money Market One, who served as the distribution channels for Merrill Lynch and Deutsche Bank, further perpetuated the myth of a vibrant, liquid market in order to take part in lucrative fees that it received in return for placing these securities with unsuspecting investors like LP.  At all relevant times, Merrill Lynch and Deutsche Bank knew that re-marketing agents like Money Market One did not make any purchases for their own account, but rather served only as intermediaries for purchases made by their brokerage customers, such as LP.

8.      In the middle of August 2007, Merrill Lynch and Deutsche Bank abruptly abandoned their historic practice of submitting bids for the entirety of the auctions for which they served as the sole or lead broker-dealer.  In particular, at a time when the market for asset-backed securities ("ABS") was showing signs of strain, Merrill Lynch and Deutsche Bank ceased placing support bids for a class of complex auction rate securities that involved structured

investments, the interest rates for which were established through periodic Dutch auctions.[3]

When Merrill Lynch and Deutsche Bank decided that they would no longer place support bids as

they had done in the past, reality intervened and the "market" for these auction rate securities

collapsed altogether. Auctions failed across the board as all of the investment banks (including

Merrill Lynch and Deutsche Bank) that previously had manipulated the auctions and fraudulently

created the appearance of liquidity withdrew from the market altogether. Only then, when it was

too late, did investors like LP learn that there was no liquid market for auction rate securities,

and that Merrill Lynch and Deutsche Bank had fraudulently created the appearance of a robust

market through their undisclosed and manipulative support bids.

9.      As a result, and notwithstanding the representations from Money Market One that

these investments were safe and liquid cash equivalents, LP was left holding illiquid and

significantly devalued securities with a par value of approximately $145.9 million. In reliance

on Money Market One's representations and the appearance of a legitimate, liquid market for

auction rate securities that was created by investment banks like Merrill Lynch and Deutsche

Bank, LP had invested nearly $146 million of its working capital in instruments that, it was

repeatedly assured, were safe and secure cash equivalents. Had Merrill Lynch or Deutsche Bank

ever disclosed the extent of their market manipulation, and the absence of sufficient legitimate

third-party demand for the securities that they underwrote, LP never would have invested in

these securities. Indeed, had Merrill Lynch and Deutsche Bank accurately disclosed their

conduct, they would have been unable to place the securities in the first instance, and the

---

[3] As detailed in the myriad of enforcement actions brought by federal and state securities
regulators against Merrill Lynch, Deutsche Bank, and other investment banks, the market for
more traditional auction rate securities evaporated in February 2008 when broker-dealers like
Merrill Lynch and Deutsche Bank abruptly stopped submitting support bids in these auctions.

underwriting would have failed.  Alternatively, these securities could only have been sold for a small fraction of their face value.

10.    LP reasonably relied on the seeming existence of a well-functioning and liquid market for auction rate securities that Merrill Lynch and Deutsche Bank had created through their market manipulation and material omissions.

11.    When the truth emerged, LP was left holding toxic securities worth a fraction of the $145.9 million that LP had invested.  LP additionally was denied access to its working capital, suffering significant consequential damages when it was forced to borrow money at unfavorable rates to fund its business operations.  Because every single auction for these securities has failed since August 2007, LP has not been able, and may never be able, to sell at auction and at par any of the auction rate securities currently held in its operating capital portfolio.

12.    On November 17, 2009, more than two years after the collapse of the market, Deutsche Bank announced a tender offer for a portion of the auction rate securities it had underwritten.  Deutsche Bank offered, on average, approximately 42 to 45 cents on the dollar for its securities, notwithstanding the fact that they had been structured in such a way that Deutsche Bank (but only Deutsche Bank) immediately could turn around and cash out the securities for 100 cents on the dollar.  LP tendered $55 million par value of its securities, and received $21.5 million in payment.  LP lost $33.5 million on those securities alone, while Deutsche Bank pocketed these proceeds from its fraud.

## **THE PARTIES**

13.    Louisiana Pacific Corporation is a corporation organized under the laws of Delaware and has its principal place of business at 414 Union Street, Suite 2000, Nashville,

Tennessee 37219.  LP manufactures and distributes building products to retail, wholesale, homebuilding, and industrial customers, employing more than 4,000 individuals.

14.    Money Market 1 Institutional Investment Dealer is a California corporation with its principal place of business at 260 California Street, Suite 200, San Francisco, California 94111.  As of the date of the initial complaint, and at all relevant times, Money Market One was a securities broker-dealer licensed to do business in the State of California and registered with the SEC, the State of California, and the Financial Industry Regulatory Authority ("FINRA").

15.    Merrill Lynch & Co., Inc. is a global financial services and banking institution incorporated in Delaware and headquartered in New York, New York.  Merrill Lynch & Co. conducts business and has offices in the State of California.  After January 1, 2009, Merrill Lynch & Co. became a wholly owned subsidiary of Bank of America Corporation.  At all relevant times, Merrill Lynch & Co. exercised control over and directed the policies and management of Defendant Merrill Lynch.  Merrill Lynch & Co. shared principal officers and directors with Defendant Merrill Lynch, including its Chief Executive Officer, Chief Financial Officer, and numerous Directors, Executive Vice Presidents, and Senior Vice Presidents.  For instance, during the relevant time period the following individuals held senior, controlling positions at both Merrill Lynch and Merrill Lynch & Co.:

| Name | Title at Merrill Lynch | Title at Merrill Lynch & Co. |
|---|---|---|
| Gregory J. Fleming | Director and Executive Vice President | Co-President and Co-Chief Operating Officer |
| James P. Gorman | Director, Chairman of the Board, and Chief Executive Officer | Executive Vice President and President of Global Private Client |
| Do Woo Kim | Director and Executive Vice President | Executive Vice President and Co-President of Global Markets and Investment Banking |
| Carlos M. Morales | Director and Senior Vice President | Senior Vice President, Strategic Initiatives Counsel |
| Rosemary T. Berkery | Executive Officer | Executive Vice President and General Counsel |
| Ahmass L. Fakahany | Director and Executive Vice President | Co-President and Co-Chief Operating Officer |
| Robert J. McCann | Director, Chairman of the Board, and Chief Executive Officer | Executive Vice President; President and Vice Chairman, Global Private Client |
| Joseph F. Regan | First Vice President, Chief Financial Officer and Controller | First Vice President, Merrill Lynch & Co. Inc. Finance |

Merrill Lynch & Co. issued consolidated financial statements that included the results for Defendant Merrill Lynch, and that omitted material information about the extent of these Defendants' holdings of collateralized debt obligations ("CDOs").

16.     Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal place of business in New York, New York.  Merrill Lynch is, and was at all relevant times, a securities broker-dealer licensed to do business in the State of California and registered with the SEC, the State of California, and FINRA.  Merrill Lynch also conducts business under the name "Merrill Lynch & Co."  Merrill Lynch is a wholly owned principal operating subsidiary of Defendant Merrill Lynch & Co.  Merrill Lynch conducts business and has offices in the State of California.

17.     Deutsche Bank Securities Inc. is a Delaware corporation with its principal place of business in New York, New York.  Deutsche Bank is, and was at all relevant times, a

securities broker-dealer licensed to do business in the State of California and registered with the

SEC, the State of California, and FINRA.  Deutsche Bank conducts business and has offices in

the State of California.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C.

§ 78aa, and 28 U.S.C. §§ 1331, 1367.  The claims asserted herein arise (in part) under Section

10(b) and Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5,

17 C.F.R. § 240.10b-5.  This action additionally contains supplemental state law claims.

19.    The Court has personal jurisdiction over the Defendants because each Defendant

is present in the State of California, and has transacted business and continues to transact

business within this state.  In addition, the Court has personal jurisdiction over Money Market

One because it is a California corporation.

20.    Venue is proper within the Northern District of California under Section 27 of the

Exchange Act because Defendants are found in the District, Defendants are inhabitants of the

District, Defendants transact business in the District, and an act or transaction constituting the

violation occurred in the District.

## BACKGROUND

I.    **Auction Rate Securities**

A.    Background

21.    Auction rate securities are long-term or perpetual equity or debt instruments that

pay interest or dividends at rates set through periodic Dutch auctions.  Auction rate securities

trade at par, and can be sold through the periodic auctions (typically every 7, 28, or 35 days) and

potentially in a secondary market. They can also trade at discounts or premiums to par in the secondary market.

22.     Auction rate securities are typically issued by states, municipalities, and state agencies, student loan originators and lenders, and closed-end preferred funds. A subset of the market consists of auction rate securities issued by special purpose vehicles or analogous trusts that hold a portfolio of ABS and/or derivative instruments. By February 2008, the overall market for auction rate securities had grown to approximately $330 billion.

23.     Orders to purchase or sell an auction rate security at auction can be placed only through designated broker-dealers, who contract with the issuer to serve in that capacity. These participating broker-dealers collect "buy" and "sell" orders, and then forward them along to the designated auction agent, who conducts the Dutch auction. The broker-dealers then sell any securities acquired at auction to the successful purchaser.

24.     At each periodic auction, existing holders of auction rate securities can either place an order to sell their securities, hold their securities at whatever rate is established through the Dutch auction, or hold their securities provided that the clearing rate for the auction is at or above a specified level. Potential investors place bids in which they specify the amount of the auction rate securities that they are interested in purchasing and the interest rate at which they seek to acquire them.

25.     In a Dutch auction, buy orders are filled beginning from the lowest specified interest rate until all securities available for sale are matched with purchase orders. The rate at which the final sell order is filled is known as the "clearing rate," and that rate applies to the entire issue of the auction rate securities – including all other buy orders, as well as to existing holders that chose to hold their securities at market.

26.    In the event there are more sell orders than buy orders, the auction "fails."  When an auction fails, investors seeking to sell their securities are forced to hold onto them and are denied any liquidity.  The offering statement for each auction rate security identifies the interest rate (either a fixed rate or a formula tied to a floating rate such as LIBOR) that will be paid in the event of a failed auction, known as the "fail rate."  For traditional auction rate securities, such as those issued by municipalities, the "fail rate" is typically set at an interest rate substantially above the ordinary clearing rate of the auction rate securities notes, often times as much as 15 percent or more.  For auction rate securities backed by CDOs or other derivative instruments, the "fail rate" is substantially lower and typically less than 100 basis points above the minimum applicable rate.

B.    The Role of Investment Banks Like Merrill Lynch and Deutsche Bank

27.    Investment banks like Merrill Lynch and Deutsche Bank played numerous roles in developing and sustaining an apparent market for auction rate securities.  First, investment banks underwrote auction rate securities on behalf of the issuers, earning lucrative investment banking fees in the process.  Merrill Lynch and Deutsche Bank were each significant underwriters of auction rate securities, including CDO, ABS, and derivative-based auction rate securities.  Indeed, Deutsche Bank and Merrill Lynch were typically involved in establishing the issuing entity – oftentimes a special purpose vehicle or a trust set up solely for the structured transaction – in the first place.  Merrill Lynch and Deutsche Bank collectively earned hundreds of millions of dollars from their underwriting activities related to CDOs and auction rate securities.

28.    Second, investment banks like Merrill Lynch and Deutsche Bank served as participating broker-dealers for the periodic auctions, generating revenue for each unit of the

13

auction rate securities that they succeeded in placing. Merrill Lynch and Deutsche Bank, for example, typically served as a participating broker-dealer for securities underwritten by their respective investment banking arms. Merrill Lynch and Deutsche Bank additionally served as broker-dealers for other issues that they did not underwrite, receiving commission payments for every security they placed with an institutional or retail customer. For each of the auction rate securities that are held by LP in its Money Market One account, either Merrill Lynch or Deutsche Bank served as the sole broker-dealer. As the sole or exclusive broker-dealer for these securities, Merrill Lynch and Deutsche Bank received all bids to purchase and all orders to sell the auction rate securities, and sold any securities acquired at auction to the successful purchaser.

29.    Investment banks also played a critical third role that was never disclosed to the investing public and that has only become apparent in the wake of the collapse of the entire market for auction rate securities. Specifically, prior to the market collapse, participating broker-dealers like Merrill Lynch and Deutsche Bank functioned as market makers for auction rate securities by placing "support bids" in every auction. In every auction for which they served as the sole broker-dealer, Merrill Lynch and Deutsche Bank would place bids for the full amount of the auction. They thereby ensured that auctions would clear, creating the artificial appearance of a liquid and efficient market by injecting false information into the marketplace about the nature and extent of demand for auction rate securities. Participating broker-dealers like Merrill Lynch and Deutsche Bank were well aware that their support bids cleared the auction and established the clearing rate for a significant percentage of all auctions, and that there was insufficient, legitimate third-party demand for auctions to clear. Merrill Lynch and Deutsche Bank nevertheless withheld these critical facts from the investing public.

14

30.    The New York Attorney General has concluded that Deutsche Bank had a policy of placing support bids in *every* auction in which it served as sole or lead broker-dealer. Likewise, the New York Attorney General and the Montana State Auditor and Commissioner of Securities each have found that Merrill Lynch had a policy of placing support bids in *every* auction for which it was sole or lead broker-dealer.  *See supra* note 2.

31.    In the absence of these support bids, a huge percentage of auctions would have failed.  The Montana State Auditor and Commissioner of Securities, for example, has determined that "[f]or the period of January 3, 2006 through May 27, 2008, 5892 auctions for which Merrill Lynch was the sole lead dealer would have failed but for Merrill Lynch's support bid."  Montana Order ¶ 57.

32.    When the participating broker-dealers decided to stop submitting these support bids, the reality that they had concealed through their manipulative activities – including the fact that there was insufficient demand for the securities – manifested itself, as the market for auction rate securities collapsed.  As a result, it has become apparent that there never really was a vibrant, functioning market for these securities in the first place.  Rather, the appearance of liquidity was entirely dependent upon the willingness of the participating broker-dealers such as Deutsche Bank and Merrill Lynch to place support bids, and the willingness of investment managers such as Money Market One to perpetuate the myth that these securities were safe and liquid cash equivalents.

C.    Best Practices for Auction Rate Securities

33.    Broker-dealers are not barred from participating in auctions altogether.  However, given the potential for market manipulation, numerous regulatory agencies and industry associations have issued guidelines and best practices for broker-dealers to follow in order to

avoid violations of the securities laws. These guidelines require express disclosure of the nature

and extent of broker-dealer participation in auctions.

34.    In May 2006, the SEC initiated cease and desist proceedings against 15

investment banks, including Merrill Lynch, that participated in a certain segment of the auction

rate market. As found by the SEC, beginning as early as January 1, 2003, these banks willfully

violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(2)

(which prohibits the offer or sale of securities by means of any material misstatements and

omissions), by "interven[ing] in auctions by bidding for their proprietary accounts or asking

customers to make or change orders without adequate disclosures."[4]  The SEC concluded that

investment banks such as Merrill Lynch had engaged in one or more enumerated violative

practices, although it did not specify which of the 15 settling banks had engaged in which

activity. In holding that broker-dealers must fully disclose their bidding activities, the SEC

concluded that disclosures merely indicating that "[a] broker-dealer may submit orders in

Auctions for its own accounts," and that "[a]ny Broker-Dealer submitting an order for its own

account in any Auction might have an advantage over other bidders in that it would have

knowledge of other orders placed through it for that Auction . . ." were inadequate as a matter of

law.

35.    Each of the settling banks, including Merrill Lynch, entered into an agreement

with the SEC pursuant to which they agreed that "commencing not later than 6 months after the

entry of this Order, each Respondent shall, at or before the completion of the applicable

---

[4] Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and
Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the
Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, at 6, *In re
Bear, Stearns & Co.*, Admin. No. 3-12310, Release Nos. 8684 *et al.* (SEC May 31, 2006),
*available at* http://www.sec.gov/litigation/admin/2006/33-8684.pdf.

transaction, provide all customers who are first-time purchasers, and all broker-dealers who are purchasers, of auction rate securities from the Respondent . . . with a written description of the Respondent's material auction practices and procedures."[5] The settling banks additionally agreed to post their "then-current material auction practices and procedures" on their websites.[6] In addition each of these banks agreed to pay a civil money penalty to the SEC. Merrill Lynch, in particular, was ordered to pay a penalty of $1,500,000 in light of its "relatively large share of the auction rate securities market" and the fact that it "engaged in more types of violative practices than" many of the other banks.[7]

36. Pursuant to this settlement, Merrill Lynch posted a document entitled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures" on its website *at* http://www.ml.com/media/70501.pdf. Despite the fact that Merrill Lynch intervened and placed "support" bids in *every* auction where it served as lead or sole broker-dealer, bidding for the full amount of the auction, Merrill Lynch stated only that it "*may* routinely place one or more bids in an auction for its own account to acquire auction rate securities for its inventory, to prevent an auction failure . . . or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the securities. . . . Merrill Lynch also *may* routinely encourage bidding by others in auctions, including to prevent an auction failure or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the auction rate securities." *Id.* at 16 (emphases added). These disclosures, which amount to little more than the disclosures

---

[5] *Id.* at 10.

[6] *Id*. at 11.

[7] *Id*. at 9.

the SEC already found to be unlawful in the May 2006 cease and desist order, are false and misleading.

37.    In January 2007, the SEC initiated cease and desist proceedings against three banks, including Deutsche Bank Trust Company Americas (an affiliate of Deutsche Bank), that participated in the auction rate market.  The SEC found that beginning January 1, 2003, Deutsche Bank Trust Company Americas violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), in its capacity as auction agent in the auction rate securities market, by "accept[ing] initial or revised bids after submission deadlines and allow[ing] broker-dealers to intervene in auctions."[8]  Deutsche Bank Trust Company Americas entered into a settlement with the SEC in which it agreed to "supply a written description of [its] current material practices and procedures for auctions to broker-dealers and issuers of each offering of auction rate securities for which it serves as auction agent to whom such written description has not previously been provided prior to the issuance of such securities."[9]  Deutsche Bank Trust Company Americas also agreed to pay a $750,000 penalty in light of its "relatively large share of the auction rate securities market."[10]

38.    On information and belief, given its prominent role as a participating broker-dealer, and the fact that its auction agent affiliate had entered into a cease and desist order with the SEC, Deutsche Bank was well aware of the SEC's settlement with Merrill Lynch and other broker-dealers.  Deutsche Bank therefore knew that the SEC considered the practice of routinely

---

[8] Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, at 2, *In re Deutsche Bank Trust Co. Americas*, Admin. No. 3-12526, Release No. 8767 (SEC Jan. 9, 2007), *available at* http://www.sec.gov/litigation/admin/2007/33-8767.pdf.

[9] *Id.* at 6.

[10] *Id*. at 5.

placing bids in auctions for the purpose of avoiding failed auctions, in the absence of full

disclosure of the nature and extent of that practice, a violation of the prohibition on material

misstatements and omissions in the offer and sale of securities.  Nevertheless, Deutsche Bank

placed bids in every auction in which it served as the lead broker-dealer, and for the full amount

of the auction, without disclosing these facts.

      39.     In April 2007, the Securities Industry and Financial Markets Association

("SIFMA"), an industry organization representing underwriters and broker-dealers (including

Merrill Lynch, and Deutsche Bank), issued "Best Practices for Broker-Dealers of Auction Rate

Securities."  These best practices provide, in pertinent part that:

> A Broker-Dealer should disclose, if true, that it *routinely* places Bids in Auctions
> generally, and the circumstances in which it may submit Orders in a particular Auction
> and the possible effect of such Orders.  For example, a Broker-Dealer should disclose, if
> true, that:  . . .
>
> (b) it routinely places one or more Bids in Auctions generally to prevent a Failed Auction
> or a Clearing Rate the Broker-Dealer believes is not a market Rate at the time it makes its
> Bid, even after obtaining knowledge of some or all of the other Orders, but is not
> obligated to continue to place such Bids or to bid in any particular Auction.

SIFMA's best practices required broker-dealers to provide a clear explanation of the extent of

their involvement in the market for auction rate securities, echoing the SEC in rejecting as

inadequate disclosures that spoke hypothetically about what broker-dealers "may" do.

      40.     On February 19, 2008, in response to the collapse of the broader auction rate

securities market, the Municipal Securities Rulemaking Board ("MSRB") issued a notice entitled

"Application of MSRB Rules to Transactions in Auction Rate Securities."  This notice, the

MSRB explained, was intended "to *remind* brokers, dealers and municipal securities dealers . . .

of the application of MSRB disclosure and suitability requirements."  The MSRB explained that:

> MSRB Rule G-17 requires dealers to deal fairly with all persons and prohibits deceptive,
> dishonest, or unfair practices.  A longstanding interpretation of Rule G-17 is that a dealer

transacting with a customer must ensure that the customer is informed of all material facts concerning the transaction, including a complete description of the security. Disclosure of material facts to a customer under Rule G-17 may be made orally or in writing, but must be made at or prior to the time of trade. In general, a fact is considered "material" if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor.

The duty to disclose material facts to a customer in an Auction Rate Securities transaction includes the duty to give a complete description of the security, including features of the auction process that likely would be considered significant by a reasonable investor.

(Internal footnotes omitted.) Rule G-17 had been in effect for decades before the conduct relevant to this Complaint, and provided clear guidance as to the disclosures expected of broker-dealers like Merrill Lynch, Deutsche Bank, and Money Market One.

41.    On March 14, 2008, the SEC issued a no-action letter concerning auction rate securities, in which it made clear that broker-dealers bidding for proprietary accounts could avoid liability for violating the federal securities laws only by disclosing "detailed information regarding bidding in the immediately preceding auction," including such material facts "as the amount of securities for sale in the auction; the number and aggregate dollar amount of bids made; the number of bidders other than the participating dealers[; and] . . . the number, interest rate(s) and amount of bids, if any, made by the participating dealers." Such information would necessarily include the extent of the broker-dealers' support bids, and the extent to which those support bids were clearing each auction. While the March 14 no-action letter was limited to municipal auction rate securities (which was the focus of the no-action request), the statutory prohibition on market manipulation applies to all securities, including the complex auction rate securities at issue in this First Amended Complaint.

42.    Merrill Lynch, Deutsche Bank, and Money Market One failed to abide by any of these guidelines or best practices. Despite placing support bids in *every* auction in which they

served as sole or lead broker-dealer to prevent market failure, for example, neither Merrill Lynch

nor Deutsche Bank ever disclosed the true nature or extent of its market manipulation.

## MERRILL LYNCH'S FRAUDULENT SCHEME

**I. Merrill Lynch's and Merrill Lynch & Co.'s Efforts To Revitalize Their Fixed-Income Underwriting Business**

43.     Merrill Lynch is an investment bank that, among other things, underwrites fixed-income and debt securities.  Merrill Lynch was among the biggest underwriters of fixed-income securities on Wall Street for much of the 1990s.  The firm often topped the Thomson Financial industry league tables for investment-grade debt and was in the top five for high-yield debt.

44.     Following a precipitous decline in its underwriting business, which saw Merrill Lynch fall from 19 percent market share in 1998 to 6.5 percent in 2001, senior executives at Merrill Lynch (acting pursuant to directives from Merrill Lynch & Co. and its Chief Executive Officer) embarked upon a concerted effort to expand its fixed-income business by focusing on underwriting and servicing a category of securities known as CDOs.

45.     In early 2003, Merrill Lynch hired a team of senior investment bankers from Credit Suisse First Boston ("Credit Suisse") who specialized in structuring, underwriting, and marketing CDOs.  At the time, the senior management of Merrill Lynch and Merrill Lynch & Co. announced publicly that the bank was "committed" to the CDO business.

**A.      Collateral Debt Obligations**

46.     CDOs are a form of structured ABS.  The issuer of the CDO raises money by selling various classes of notes, which typically have different credit ratings and offer different interest rates.  The issuer of the CDO typically uses the proceeds from the sale of the notes to acquire various types of ABS, including sub-prime mortgages, consumer and retail debt, synthetic securities, and even other CDO notes.  Following payment of certain administrative

costs, the cash flows from these collateral assets are paid in order to the holders of the separate tranches of CDO notes.  The first in line to be paid is the most senior tranche (frequently classified as the A-1 tranche), followed by each subordinate tranche in the waterfall. Subordinate tranches typically earn higher interest rates than the more senior tranches to compensate for the risk that the cash flows may prove insufficient to cover their interest payments.  If the underlying CDO assets suffer losses, the losses are first applied to the lowest tranche, and then applied to the next most junior debt tranche, devouring value in reverse order of seniority until losses work their way up to the most senior tranche.

47.    While the potential interest rate for each class of CDO notes is typically stated in the offering documents – it is only a potential interest rate because receipt of the interest payments is contingent upon the cash flows from the collateral – certain CDOs contained an auction rate component.  In particular, one or more tranches of the CDO notes may have its interest rate set through periodic auctions, thereby functioning as a form of auction rate securities.

48.    Regardless of the quality of the underlying ABS, the first or second senior most tranches of the CDO notes were typically given an AAA rating from the rating agencies, purportedly indicating that they were the safest form of debt obligation.  Subordinate tranches were typically given progressively lower ratings given their increase in risk.  As one industry expert has stated, CDOs were designed to "tak[e] a pool of risky, illiquid bonds, and, through the magic of securitization, offer[] higher yields than on similarly rated securities."

49.    Merrill Lynch, like other investment banking firms that underwrote CDOs, was involved in many aspects of structuring, managing, marketing, and selling CDO products.  With respect to the Merrill Lynch-underwritten securities at issue here, Merrill Lynch was involved in

creating the offshore entity or entities that issued the CDO notes. Merrill Lynch selected and hired the "collateral manager" – the entity responsible for identifying and purchasing (in consultation with Merrill Lynch, and often from Merrill Lynch's own inventory) the underlying collateral. Merrill Lynch selected and hired the trustee – the entity responsible for holding the collateral, receiving income generated by the collateral, and making interest payments to the CDO noteholders. Merrill Lynch interacted with the rating agencies to secure favorable ratings for each tranche of notes, and arranged for substantial payments to be made to the ratings agencies in exchange for providing the specific ratings that Merrill Lynch requested. Merrill Lynch participated in drafting the offering statement, private placement memorandum, and the indenture. As sole or lead underwriter, Merrill Lynch purchased all of the CDO notes from the issuer with the goal of immediately selling the notes to investors (typically earning 1 percent to 1.5 percent of the deal's total size).[11] When those efforts were unsuccessful, Merrill Lynch typically retained ownership of any unsold CDO notes.

50.    For CDOs that Merrill Lynch structured to contain an auction rate tranche of notes, such as the Merrill Lynch securities at issue in this case (as described in detail below), Merrill Lynch performed additional functions. Merrill Lynch selected and hired the auction agent – the entity that receives all auction orders from Merrill Lynch and conducts the Dutch auction that determines the periodic interest payable on each auction rate note. Merrill Lynch additionally participated in drafting the auction rate supplements to the offering statements. Furthermore, Merrill Lynch typically served as the sole broker-dealer for the auctions, with responsibility for receiving and transmitting all buy, hold, or sell orders in every auction. Merrill

---

[11] *See* Carrick Mollenkamp & Serena Ng, *Wall Street Wizardry Amplified Credit Crisis*, Wall St. J., Dec. 27, 2007.

Lynch received commissions in connection with each auction (typically 25 basis points of the par value of the auction rate tranche), and entered into re-marketing agreements with broker-dealers like Money Market One who placed Merrill Lynch-underwritten securities with their own customers.  Pursuant to these agreements, Merrill Lynch paid placement fees to any downstream broker whose customer acquired any of the Merrill Lynch-underwritten securities in the initial placement, as well as a portion of the commissions earned in connection with each successive auction.  Merrill Lynch knew that its re-marketing agents did not purchase the Merrill Lynch-underwritten securities for their own account, but rather served only as intermediaries for purchases made by brokerage customers, such as LP.

### B.    Merrill Lynch's CDO Underwriting Activities

51.    Merrill Lynch's efforts to expand its CDO underwriting appeared to be extremely successful.  Between 2003 and 2006, Merrill Lynch's underwriting of CDOs grew from $4.8 to approximately $55 billion, moving Merrill Lynch from tenth place (in 2002) to first place (in 2004-2006) in the Thomson Financial league tables for United States CDOs, as measured by the value of the securities underwritten.  By the first quarter of 2007, Merrill Lynch was underwriting nearly 22.9 percent of all CDOs in the United States.

52.    For these efforts, Merrill Lynch was richly rewarded.  According to articles published in the *Wall Street Journal*, Merrill Lynch typically earned underwriting fees ranging from 1 percent to 1.5 percent of its CDO underwritings, such that Merrill Lynch would earn $10 to $15 million in revenue for underwriting $1 billion of CDO notes.  Other public reports indicate that Merrill Lynch collected approximately $700 million in CDO underwriting fees in 2006, and an additional $395 million in 2007.

53.    However, it has now become apparent that Merrill Lynch's CDO underwritings vastly exceeded investor demand.  When Merrill Lynch was unable to find buyers for the CDO notes it underwrote, Merrill Lynch secretly retained ownership of those notes.  According to an April 16, 2008 article in the *Wall Street Journal*, Merrill Lynch took increasing volumes of CDO notes onto its balance sheet in order to ensure that the CDOs it underwrote would close, and that Merrill Lynch could earn and recognize the underwriting fees associated with each CDO. According to that same article, Merrill Lynch fired several senior executives who objected to these practices.  Merrill Lynch and its parent company concealed this practice, and Merrill Lynch & Co.'s SEC Form 10-K for the year ended December 29, 2006 (filed February 26, 2007) contains no disclosure of their extensive portfolio of CDO notes.  Indeed, the investing public did not learn the extent of the Merrill Lynch Defendants' holdings until late 2007 and early 2008, when Merrill Lynch & Co. was forced to write down the value of its CDO portfolio by nearly $20 billion.  Only then did Merrill Lynch & Co. report that it held some $32 billion in CDO notes that it had been unable to place with third-party buyers.

54.    As the total dollar value of CDO notes that Merrill Lynch held in inventory increased, Merrill Lynch began to search for ways to create new demand for these securities. One strategy involved the use of these securities as collateral for newly created CDOs.  In other words, Merrill Lynch would structure and underwrite new CDOs, earning lucrative underwriting fees in the process, and then would arrange for the new CDO to purchase the CDO notes held in Merrill Lynch's inventory.  These new CDOs, which held previously issued CDO notes as collateral, became known in the industry as "CDO-squared."  When Merrill Lynch was unable to find buyers for the CDO-squared notes that it underwrote, Merrill Lynch again retained

ownership of those securities.  It then repeated the process, creating new CDOs – known as "CDO-cubed" – that purchased unsold CDO-squared notes held in Merrill Lynch's inventory.

55.     On information and belief, Merrill Lynch additionally sought to reduce its growing inventory of CDO notes (including CDO auction rate notes) by placing these securities in the accounts of its advisory clients.  MetroPCS Communications, Inc. ("MetroPCS"), for example, has filed suit against Merrill Lynch arising out of Merrill Lynch's provision of investment advisory services to MetroPCS.[12]  According to the complaint, Merrill Lynch used its authority over MetroPCS's cash reserves to cause MetroPCS to acquire approximately $134 million of CDO auction rate notes underwritten by Merrill Lynch.  These purchases had the effect of reducing the quantity of CDO notes held in Merrill Lynch's inventory.  Merrill Lynch appears to have engaged in similar conduct with other clients as well.  The Commonwealth of Massachusetts, for example, brought suit against Merrill Lynch after it was discovered that Merrill Lynch had used its authority and control over a cash account for the City of Springfield, Massachusetts to purchase another $14 million of Merrill Lynch-underwritten CDO notes out of Merrill Lynch's inventory.[13]  Once again, Merrill Lynch appears to have taken steps to reduce its own holdings of CDO auction rate notes by placing these unwanted securities with its unwitting advisory clients.  Merrill Lynch settled this lawsuit by purchasing the CDO notes back from the City of Springfield and covering Springfield's legal fees.[14]  The auction rate CDO notes that

---

[12] *See* Plaintiffs' Original Petition and Jury Demand, *MetroPCS Communications, Inc.  v. Merrill Lynch & Co., Inc.*, No. 07-12430 (Tex. Dist. Ct. Dallas County filed Oct. 18, 2007).

[13] *See* Administrative Complaint, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, Docket No. 2008-0001 (Mass. Office Sec. Div. Feb. 1, 2008).

[14] Craig Karmin, *Merrill Lynch Pays Back Springfield, Mass., For CDO Purchase*, Wall St. J., Feb. 1, 2008, at C2.

Merrill Lynch apparently foisted upon its clients include several of the same securities that are the subject of this lawsuit, including the Alesco I, Lakeside CDO I, Lakeside CDO II, and South Coast Funding V securities (*see infra* ¶ 140).

### C.    Merrill Lynch's Underwriting of CDO Auction Rate Notes

56.    Most CDO notes are unregistered, long-term debt securities that can be sold only to qualified institutional buyers or foreign investors.  Because the investment guidelines for many corporate treasury departments (such as LP) and other institutional customers are limited to short-term, liquid instruments with high credit quality, CDOs were not an attractive or eligible investment for this class of prospective purchasers.  Thus, in order to increase the demand for CDOs and to market CDOs to this group of investors, Merrill Lynch designed and structured a form of CDO note that would appear to meet the liquidity and durational requirements required by corporate treasury departments.  Specifically, by no later than 2003, Merrill Lynch began to design, structure, and underwrite CDOs that included a senior-level tranche of auction rate securities, and then marketed these securities as short-term, highly liquid debt.

57.    Unlike the other tranches of CDO notes, the auction rate tranche was designed by Merrill Lynch to have an appearance of liquidity.  Because these notes were re-priced and re-issued at pre-established intervals through the Dutch auction process, they had the potential (to the extent that they provided actual liquidity) to expand the potential customer base for Merrill Lynch's CDO products and, by extension, the size and volume of the CDOs that Merrill Lynch underwrote and the underwriting fees that it generated.  As discussed in greater detail below, Merrill Lynch secretly took steps to create an appearance of liquidity by engaging in an extensive pattern of deceptive and manipulative activities.

II.    **The Auction Rate Tranches of the Alesco, Cascade, Lakeside, and South Coast CDOs**

58.    In September 2003, Merrill Lynch underwrote a $344,100,000 CDO identified as Alesco Preferred Funding I, Ltd. ("Alesco I"), with a maturity date of 2033.  Alesco I issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $149,000,000.00 |
| Class A-2 | $66,000,000.00 |
| Class B-1 | $56,700,000.00 |
| Class B-2 | $45,000,000.00 |
| Preferred Shares | $27,400,000.00 |
| **Total** | **$344,100,000.00** |

59.    In December 2003, Merrill Lynch underwrote a $348,600,000 CDO identified as Alesco Preferred Funding II, Ltd. ("Alesco II"), with a maturity date of 2034.  Alesco II issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $150,000,000.00 |
| Class A-2 | $66,000,000.00 |
| Class B-1 | $64,300,000.00 |
| Class B-2 | $40,000,000.00 |
| Preferred Shares | $28,300,000.00 |
| **Total** | **$348,600,000.00** |

60.    In December 2003, Merrill Lynch underwrote a $800,500,000 CDO identified as Lakeside CDO I, Ltd. ("Lakeside CDO I"), with a maturity date of 2039.  Lakeside CDO I issued securities in the following tranches:

| | |
|---|---|
| Class A-1 | $624,000,000.00 |
| Class A-2A | $100,000,000.00 |
| Class A-2B | $52,000,000.00 |
| Class B | $9,000,000.00 |
| Preference Shares | $15,500,000.00 |
| **Total** | **$800,500,000.00** |

61.     In March 2004, Merrill Lynch underwrote a $1,501,500,000 CDO identified as

Lakeside CDO II, Ltd. ("Lakeside CDO II"), with a maturity date of 2040.  Lakeside CDO II

issued securities in the following tranches:

| Class A-1 | $1,170,000,000.00 |
|---|---|
| Class A-2A | $150,000,000.00 |
| Class A-2B | $129,900,000.00 |
| Class B | $15,000,000.00 |
| Class C | $15,000,000.00 |
| Preference Shares | $21,600,000.00 |
| **Total** | **$1,501,500,000.00** |

62.     In July 2004, Merrill Lynch underwrote a $402,700,000 CDO identified as

Cascade Funding CDO I, Ltd. ("Cascade Funding CDO I"), with a maturity date of 2042.

Cascade Funding CDO I issued securities in the following tranches:

| Class A-1 | $328,000,000.00 |
|---|---|
| Class A-2 | $46,000,000.00 |
| Class B | $14,000,000.00 |
| Class C | $7,000,000.00 |
| Preference Shares | $7,700,000.00 |
| **Total** | **$402,700,000.00** |

63.     In July 2004, Merrill Lynch underwrote a $1,147,000,000 CDO identified as

South Coast Funding V, Ltd. ("South Coast Funding V"), with a maturity date of 2039.  South

Coast Funding V issued securities in the following tranches:

| Class A-1 | $748,000,000.00 |
|---|---|
| Class A-2 | $92,750,000.00 |
| Class A-3 | $53,000,000.00 |
| Class B | $115,500,000.00 |
| Class C-1 | $47,050,000.00 |
| Class C-2 | $5,200,000.00 |
| Preference Shares | $46,700,000.00 |
| Class A-1 Combination Securities | $10,000,000.00 |
| Class A-2 Combination Securities | $4,000,000.00 |

| Class A-3 Combination Securities | $10,000,000.00 |
| Class P-1 Combination Securities | $4,000,000.00 |
| Class P-2 Combination Securities | $1,900,000.00 |
| Class P-3 Combination Securities | $2,225,000.00 |
| Class P-4 Combination Securities | $6,675,000.00 |
| **Total** | **$1,147,000,000.00** |

64.     In each of the foregoing CDOs, the second or Class A-2 tranches of the CDO are auction rate securities.  Thus, the interest rate to be paid on these notes is determined through periodic Dutch auctions that occur monthly (for the Cascade, Lakeside, and South Coast Funding securities) or every three months (for the Alesco securities).  However, in contrast to traditional municipal auction rate securities, the interest rate range for the auction rate tranches of CDO notes is narrowly circumscribed, analogous to the rates of interests paid by short-term, liquid securities.  The table below sets forth the "Minimum Applicable Rate" and the "Maximum Applicable Rate" for the Class A-2 tranches of the relevant CDOs underwritten by Merrill Lynch:

| Security | Minimum Rate | Maximum Rate |
|---|---|---|
| Alesco I | 90% of 3 Month LIBOR | 3 Month LIBOR + .84% |
| Alesco II | 90% of 3 Month LIBOR | 3 Month LIBOR + .84% |
| Cascade CDO I | 90% of 1 Month LIBOR | 1 Month LIBOR + .75% |
| Lakeside CDO I | 90% of 1 Month LIBOR | 1 Month LIBOR + .75% |
| Lakeside CDO II | 90% of 1 Month LIBOR | 1 Month LIBOR + .75% |
| South Coast Funding V | 90% of 1 Month LIBOR | 1 Month LIBOR + .962% |

65.     By structuring the Class A-2 tranches of these securities as auction rate securities, Merrill Lynch was able to market these CDO securities as short-term, liquid notes, rather than as fixed-income notes with maturity dates some 30 to 40 years in the future.  Because the interest for the Class A-2 tranches were collared at short-term interest rates, these securities would have been unsaleable without Merrill Lynch's undisclosed, manipulative, and deceptive practices; investors would not have purchased securities with 30 to 40 year maturities that only paid short-

term interest rates.  In the alternative, the securities could only have been sold at a significant

discount to their face value.

66.     The auction rate supplements for each of these securities provide that "Existing

Holders and Potential Holders of Class A-2 Notes *must* submit orders through a Broker-Dealer in

order to participate in an Auction."  They further identify Merrill Lynch as "[t]he initial Broker-

Dealer."  Merrill Lynch was therefore the sole broker-dealer for the auction rate tranches of the

Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South

Coast Funding V CDOs.  In that capacity, all bids to purchase or orders to sell these CDO

auction rate notes had to be submitted to Merrill Lynch.  This access to all bids to purchase, and

orders to sell, these auction rate notes permitted Merrill Lynch to place bids for its own account

in such a way as to influence the outcome of the auction.  Because the auctions were conducted

anonymously, and Merrill Lynch never identified itself as the source of any particular order,

other market participants had no way of knowing whether, and to what extent, Merrill Lynch

either submitted bids in the auctions for its own account or was responsible for clearing any

individual auction.

67.     At the time that it underwrote the Alesco I, Alesco II, Lakeside CDO I, Lakeside

CDO II, Cascade Funding CDO I, and South Coast Funding V securities, Merrill Lynch knew

that there was no liquid market for the Class A2 auction rate securities tranches of these

securities.  Merrill Lynch had served as the underwriter and participating broker-dealer for

numerous other issues of auction rate securities and auction rate tranches of CDO notes.  Merrill

Lynch therefore knew that the auctions for these securities would not clear in the absence of

Merrill Lynch's routine placement of support bids.

68.    Notwithstanding the fact that Merrill Lynch had served as a market maker for such securities, placing support bids in nearly 100 percent of the auctions, the Offering Statements and Class A2 Supplements for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities state only that Merrill Lynch "may" participate in such auctions, suggesting that there was some uncertainty or doubt about whether it would, in fact, participate in future auctions, and further suggesting that its participation would only be periodic rather than a functional necessity.  *See* Appendix A (quoting each CDO Auction Rate Supplement).  These broad disclaimers failed to inform investors of the true nature and extent of Merrill Lynch's market manipulation.  By the time the offering statements were issued, Merrill Lynch knew that it would participate (and had participated) in 100 percent of the auctions, and that the continued existence of the purported market for these auction rate instruments was wholly dependent upon its continued placement of support bids. Merrill Lynch likewise knew that it would be unable to continue to underwrite CDOs that contained any auction rate tranches to the extent that it permitted any of the periodic auctions to fail.  Merrill Lynch structured each of the foregoing CDOs, and was directly involved in drafting and disseminating each of the Offering Statements and the Class A2 Supplements.  It nevertheless failed to disclose any of these material facts.

69.    The pricing supplements for these auction rate notes contain other misleading statements, and fail to disclose information that is necessary in order to make the statements made not misleading.  For example, while each supplement states that there was some possibility that the securities might not be liquid, because of the possibility that a periodic auction could fail, Merrill Lynch failed to disclose the virtual certainty that auctions would fail in the event that Merrill Lynch decided to stop placing support bids.  Based on its experiences serving as

participating broker-dealer for numerous other issues of auction rate securities and auction rate tranches of CDO notes, Merrill Lynch knew that the auctions for these securities would fail in the absence of its support bids. Merrill Lynch similarly knew that the false appearance of liquidity was essential to the placement of these securities. Accordingly, Merrill Lynch withheld these material facts from the investing public.

70.    In 2006, following the entry of the SEC's cease and desist order against it, and pursuant to its obligations thereunder, Merrill Lynch posted on its public website a document entitled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures." Notwithstanding its multi-year practice of placing support bids in the full amount of the auction for 100 percent of the auctions where it served as lead or sole broker-dealer, notwithstanding the SEC's order to disclose all material facts concerning the extent of its auction rate practices, and notwithstanding the SEC's determination that such disclosures violated Section 17(a)(2) of the Securities Act, Merrill Lynch again stated only that it "may" place bids in an auction for its own account. Merrill Lynch knew that it would participate and place bids in these auctions, and further that the market would collapse should it fail to do so, yet failed to make these necessary disclosures.

## III.    Merrill Lynch Fraudulently Manipulated the Market for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V Securities

71.    According to the Massachusetts Office of the Secretary of the Commonwealth's Securities Division, which took extensive testimony from Merrill Lynch employees prior to filing an administrative complaint against the company, Merrill Lynch marketed auction rate securities to its own brokerage customers as "safe, cash like, and liquid investments," and its financial advisors "routinely represented [auction rate securities] to clients as fully-liquid,

principal protected and cash-like."  Merrill Lynch was also aware that downstream brokers marketed auction rate securities in the same manner.

72.      In order to perpetuate this misperception, to place the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities with investors, to avoid taking substantial write downs on the value of its extensive portfolio of unsold CDO notes, and to safeguard the lucrative fees associated with underwriting and servicing these and other CDO notes, Merrill Lynch had to conceal from the market the inherent lack of liquidity of these securities.  To that end, Merrill Lynch manipulated the market for the Class A2 tranches of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.

73.      Acting in its capacity as the sole broker-dealer for these securities, Merrill Lynch placed "support bids" in 100 percent of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities auctions.  When placing these support bids, Merrill Lynch would bid for the entire notional value of the issue being auctioned, thereby ensuring that the auctions would clear without regard to the legitimate volume of buy, sell, or hold orders Merrill Lynch had received.  *See* Appendix B (setting forth the dates on or about which the auctions for the subject securities occurred, and in which Merrill Lynch placed support bids for the entire notional value of the issue being auctioned).  On information and belief, these support bids cleared the auction and established the clearing rate for a significant percentage of all Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities auctions.

74.      Merrill Lynch's pervasive practice of placing "support bids" to prevent auction failures had two primary effects.  First, the "support" bids directly affected the clearing rate of

the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South

Coast Funding V securities auctions.  Second, these undisclosed "support" bids injected false

information into the marketplace and disturbed the natural interplay of supply and demand,

creating the outward appearance that the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II,

Cascade Funding CDO I, and South Coast Funding V securities were readily liquid investments.

Indeed, with each "successful" auction, Merrill Lynch implicitly represented that there was

sufficient legitimate third-party demand for these securities to provide liquidity to any actual or

potential investor.  By intervening to prevent auction failures, Merrill Lynch was able to obscure

the liquidity risks inherent in the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II,

Cascade Funding CDO I, and South Coast Funding V auction rate securities.

75.    Merrill Lynch had no legitimate investment reason to purchase the Alesco I,

Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast

Funding V securities at auction.  Merrill Lynch did not want to own these securities in its

proprietary accounts for investment purposes, and it was not necessary for Merrill Lynch to

maintain an inventory of these securities to satisfy demand from its customers.  Indeed, Merrill

Lynch routinely tried to reduce – not increase – its inventory of CDO auction rate notes.  Rather,

Merrill Lynch placed bids for the sole purpose of preventing auction failures and controlling the

interest rate at which the auction cleared.  According to the trial testimony of James Child, who

served as head of the fixed-income trading desk at Credit Suisse in 2007 and who testified on

August 13, 2009 in *United States v. Butler*, Merrill Lynch routinely offered its inventory of CDO

auction rate notes to its remarketing agents (including Credit Suisse) in the hope that their

customers might purchase those securities from Merrill Lynch's inventory.  The lawsuits filed by

MetroPCS and on behalf of the City of Springfield suggest that Merrill Lynch engaged in other, improper activities in order to reduce its inventory of CDO auction rate notes.

76.     In the absence of Merrill Lynch's undisclosed support bids, a huge percentage of auctions would have failed.  That is precisely what happened during August 2007 when Merrill Lynch stopped submitting support bids in the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V auctions.  Immediately following this decision, and beginning in August 2007, the market for these structured securities completely evaporated.  It has become apparent that there never really was a functioning market for these securities in the first place, as there was insufficient legitimate third-party demand to clear the auctions.  Rather, the appearance of liquidity was entirely dependent upon the willingness of Merrill Lynch to place support bids, support that could be withdrawn at any time.

77.     By manipulating the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, Merrill Lynch prevented investors, such as LP, from learning the true risk, value and liquidity features of, and the actual demand for these securities.  LP relied on the appearance of liquidity created by Merrill Lynch in the market for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities when it invested in those securities for its working capital account.  Had LP known the true risk, value, and liquidity features of these securities, and the absence of any genuine market demand, it never would have purchased them.  Indeed, under the investment guidelines and principles that LP has applied to its working capital account, LP would have been precluded from acquiring these illiquid securities.

IV.   **Merrill Lynch Omitted Material Facts About the Liquidity and Risks of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V Securities, and its Manipulation of the Market for Those Securities**

78.     Merrill Lynch developed and engaged in a comprehensive fraudulent scheme to market and sell the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities to investors, such as LP, that included making omissions of material fact.

79.     As previously explained, Merrill Lynch played a central role in drafting the offering statements, auction rate supplements, and private placement memoranda used in connection with underwriting the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.  Those documents contained, among other things, generalized disclosures about the role of Merrill Lynch in structuring, issuing, underwriting, and trading the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.  Merrill Lynch had a duty to ensure that it made full and accurate disclosures about its roles and activities and that the offering documents did not omit information necessary to make those disclosures complete and accurate in all material respects.

80.     In addition, Merrill Lynch had a duty to make full and accurate disclosures of all material information concerning Merrill Lynch's participation as the sole broker-dealer in auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.  Merrill Lynch was required to make robust disclosures about the nature, extent, and motivation for any trading for its own account in auctions for these securities, including but not limited to disclosures about the extent of its bidding to prevent auction failures, and every instance that Merrill Lynch placed a bid at a price that Merrill Lynch

did not believe to be at the then-prevailing market rate at the time it entered the bid. These

disclosures included the number, interest rate(s), and amount of any bids made by Merrill Lynch

in any previous auction for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade

Funding CDO I, and South Coast Funding V securities, as well as the effect those bids had on the

result of that previous auction.

81.    Under the terms of the May 31, 2006 SEC cease and desist order, beginning no

later than August 31, 2006, Merrill Lynch was required to make these disclosures readily

available to investors and to post on its website a written description of its then-current material

practices and procedures with respect to its placement of bids in auctions for the Alesco I, Alesco

II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V

securities, and other activities that had the possibility of affecting the results of any auction for

these securities.

82.    In addition, as *de facto* market maker for the Alesco I, Alesco II, Lakeside CDO I,

Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, a position

that Merrill Lynch occupied by virtue of its bidding for 100 percent of the securities at auction

and its subsequent attempts to sell any inventory it acquired, Merrill Lynch had an affirmative

obligation to disclose all material information concerning its role as market maker.

83.    Nonetheless, Merrill Lynch knowingly and/or recklessly failed to disclose, among

other things that:

(a)    the auction market operated without transparency to investors, thus enabling
manipulation by Merrill Lynch in its capacity as the sole broker-dealer for the
Class A2 tranches of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II,
Cascade Funding CDO I, and South Coast Funding V securities;

(b)    the "auctions" for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II,
Cascade Funding CDO I, and South Coast Funding V securities were not true
auctions, as Merrill Lynch submitted "support bids" and engaged in other

manipulative practices for its own account in all of the auctions for these
securities;

(c)     Merrill Lynch submitted bids in auctions for the Alesco I, Alesco II, Lakeside
CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V
securities for the full amount of the securities at auction;

(d)     Merrill Lynch intervened in auctions for its own benefit, to set rates and to
prevent all-hold auctions and failed auctions;

(e)     there was insufficient legitimate third-party demand in a significant number of the
auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade
Funding CDO I, and South Coast Funding V securities to avoid auction failures;

(f)     there were more sell orders than buy orders in a large percentage of the auctions,
such that Merrill Lynch's bidding activity directly or indirectly set the clearing
rate in those auctions;

(g)     without Merrill Lynch's bids in these auctions, the interest rate paid to holders of
the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding
CDO I, and South Coast Funding V securities would have been the fail rate;

(h)     the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding
CDO I, and South Coast Funding V securities only appeared to be liquid because
Merrill Lynch was artificially supporting and manipulating the auction market to
maintain the appearance of liquidity and stability;

(i)     the short-term liquid nature of the Alesco I, Alesco II, Lakeside CDO I, Lakeside
CDO II, Cascade Funding CDO I, and South Coast Funding V securities and the
ability of investors to liquidate these securities at par depended on the
perpetuation of the artificial auction rate market created by Merrill Lynch;

(j)     Merrill Lynch had no legitimate investment interest in acquiring the Alesco I,
Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and
South Coast Funding V securities, and was actively seeking to sell the securities
that it acquired at auction;

(k)     as a result of the involvement of Merrill Lynch in auctions for the Merrill Lynch-
underwritten securities, Merrill Lynch maintained a substantial inventory of
Merrill Lynch-underwritten securities;

(l)     as a result of Merrill Lynch's past involvement in auctions for CDO auction rate
notes and related activities in the market for CDO notes, Merrill Lynch was
holding tens of billions of dollars worth of CDO notes and, due to capital
constraints, could not continue to place orders in auctions for the Merrill Lynch-
underwritten securities to prevent auction failures; and

(m)    in the event of auction failures, the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities would be saleable only at a substantial discount from their purchase price, if at all.

## V.    The Market Impact of Merrill Lynch's Manipulative and Deceptive Conduct

84.    By placing bids for its own account in the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, notwithstanding the absence of any legitimate investment interest in owning those securities, Merrill Lynch caused the rates set in the auctions to be lower than they otherwise would have been.  As a result, holders of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, including LP, earned less in interest than they would have earned in the absence of Merrill Lynch's bidding.

85.    Merrill Lynch's practice of placing bids for 100 percent of the securities available for auction in 100 percent of the auctions injected false information into the marketplace about the extent of legitimate third-party demand for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.  Merrill Lynch's conduct created the false impression that there was sufficient liquidity in the auction process for any actual holder or potential purchaser of these securities to be able to sell them at par through the auction process.  Merrill Lynch's actions significantly overstated the extent of perceived investor demand for these securities, and created the false impression that the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities would perform like short-term, AAA-rated liquid securities and money market alternatives rather than as illiquid long-term notes.

86.    Merrill Lynch's manipulation of the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, and its efforts to expand the pool of potential purchasers for CDO auction rate notes, also postponed

the need for Merrill Lynch & Co. to take substantial write downs on the value of its extensive portfolio of unwanted and unsold CDO notes.  Merrill Lynch & Co. was thereby able to conceal the extent of its CDO holdings, and to avoid reporting a massive loss on its current period income statement.  Merrill Lynch & Co. likewise avoided the significant drop in the market price of its common stock that it knew would follow, and eventually followed, the revelation of the material information that it concealed.

## VI.    Merrill Lynch Has Been the Target of Investigations by Numerous Securities Regulators

87.     As a result of its market manipulation and false and misleading misstatements and omissions in the auction rate securities market, Merrill Lynch has been a target of investigations and civil litigation by securities regulators and law enforcement officials.

88.     As set forth above, on May 31, 2006, Merrill Lynch entered into a settlement with the SEC regarding its auction rate procedures.  Merrill Lynch agreed to pay civil money penalties of $1.5 million.

89.     After an investigation conducted pursuant to Article 23-A of the General Business Law (the "Martin Act"), the Office of the Attorney General of the State of New York entered into an Assurance of Discontinuance with Merrill Lynch that was announced on July 7, 2009. The Attorney General issued written findings in which it concluded that Merrill Lynch had materially misrepresented the nature, risk, and liquidity of auction rate securities, falsely portraying them as "highly liquid, safe, cash management alternative investments."[15]  The Attorney General further found that "[s]ince the inception of the auction rate securities market,

---

[15] *See* Merrill Lynch Assurance of Discontinuance ¶¶ 6-7.

Merrill Lynch and other broker-dealers submitted support bids, purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker."[16]

90.    Overall, Merrill Lynch has agreed to pay state securities regulators penalties in the amount of $125 million (including New York) and to buy back over $26 billion in auction rate securities from Merrill Lynch's retail customers.  As part of this multi-state agreement, on or about June 2, 2009, Merrill Lynch entered into a settlement with the Montana Securities Department whereby Merrill Lynch agreed to pay $372,977 in fines and buy back $38 million in auction rate securities.  On or about June 11, 2009, Merrill Lynch entered into a settlement with the Arizona Corporation Commission whereby Merrill Lynch agreed to pay a $1,751,003 fine and to buy back $168.6 million in auction rate securities from retail customers in Arizona.  On or about June 18, 2009, Merrill Lynch entered into a settlement with the Colorado Division of Securities whereby Merrill Lynch agreed to buy back $256 million worth of auction rate securities from retail customers in Colorado.  On or about August 28, 2008, the SEC's Division of Enforcement announced that it had entered into a preliminary settlement-in-principle with Merrill Lynch arising out of Merrill Lynch's misrepresentations concerning the safety and liquidity of the auction rate securities market, and Merrill Lynch's failure to disclose "that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand."  The SEC further indicated that Merrill Lynch faced "the prospect of a financial penalty to the SEC after it has completed its obligations under the settlement agreement."

---

[16] *Id.* ¶ 8.

## DEUTSCHE BANK'S FRAUDULENT SCHEME

91.     Deutsche Bank has underwritten billions of dollars of auction rate securities, including auction rate securities issued by trusts that were set up by Deutsche Bank and that held portfolios of ABS and/or derivative instruments.  For each of these securities, Deutsche Bank performed a number of additional functions.  Deutsche Bank selected and hired the auction agent, and served as the sole broker-dealer for the auctions, with responsibility for receiving and transmitting all buy, hold, or sell orders in every auction.  Deutsche Bank received commissions in connection with each auction (typically 25 basis points of the par value of the securities that it manages), and entered into re-marketing agreements with broker-dealers like Money Market One to place Deutsche Bank-underwritten securities.  Pursuant to these agreements, Deutsche Bank paid placement fees to any downstream broker whose customer acquired any of the Deutsche Bank-underwritten securities in the initial placement, as well as a portion of the commissions earned in connection with each successive auction.  Deutsche Bank knew that its re-marketing agents did not make purchases for their own accounts, but rather served only as intermediaries for purchases made by their brokerage customers, such as LP.

92.     Deutsche Bank has earned tens to hundreds of millions of dollars in fees for underwriting auction rate securities, and earned millions of dollars more for acting as the sole or primary broker-dealer for the auction rate securities that it underwrote.

93.     Even as the credit markets were deteriorating in the spring and summer of 2007, and after Deutsche Bank had made the internal decision to exit the structured finance related market (including the market for the auction rate securities at issue here), it continued to underwrite hundreds of millions of dollars of auction rate securities, including auction rate securities collateralized by highly complex derivative instruments.

I.      **The Camber Master Trust, Pivot Master Trust, and Capstan Master Trust Auction Rate Securities**

94.     Among the numerous auction rate securities underwritten and serviced by Deutsche Bank are the following derivative backed auction rate securities that were issued by three trusts – the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust[17] – that were set up by Deutsche Bank for the sole purpose of issuing these securities:

| Security | Date of Issuance | Amount |
|---|---|---|
| Camber Master Trust Series 7 | January 19, 2007 | $175,000,000 |
| Camber Master Trust Series 9 | March 9, 2007 | $125,000,000 |
| Pivot Master Trust Series 1 | May 8, 2007 | $125,000,000 |
| Pivot Master Trust Series 2 | May 8, 2007 | $125,000,000 |
| Pivot Master Trust Series 4 | May 23, 2007 | $125,000,000 |
| Capstan Master Trust Series 1 | August 1, 2007 | $150,000,000 |
| Capstan Master Trust Series 3 | August 2, 2007 | $150,000,000 |
| Capstan Master Trust Series 4 | August 2, 2007 | $150,000,000 |

A.      The Structure of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust Securities

95.     The Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities are a form of highly complicated derivative auction rate securities that were devised, structured, and underwritten by Deutsche Bank.  Each issuer (*i.e.*, the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust, each of which was established by Deutsche Bank) used the proceeds from its offering to acquire a series of Credit Linked Notes ("CLNs") that had been issued by another special purpose vehicle trust established by Deutsche Bank.  The

---

[17] Deutsche Bank underwrote at least four different series of auction rate securities issued by the Camber Master Trust, with an aggregate par value of $600 million; eight different series of auction rate securities issued by the Pivot Master Trust, with an aggregate par value of $1.1 billion; and four different series of auction rate securities issued by the Capstan Master Trust, with an aggregate par value of $600 million.  The particular securities listed in the foregoing table are those series that were acquired by LP.

proceeds received by the special purpose vehicle trust were then invested in medium term notes
or deposited in an account with Deutsche Bank.

96.    The special purpose vehicle trust then entered into a series of credit default swaps
("CDS") with Deutsche Bank's London office.  A CDS is an over-the-counter contract between
two parties through which one of the parties purchases protection or insurance against any losses
associated with some specified reference entity.  The purchaser of the insurance pays a periodic
premium, and, in return, the counter-party (or seller of the protection) guarantees that it will
make the purchaser whole should a credit event (such as a credit downgrade or a failure to make
an interest payment) occur with respect to the reference entity.  With respect to these particular
auction rate securities, Deutsche Bank's London office purchased protection from the special
purpose vehicle trust that Deutsche Bank had established, and the medium term notes acquired
by the trust or the deposit account with Deutsche Bank served as the collateral for the CDS
transactions.  The reference securities were a portfolio of corporate bonds.  In effect, the special
purpose vehicle trust provided a form of insurance against the performance of the portfolio of
reference corporate bonds, agreeing to compensate Deutsche Bank's London office in the event
the bonds are downgraded or otherwise fail to make any payments of interest or principal.  In
return for a nominal "premium," Deutsche Bank received a guarantee that it would be made
whole in the event that the portfolio of corporate bonds were downgraded or otherwise failed to
perform, offloading the risk from its balance sheet onto the shoulders of unsuspecting investors
several steps down the chain.

97.    The special purpose trust received two different income streams.  First, it received
interest payments from the medium term notes that it had acquired.  These payments would be
reduced to the extent that the special purpose trust had to liquidate any of the medium term notes

or the amount on deposit with Deutsche Bank that served as collateral for the CDS.  Second, the special purpose trust received a payment or premium from Deutsche Bank's London office in connection with the CDS.  These cash flows were then used to pay interest on CLNs issued by the special purpose trust.

98.    Separately, the trust that issued the auction rate securities and that held the CLNs (*i.e.*, the Camber Master Trust, Pivot Master Trust, or Capstan Master Trust) entered into a "basis swap" with Deutsche Bank's London office.  Pursuant to the terms of the swap, Deutsche Bank's London office would receive 100 percent of the interest payments from CLNs.  In exchange, Deutsche Bank's London office paid the interest on the auction rate securities and other administrative fees (including commissions to Deutsche Bank for serving as the broker-dealer).

99.    The structure of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities is as follows:



100.    The Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities have another significant feature, the significance of which has only recently become apparent.  To the extent that Deutsche Bank AG (Deutsche Bank's parent company) or any of its affiliates (including Deutsche Bank) hold any of these securities, the offering documents (drafted by Deutsche Bank) grant Deutsche Bank AG or its affiliates the ability to exchange those holdings for the portion of the CLNs relating to the securities. Once Deutsche Bank or its affiliates hold the underlying CLNs, they have the ability to exchange the CLNs for the corresponding amount of collateral.  In other words, to the extent that Deutsche Bank AG or its affiliates hold any of these ARS, they can unwind the structure and receive the face value of the securities in cash.  On information and belief, Deutsche Bank AG and its affiliates never exercised this right during the time period in which Deutsche Bank was manipulating the market for these securities, as doing so would have alerted the investing public as to the extent of Deutsche Bank's manipulative activities.

101.    In contrast to traditional municipal or student loan backed auction rate securities, the interest rate range for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities is narrowly circumscribed.  The table below sets forth the "Minimum Rate" and the "Maximum Rate" for these securities, which automatically applies in the event of an auction failure.  The maximum rate for these securities is tied to their rating, and increases in the event the securities are downgraded by the rating agencies.  Because all of these securities have been downgraded by the rating agencies, the current maximum rate is higher than the maximum rate when the auctions initially failed:

| Security | Minimum Rate | Maximum Rate When AAA-Rated | Current Maximum Rate |
|---|---|---|---|
| Camber Master Trust Series 7 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Camber Master Trust Series 9 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Pivot Master Trust Series 1 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Pivot Master Trust Series 2 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Pivot Master Trust Series 4 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Capstan Master Trust Series 1 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.00% |
| Capstan Master Trust Series 3 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.00% |
| Capstan Master Trust Series 4 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.00% |

102.    By structuring them as auction rate securities, Deutsche Bank was able to market the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities as short-term, liquid notes, rather than as fixed-income notes with maturity dates some 10 years in the future. Because the interest rate was collared at short-term interest rates, these securities would have been unsaleable without Deutsche Bank's undisclosed, manipulative, and deceptive practices; no investor would have purchased long-term notes with a 10-year maturity date that paid only short-term interest rates. In the alternative, the securities could only have been sold at a significant discount to their face value.

103.    The offering documents for each of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities provide that "Existing Holders and Potential Holders of certificates *must* submit orders through a Broker-Dealer in order to participate in an Auction." They further identify Deutsche Bank as the "Broker-Dealer" for the auctions. At all relevant times, Deutsche Bank was the sole broker-dealer for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities. In that capacity, all bids to purchase or orders to sell these CDO auction rate notes had to be submitted to Deutsche Bank. This access to all bids to

purchase, and orders to sell, these auction rate notes permitted Deutsche Bank to place bids for

its own account in such a way as to influence the outcome of the auction. Because the auctions

were conducted anonymously, and Deutsche Bank never identified itself as the source of any

particular order, other market participants – including LP – had no way of knowing whether, and

to what extent, Deutsche Bank either submitted bids in the auctions for its own account or was

responsible for clearing any individual auction.

104.    At the time it underwrote the Camber Master Trust, Pivot Master Trust, and

Capstan Master Trust securities, Deutsche Bank knew that there was no liquid market for auction

rate securities. Deutsche Bank had served as the underwriter and participating broker-dealer for

numerous other issues and Deutsche Bank therefore knew that these auctions would not clear in

the absence of Deutsche Bank's routine placement of support bids.

105.    Indeed, by the time it underwrote the Pivot Master Trust securities in May 2007,

Deutsche Bank already had extensive experience with the similarly structured Camber Master

Trust securities that were issued between August 2006 and January 2007. As the sole broker-

dealer, Deutsche Bank received all of the bidding and sales activity for each of the series of

Camber Master Trust securities. Deutsche Bank placed support bids for the full amount of the

issue in 100 percent of these auctions, and knew that the auctions routinely would have failed in

the absence of its support bids. Accordingly, by the time it underwrote the Pivot Master Trust

securities (and later the Capstan Master Trust securities), Deutsche Bank knew that there was no

liquid, efficient market for these securities, that there was insufficient legitimate third-party

demand to clear the auctions for these securities, and that any appearance of liquidity was

predicated entirely upon Deutsche Bank's support bids. Deutsche Bank similarly knew that if

the truth were to emerge, or if any of the auctions were to fail, it would be unable to place, and to

earn the lucrative underwriting fees associated with, any subsequent series of the Camber Master Trust securities, much less the Pivot Master Trust or the Capstan Master Trust securities.

106.    Notwithstanding the fact that Deutsche Bank had served as a market maker for other auction rate securities, placing support bids in 100 percent of the auctions, the Private Placement Memoranda for the Camber Master Trust and Pivot Master Trust securities state only that "Broker-Dealers *may* submit Orders and purchase certificates for their own account" suggesting that there was some uncertainty or doubt about whether Deutsche Bank would, in fact, submit such orders or support bids, and further suggesting that its participation would only be periodic rather than a functional necessity.  *See* Appendix A.  These broad disclaimers failed to inform investors of the true nature and extent of Deutsche Bank's market manipulation.  By the time that the offering statements were issued, Deutsche Bank knew that it would participate (and had participated) in 100 percent of the auctions, and that the continued existence of a purported market for these auction rate instruments was wholly dependent upon its continued placement of support bids.  Deutsche Bank likewise knew that it would be unable to continue to underwrite these types of auction rate securities to the extent it permitted any of the periodic auctions to fail.  Deutsche Bank structured each of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, and was directly involved in drafting and disseminating each Private Placement Memorandum and Series Pricing Supplement.  It nevertheless failed to disclose any of these material facts.

107.    The Private Placement Memoranda for these auction rate securities contain other misleading statements, and fail to disclose information that is necessary in order to make the statements made not misleading.  For example, while each memorandum states that there was some possibility that the securities might not be liquid, because of the possibility that a periodic

auction could fail, Deutsche Bank failed to disclose the virtual certainty that auctions would fail in the event that Deutsche Bank decided to stop placing support bids. Based on its experiences serving as participating broker-dealer for numerous other issues of auction rate securities, Deutsche Bank knew that the auctions for these securities would fail in the absence of its support bids. Deutsche Bank similarly knew that the false appearance of liquidity was essential to the placement of these securities. Accordingly, Deutsche Bank withheld these material facts from the investing public.

108.    By July 2007, Deutsche Bank had made the conscious decision to exit the market, and to forego placing support bids in auction rate securities backed by derivatives, such as the Capstan Master Trust securities. As Deutsche Bank's Chairman of the Management Board, Dr. Josef Ackermann, stated in February 2008, "I think one of the reasons we were successful is that *in July [2007], when the first signals started, we said out, exit*, whereas some others hoped for better times. And I still hear this, you are jeopardizing our bonus pool by doing this, or when traders – investors come back from their vacation, they start buying again. We did not share that view. Based on more macroeconomic analysis, we felt that the subprime will not recover and that it will get worse, and so we got out of related products."

109.    Thus, as of July 30, 2007, the date that it underwrote the Capstan Master Trust securities, Deutsche Bank knew it would not place any support bids for these securities, and it also knew that in the absence of these support bids, all of the auctions for the Capstan Master Trust securities would fail and therefore any investor who purchased the Capstan Master Trust securities would be left holding an illiquid and substantially impaired security. Nonetheless, to secure its lucrative underwriting fees, and the credit protection provided by the CDS that were part of the overall structure, Deutsche Bank sold the Capstan Master Trust securities into the

market knowing they were completely illiquid and would, only a few days later, become

unsaleable.  Deutsche Bank failed to disclose any of these material facts to potential investors.

In fact, Deutsche Bank continued to support the auctions for the Pivot Master Trust and Camber

Master Trust auctions until just after it had successfully sold the Capstan Master Trust securities

to unsuspecting investors, at which point it allowed all of the relevant auctions to fail.

## II.    Deutsche Bank Fraudulently Manipulated the Market for Camber Master Trust, Pivot Master Trust, and Capstan Master Trust Securities

110.    According to an SEC complaint filed against Deutsche Bank on June 1, 2009,

Deutsche Bank was aware that its own client advisors marketed auction rate securities to

Deutsche Bank's customers as, among other things "safe" and "liquid," and that its employees

consistently represented that there was "no risk involved."  Deutsche Bank was also aware that

certain Deutsche Bank client advisors had represented that auction rate securities were "just like

money markets," but with a "better return," and that auction rate securities had "equivalent

liquidity" in relation to money markets.  Deutsche Bank further knew that downstream brokers,

such as Money Market One, were marketing the Deutsche Bank-underwritten auction rate

securities in the same manner.

111.    Deutsche Bank's own documents, however, reveal that Deutsche Bank allowed its

own employees and downstream brokers to market auction rate securities in this manner even

though it knew that such statements were false.  The SEC's complaint states that "[t]he manual

that governed [Deutsche Bank]'s Fixed Income Desk, which was reviewed and approved

annually by the head of the Fixed Income Desk, included ARS as a possible 'Non-Conventional

Investment,'" which it described as a product that "'may carry comparatively greater risk than

conventional products, and often have complex terms and features . . .'"  The Fixed Income

Desk's manual also explained that some of the more common traits of non-conventional

investments include "'unique structures, varied forms of collateral, less market liquidity, less pricing transparency and heightened credit risks.'"  Moreover, the Deutsche Bank manual that governed its client advisors states that "[g]iven the distinct, often more difficult character of [non-conventional investments] all CAs and supervisory personnel must comport their sales conduct to the following obligations:  due diligence regarding the product, reasonable basis suitability analysis, customer specific suitability analysis, balanced disclosure, and training."

112.    In order to place the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities with investors, to collect the fees associated with underwriting and servicing these securities, and to gain the credit protection from the CDS in favor of its London Office, Deutsche Bank had to mask the inherent lack of liquidity of the these securities.  To that end, Deutsche Bank manipulated the market for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, and for other similar auction rate securities that Deutsche Bank managed in its capacity as a broker-dealer.

113.    Acting in its capacity as the sole broker-dealer for these securities, Deutsche Bank placed "support bids" in 100 percent of the auctions for the Pivot Master Trust and Camber Master Trust securities.  When placing these support bids, Deutsche Bank would bid for the entire notional value of the issue being auctioned, thereby ensuring that the auctions would clear without regard to the volume of buy, sell, or hold orders Deutsche Bank had received.  *See* Appendix B (setting forth the dates on or about which the auctions for the subject securities occurred, and in which Deutsche Bank placed support bids for the entire notional value of the issue being auctioned).  On information and belief, these support bids cleared the auction and established the clearing rate for a significant percentage of the auctions.

114.    Deutsche Bank's pervasive practice of placing "support bids" to prevent auction failures had two primary effects.  First, the "support bids" directly affected the clearing rate of the Camber Master Trust and Pivot Master Trust auctions, artificially depressing the interest rate. Deutsche Bank pocketed the difference between the interest earned on the collateral and the depressed interest rates established through the manipulated auctions.  Second, these "support" bids injected false information into the marketplace and disturbed the natural interplay of supply and demand, creating the outward appearance that auction rate securities underwritten by Deutsche Bank, including the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, were readily liquid investments.  Indeed, with each "successful" auction, Deutsche Bank implicitly represented that there was sufficient legitimate third-party demand for the securities to provide liquidity to any actual or potential investor.  By intervening to prevent auction failures, Deutsche Bank was able to obscure the liquidity risks inherent in the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust auction rate securities.

115.    Deutsche Bank had no legitimate investment reason to purchase the Camber Master Trust and Pivot Master Trust securities at auction.  Deutsche Bank did not want to own these securities in its proprietary accounts for investment purposes, and it was not necessary for Deutsche Bank to maintain an inventory of these securities to satisfy demand from its customers. Indeed, Deutsche Bank routinely tried to reduce – not increase – its inventory of its auction rate notes.  Thus, Deutsche Bank placed bids for the sole purpose of preventing auction failures and controlling the interest rate at which the auction cleared.  As set forth above, however, Deutsche Bank had drafted the offering documents in such a way as to grant it (and its parent and affiliated companies) the ability to unwind the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities it held in inventory and to exchange those holdings for the unimpaired

and liquid collateral supporting the CDS.  Thus, in the absence of sufficient legitimate third-party

demand for the securities to permit the periodic auctions to clear, Deutsche Bank and its parent

and affiliated companies alone had the ability to recover the face value of the Camber Master

Trust, Pivot Master Trust, and Capstan Master Trust securities.

116.    In the absence of Deutsche Bank's undisclosed support bids, a huge percentage of

auctions would have failed.  This is precisely what happened in August 2007 – some three

months after Deutsche Bank underwrote the Pivot Master Trust securities and immediately after

Deutsche Bank underwrote the Capstan Master Trust securities – when Deutsche Bank stopped

submitting support bids for the securities it had underwritten.  Immediately following this

decision, and beginning in mid-August 2007, the market for these structured securities

completely evaporated.  It has become apparent that there never really was a vibrant, functioning

market for these securities in the first place, as there was insufficient legitimate third-party

demand to clear the auctions.  Rather, the appearance of liquidity was entirely dependent upon

the willingness of Deutsche Bank to place support bids, support that could be withdrawn at any

time.

117.    By manipulating the auctions for the Camber Master Trust and Pivot Master Trust

auction rate securities, and for other auction rate securities as well, Deutsche Bank prevented

investors, such as LP, from learning the true risk, value, and liquidity features of these securities.

LP relied on the appearance of liquidity created by Deutsche Bank in the market for the Camber

Master Trust, Pivot Master Trust, and Capstan Master Trust auction rate securities when it

invested in those securities for its working capital account.  Had LP known the true risk, value,

and liquidity features of these securities, it never would have purchased them.  Indeed, under the

investment guidelines and principles that LP has applied to its working capital account, LP

would have been precluded from acquiring these illiquid securities.

III.    **Deutsche Bank Omitted Material Facts About the Liquidity and Risks of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust Securities, and its Manipulation of the Market for Those Securities**

118.    Deutsche Bank developed and engaged in a comprehensive fraudulent scheme to

market and sell the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust

securities to investors, such as LP, that included making omissions of material fact.

119.    As previously explained, Deutsche Bank played a central role in drafting the

Private Placement Memoranda used in connection with underwriting the Camber Master Trust,

Pivot Master Trust, and Capstan Master Trust securities.  Those documents contained, among

other things, generalized disclosures about the role of Deutsche Bank in structuring, issuing,

underwriting, and trading the Camber Master Trust, Pivot Master Trust, and Capstan Master

Trust securities.  Deutsche Bank had a duty to ensure that it made full and accurate disclosures

about its roles and activities and that the offering documents did not omit information necessary

to make those disclosures complete and accurate in all material respects.

120.    In addition, Deutsche Bank had a duty to make full and accurate disclosures of all

material information concerning Deutsche Bank's participation as the sole broker-dealer in

auctions for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities.

Deutsche Bank was required to make robust disclosures about the nature, extent, and motivation

for any trading for its own account in auctions for these securities, including but not limited to

disclosures about the extent of its bidding to prevent auction failures, and every instance that

Deutsche Bank placed a bid at a price that Deutsche Bank did not believe to be at the then-

prevailing market rate at the time it entered the bid.  These disclosures included the number,

interest rate(s), and amount of any bids made by Deutsche Bank in any previous auction for the

Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, as well as the

effect those bids had on the result of that previous auction.

121.    In addition, as *de facto* market maker for the Deutsche Bank-underwritten

securities, a position that Deutsche Bank occupied by virtue of its bidding for 100 percent of the

securities at auction and its subsequent attempts to sell any inventory it acquired, Deutsche Bank

had an affirmative obligation to disclose all material information concerning its role as market

maker.

122.    Nonetheless, Deutsche Bank knowingly failed to disclose, among other things

that:

(a)    the auction market operated without transparency to investors, thus enabling
manipulation by Deutsche Bank in its capacity as the sole broker-dealer for the
Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities;

(b)    the "auctions" for the Camber Master Trust and Pivot Master Trust securities
were not true auctions, as Deutsche Bank submitted "support bids" and engaged
in other manipulative practices for its own accounts in all of the auctions for these
securities;

(c)    Deutsche Bank submitted bids in auctions for the Camber Master Trust and Pivot
Master Trust securities for the full amount of the securities at auction;

(d)    Deutsche Bank routinely intervened in auctions for its own benefit, to set rates
and prevent all-hold auctions and failed auctions;

(e)    there was insufficient legitimate third-party demand in a significant number of the
auctions for the Camber Master Trust and Pivot Master Trust securities to avoid
auction failures;

(f)    there were more sell orders than buy orders in a large percentage of the auctions
for the Camber Master Trust and Pivot Master Trust securities, such that Deutsche
Bank's bidding activity directly or indirectly set the clearing rate in those
auctions;

(g)    without Deutsche Bank's bids in these auctions, the interest rate paid to holders of
the Camber Master Trust and Pivot Master Trust securities would have been the
fail rate;

(h)     the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities appeared readily liquid only because Deutsche Bank was artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

(i)     the short-term liquid nature of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities and the ability of investors to liquidate these securities at par depended on the perpetuation of the artificial auction rate market created by Deutsche Bank;

(j)     Deutsche Bank had no legitimate investment interest in acquiring the Camber Master Trust and Pivot Master Trust securities, and was actively seeking to sell the securities that it acquired at auction;

(k)     as a result of the involvement of Deutsche Bank in auctions for the Camber Master Trust and Pivot Master Trust securities, Deutsche Bank maintained a substantial inventory of these securities;

(l)     in the event of auction failures, the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust would be saleable only at a substantial discount from their purchase price, if at all; and

(m)     Deutsche Bank underwrote the Capstan Master Trust securities with full knowledge that it would not place any support bids in the auctions, and therefore that there would never be a functioning market for these securities or sufficient market demand to provide the liquidity expected by purchasers.

## IV.    The Market Impact of Deutsche Bank's Manipulative and Deceptive Conduct

123.     By placing bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities, notwithstanding the absence of any legitimate investment interest in owning those securities, Deutsche Bank caused the rates set in the auctions to be lower than they otherwise would have been.  As a result, holders of the Camber Master Trust and Pivot Master Trust securities, including LP, earned less in interest than they would have earned in the absence of Deutsche Bank's bidding.

124.     Deutsche Bank's practice of placing bids for 100 percent of the securities available for auction in 100 percent of the auctions injected false information into the marketplace about the extent of legitimate third-party demand for the Camber Master Trust,

Pivot Master Trust, and Capstan Master Trust securities.  Deutsche Bank's conduct created the false impression that there was sufficient liquidity in the auction process for any actual holder or potential purchaser of these securities to be able to sell them at par through the auction process. Deutsche Bank's actions significantly overstated the extent of perceived investor demand for these securities, and created the false impression that the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities would perform like short-term, AAA-rated liquid securities and money market alternatives rather than as illiquid long-term notes.

**V.     Deutsche Bank Has Been the Target of Investigation By Securities Regulators**

125.    As a result of its fraudulent market manipulation and false and misleading misstatements and omissions, Deutsche Bank has been a target of investigations and civil litigation by securities regulators and law enforcement officials since the collapse of the auction rate securities market.  For instance on August 21, 2008, the New York Attorney General announced that Deutsche Bank had agreed to a settlement-in-principle with state regulators that involves restoring liquidity to certain Deutsche Bank investor clients holding auction rate securities.  In addition, Deutsche Bank agreed to pay state securities regulators a penalty in the amount of $15 million.  The New York Attorney General's Office issued and Deutsche Bank executed an Assurance of Discontinuance on or about June 3, 2009.

126.    On June 3, 2009, the SEC announced that it had entered into finalized settlements with Deutsche Bank to resolve SEC charges that Deutsche Bank misled investors regarding the liquidity risks associated with auction rate securities that they underwrote, marketed, or sold.  As part of the settlement, Deutsche Bank agreed to buy back auction rate securities that have failed at auction since February 13, 2008 and are still owned by individual or small business investors.

### MONEY MARKET ONE'S FRAUDULENT SCHEME

**I.    The Relationship Between LP and Money Market One**

      A.     LP Entrusts Its Working Capital Account to Money Market One

127.    In or around 1999, LP was solicited by Money Market One, which pitched its knowledge and skill in recommending fixed-income investments to private corporate customers. LP eventually agreed to open an account with Money Market One, and it made investments based on Money Market One's recommendations.  From 1999 through August 2007, the relationship between LP and Money Market One grew and evolved.  By 2005, LP had increased the size of its working capital account invested through Money Market One to more than $300 million.

128.    LP provided Money Market One with detailed investment guidelines and objectives for its working capital account.  These investment guidelines reflected the conservative nature of LP's investing strategy and its working capital accounts, including the fact that LP routinely needed to access the invested capital on short notice to fund its ongoing business operations.  LP advised Money Market One that it would only invest its working capital in short-term, liquid, and secure instruments such as money market funds and other cash equivalents.  LP further advised Money Market One that its working capital should only be invested in AAA or equivalent rated instruments with short-term maturities, and that LP was prohibited from making investments in any speculative or exotic instruments.  Swaps and derivative instruments fell well outside the scope of permitted investments.

129.    Money Market One acknowledged these objectives and represented that it would only recommend instruments that met these objectives and LP's working capital needs.  Money Market One never advised LP that any of the instruments in which it proposed to invest LP's

working capital were inconsistent with LP's investment parameters and had a high risk of

illiquidity and/or principal loss.

      B.    <u>Money Market One Recommends Auction Rate Securities for LP's Working</u>
                <u>Capital Account</u>

      130.    Money Market One first introduced LP to auction rate securities in the latter half

of 2004.  At the time, and on numerous occasions prior to August 2007, Money Market One

represented that auction rate securities were safe, secure, and liquid instruments that were

consistent with LP's investment objectives and fell squarely within LP's investment guidelines.

Money Market One assured LP that auction rate securities were the equivalent of cash

instruments, that they could always be sold on short notice at periodic auctions, and that there

was virtually no risk of principal loss.  Money Market One represented that there was no real

possibility of auction failure, and therefore no risk that LP could be left holding long-term

illiquid securities in violation of LP's investment guidelines and objectives.

      131.    Indeed, on the monthly account statements that Money Market One provided to

LP for its working capital accounts, auction rate securities were categorized as "CashEQ,"

signifying that they were cash equivalents.  The monthly account statements also provided that

the "stated maturity date" of these securities was no longer than one month in the case of the

Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber

Master Trust, Pivot Master Trust, and Capstan Master Trust securities, and no longer than three

months in the case of the Alesco I and Alesco II securities.

      132.    Deutsche Bank and Merrill Lynch were making similar misrepresentations to their

own brokerage customers and,[18] on information and belief, encouraging investment managers,

---

[18] *See supra* ¶¶ 71-72; 110-11.  Numerous lawsuits and administrative complaints have been
filed against Merrill Lynch and Deutsche Bank alleging that these banks misrepresented the

such as Money Market One, to market these auction rate securities in this manner.  This ensured that the true facts about the auction rate securities market would not be disseminated in the marketplace.

133.    At no point in time did Money Market One ever disclose all of the material information in its possession concerning the fragile nature of the purported market for auction rate securities, and the absence of sufficient demand to create and ensure liquidity.  Although Money Market One was aware that participating broker-dealers placed supporting bids in nearly every auction, it failed to disclose that fact to LP.  Money Market One similarly failed to disclose the fact that there was no liquid market for auction rate securities, that broker-dealer supporting bids cleared a significant percentage of auctions, and that the appearance of a market was entirely dependent upon broker-dealer participation.

C.    Money Market One's Material Misrepresentations and Omissions in Its Communications with LP

134.    LP's primary contacts at Money Market One were Senior Vice President Hal Johnson, Vice President of Institutional Sales Will Longstreth, and Chief Executive Officer Lee Epstein.  Representatives from Money Market One, including Messrs. Johnson, Longstreth, and Epstein, communicated with LP on a near-daily basis, both by telephone and e-mail.  In these daily exchanges, Money Market One would typically recommend potential investments for LP's working capital account.  Although Money Market One recommended both traditional auction rate securities (such as those issued by municipalities or backed by student loans) and the complex, structured securities underwritten by Merrill Lynch and Deutsche Bank, it failed to

---

nature and risk of auction rate securities to their brokerage customers and that they engaged in market manipulation to create the false appearance of a liquid and functional market.  Several of the suits brought by regulatory authorities either attach materially misleading marketing material or quote e-mails or other communications in which Merrill Lynch and Deutsche Bank employees misrepresent the nature and risk of auction rate securities.

explain that the latter were inconsistent with LP's investment guidelines and objectives. Money Market One would typically identify the length of the auction reset period, the credit rating assigned to the security, and the price talk provided by the broker-dealer, but never fully explained the nature of the structured products that it was recommending, the assets underlying them, or the risks thereof.

135.    Money Market One further represented that it had reviewed the relevant offering materials, that it understood the securities it was recommending, and that all of those instruments (including all of the illiquid securities that LP currently holds) fell within LP's investment parameters. In reality, however, Money Market One either did not read or did not understand the offering materials before recommending that LP invest its working capital in unsuitable securities. Mr. Epstein admitted as much in an April 13, 2008 article posted on Money Market One's own website, in which he stated that brokers did not read the prospectuses for auction rate securities.

136.    During its near-daily communications with LP, Money Market One never disclosed the material facts that it knew or reasonably should have known concerning the risks associated with auction rate securities generally and with the specific auction rate securities sold to LP in particular. Among other things, Money Market One failed to disclose that there was no actual liquid market for auction rate securities and that participating broker-dealers like Merrill Lynch and Deutsche Bank had merely created the appearance of an efficient market by propping up and rigging the auctions. Money Market One had access to the inventories of auction rate securities held by the participating broker-dealers and therefore could see that these broker-dealers were buying these securities solely in order to clear the auctions. Money Market One

knew, but failed to disclose, that the resulting "liquidity" would disappear the moment that the participating broker-dealers withdrew their support for the market.

137.    In addition, representatives of Money Market One met with senior finance officials at LP multiple times a year to discuss LP's working capital investment portfolio and Money Market One's assessment of the market.  During these quarterly or semi-annual meetings, Money Market One made additional misrepresentations and material omissions.  For example, senior LP officials repeatedly asked Money Market One whether auction rate securities really were cash equivalents and sought an explanation as to why those securities paid higher interest than money market funds.  Rather than disclosing the risks of principal loss or the absence of liquidity, Money Market One falsely represented that complex auction rate securities paid a higher interest rate than money market funds because they were private placements, not available to money market funds, and only available to a subset of the investing public.  Money Market One did not adequately disclose that the Deutsche Bank-underwritten securities were predicated upon derivatives and swaps (each of which was inconsistent with LP's investment guidelines), or that the Merrill Lynch-underwritten securities were exposed to sub-prime mortgages and the performance of other toxic securities.  Instead, Money Market One represented that it was familiar with each of the securities and that they were safe and secure, and consistent with LP's working capital investment parameters.

138.    During a face-to-face meeting in approximately late 2006, LP's Treasurer specifically asked Mr. Johnson whether auction rate securities were safe and liquid money market equivalents.  Mr. Johnson assured LP that auction rate securities were indeed liquid, that there was virtually no risk of auction failure, and therefore that auction rate securities should be

considered as safe as cash.  He then forwarded LP a study of auction rate securities via e-mail that purported to substantiate his prior representations.

## II.    LP's Acquisition of the Merrill Lynch- and Deutsche Bank-Underwritten Auction Rate Securities

139.    Over time, Money Market One increasingly recommended auction rate securities to LP for its working capital account.  In reliance on these recommendations, as well as the appearance of a liquid and efficient market that had been manufactured by the undisclosed activities of participating broker-dealers like Merrill Lynch and Deutsche Bank, LP invested heavily in auction rate securities.  By the end of 2005, LP had invested approximately $335 million through Money Market One in this market.  Consistent with the nature of its working capital account, LP would sell securities at their periodic auctions whenever it needed funds to cover its operating expenses.  At the time of these sales, LP was unaware that this appearance of liquidity was purely artificial.

140.    In reliance upon the specific recommendations of Money Market One, LP acquired each of the Merrill Lynch- and Deutsche Bank-underwritten securities discussed in paragraphs 58 through 86 and 94 through 124.  Specifically, LP acquired the quantities of the Merrill Lynch- and Deutsche Bank-underwritten securities on the dates set forth in the table below:

### MERRILL LYNCH-UNDERWRITTEN SECURITIES

| Security | Date of Purchase | Amount Held By LP |
|---|---|---|
| Alesco I | 7/16/2007 | $20,000,000 |
| Alesco II | 7/30/2007 | $10,000,000 |
| Lakeside CDO I | 5/8/2007 & 6/8/2007 | $14,675,000 |
| Lakeside CDO II | 4/4/2007 | $5,000,000 |
| Cascade Funding CDO I | 2/5/2007 | $3,700,000 |
| South Coast Funding V | 6/20/2007 | $2,200,000 |

**DEUTSCHE BANK-UNDERWRITTEN SECURITIES**

| Security | Date of Purchase | Amount Held By LP |
|---|---|---|
| Camber Master Trust Series 7 | 7/11/2007 | $10,000,000 |
| Camber Master Trust Series 9 | 5/4/2007 & 6/29/2007 | $13,400,000 |
| Pivot Master Trust Series 1 | 5/8/2007 | $20,000,000 |
| Pivot Master Trust Series 2 | 6/8/2007 | $5,000,000 |
| Pivot Master Trust Series 4 | 5/23/2007 | $20,000,000 |
| Capstan Master Trust Series 1 | 8/1/2007 | $1,900,000 |
| Capstan Master Trust Series 3 | 8/2/2007 | $10,000,000 |
| Capstan Master Trust Series 4 | 8/2/2007 | $10,000,000 |

141.    LP purchased the Pivot Master Trust Series 1 and 4 and Capstan Master Trust Series 1, 3, and 4 securities in the initial offering for these securities.  The Private Placement Memoranda for both the Pivot Master Trust and Capstan Master Trust securities make clear that Deutsche Bank was the seller of all the securities in the initial offering:  "Deutsche Bank Securities, Inc. will be the initial purchaser . . . of the Series for the private placement of the Certificates" and the "Certificates are being offered by the Initial Purchaser."  As set forth above, because Deutsche Bank had entered into re-marketing agreements with Money Market One, Deutsche Bank knew that Money Market One did not make purchases of the Deutsche Bank-underwritten securities for its own account, but rather served only as an intermediary for purchases made by its brokerage customers, such as LP.

142.    In recommending that LP invest in these securities, Money Market One represented that each security was a AAA-rated, safe and liquid cash equivalent, and an investment that would be fully consistent with LP's investment guidelines and objectives. Money Market One knew, but failed to disclose, however, that these securities were not safe investments or analogous to money market instruments, but instead were highly risky structured products.  Money Market One knew, but failed to disclose, that the Merrill Lynch-underwritten securities included CDO notes that were exposed to sub-prime mortgages.  Money Market One

similarly knew, but failed to disclose, that the Deutsche Bank-underwritten securities were inconsistent with LP investment guidelines and objectives and were based upon CDSs and other derivative products that had been structured to provide insurance to Deutsche Bank's London office against various credit events. Had LP known the true nature and characteristics of any of these securities, it never would have followed Money Market One's recommendations and acquired them for its working capital account. Indeed, had LP known the true facts about the nature, risks, and liquidity of these securities, it could not have invested in them consistent with its investment guidelines and parameters.

143.    As the credit markets began to deteriorate in the summer of 2007, and in advance of the initial auction failures, LP officials made numerous inquiries of Money Market One concerning the nature and safety of the investments in LP's working capital account. On July 11, 2007, for example, after S&P announced that it would potentially downgrade some $12 billion in sub-prime mortgage-backed securities, LP sent an e-mail to Mr. Johnson asking whether LP's investment portfolio had any exposure to sub-prime securities. Mr. Johnson responded that same day assuring LP that it had no sub-prime exposure. That representation was false, as several of the Merrill Lynch-underwritten CDOs were heavily invested in sub-prime securities.

144.    As set forth above, prior to August 2007, Merrill Lynch and Deutsche Bank routinely placed support bids in the market for the foregoing securities. During the month of August 2007, however, the investment banks that had earned hundreds of millions of dollars in underwriting fees by creating the false appearance of a market for CDOs and other complex derivatives decided to withdraw from the market. As a result, the market for these structured securities completely evaporated.

145.    On August 7, 2007, the Lakeside CDO I auction failed.  Over the following weeks, auctions for each of the other auction rate securities that Money Market One purchased for LP's working capital account failed as well.  The table below summarizes the approximate dates that each auction first failed and the par value of the securities held by LP:

| Security | Fail Date | Amount Held By LP |
|---|---|---|
| Alesco I | October 12, 2007[19] | $20,000,000 |
| Alesco II | October 29, 2007 | $10,000,000 |
| Lakeside CDO I | August 7, 2007 | $14,675,000 |
| Lakeside CDO II | August 31, 2007 | $5,000,000 |
| Cascade Funding CDO I | August 31, 2007 | $3,700,000 |
| South Coast Funding V | August 17, 2007 | $2,200,000 |
| Camber Master Trust Series 7 | September 4, 2007 | $10,000,000 |
| Camber Master Trust Series 9 | August 23, 2007 | $13,400,000 |
| Pivot Master Trust Series 1 | August 27, 2007 | $20,000,000 |
| Pivot Master Trust Series 2 | August 30, 2007 | $5,000,000 |
| Pivot Master Trust Series 4 | August 14, 2007 | $20,000,000 |
| Capstan Master Trust Series 1 | August 20, 2007 | $1,900,000 |
| Capstan Master Trust Series 3 | August 27, 2007 | $10,000,000 |
| Capstan Master Trust Series 4 | August 28, 2007 | $10,000,000 |

146.    Since the initial auction failures, LP has consistently attempted to sell all of its holdings of the Merrill Lynch- and Deutsche Bank-underwritten securities at each successive auction.  Through the date of this filing, however, each such auction has failed.  Throughout this time period, Defendants have continued to receive fees in connection with each failed auction.

147.    As a result, LP was left holding illiquid securities recommended by Money Market One and underwritten by Deutsche Bank with a par value of $90.3 million, as well as securities recommended by Money Market One and underwritten by Merrill Lynch with a par value of $55.575 million.

---

[19] The auctions for the Alesco I and Alesco II securities occurred on a quarterly basis.  As a result, October 2007 was the first auction date for each of these securities following the initial auction failures in August 2007.

**III.    Money Market One Makes Additional Misrepresentations and Material Omissions**

148.    After the initial auction failures occurred in August 2007, senior LP finance officials had numerous communications – both by telephone, in person, and via e-mail – with representatives from Money Market One.  During these communications, LP sought additional information about the securities that Money Market One had recommended, and Money Market One again dissembled.  For instance, in an e-mail dated August 7, 2007, LP asked Mr. Johnson to explain the Deutsche Bank-underwritten securities.  Mr. Johnson responded by e-mail dated August 8, 2007, in which he claimed that the "Camber, Pivot, & Capstan . . . are backed by corporate bonds," and enclosed a document purporting to show the specific bonds held by the master trusts.  That representation was false.  As previously indicated, these trusts owned CLNs that had been issued by a special purpose vehicle trust, which had written CDSs against a portfolio of referenced corporate bonds.  But the special purpose vehicle trust did not own a basket of 125 corporate bonds.  Rather, it had merely provided insurance to Deutsche Bank against the performance of a reference portfolio of bonds, and it faced the prospect of losing all of its collateral should a small percentage of those bonds fail to perform.

149.    During these August communications, LP again asked Money Market One whether the Merrill Lynch-underwritten securities had any exposure to sub-prime mortgages. Money Market One again assured LP that they did not.  In the face of these denials, LP asked Money Market One to provide a list of the assets held by each of the CDOs.  When Money Market One provided this list, it became apparent that the Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V CDOs each held numerous sub-prime mortgage securities and that Money Market One's prior denials of that fact were false and misleading.  When LP pointed out the disparity between the actual asset holdings and Money

Market One's characterization of them, Money Market One then changed its story and claimed that the exposure to sub-prime mortgages was irrelevant because none of the CDOs was in a state of default.

150.   In December of 2007, two months after the market for these auction rate securities completely evaporated, Mr. Epstein continued to tout these securities and represented to LP that notwithstanding the market failure, the actual value of the now illiquid auction rate securities in LP's account exceeded their par value.  These representations were either knowingly false or reflected a gross misunderstanding of the relevant securities.

151.   To this date, Money Market One has never provided an explanation as to why its representations concerning the collateral purportedly held by the Deutsche Bank- and Merrill Lynch-underwritten securities were false and misleading.  Nor has Money Market One provided any other explanation as to its failure to conduct appropriate diligence before recommending that LP invest its working capital in such illiquid and toxic assets, in violation of LP's investment guidelines and objectives.

**LP IS FORCED TO SEEK FINANCING TO FUND ITS DAILY OPERATIONS**

152.   In the wake of the auction failures, and as a direct and reasonably foreseeable result of Defendants' wrongdoing, LP has suffered consequential damages.  Although LP had made investments in its working capital account based on an understanding, created by Defendants, that the Merrill Lynch- and Deutsche Bank-underwritten securities were safe and liquid cash equivalents, LP found itself holding more than $145 million of illiquid and significantly devalued securities.

153.   Unable to utilize the more than $145 million in its working capital account that were effectively frozen, LP turned to the capital markets to fund its current and anticipated

operating expenses.  In the first quarter of 2009, LP issued and sold 375,000 Units consisting of

(1) $375,000,000 principal amount at maturity of 13 percent Senior Secured Notes due 2017, and

(2) warrants to purchase 18,395,963 shares of LP common stock at an exercise price of $1.39 per

share, subject to adjustment in certain circumstances and to mandatory cashless exercise

provisions.  In addition, LP entered into a new credit facility, which provides for a committed

asset-based borrowing capacity of $100 million, with a sublimit for letters of credit.

154.    Given the depressed state of the credit markets at the end of 2008 and the

beginning of 2009, LP, like other borrowers at the time, incurred especially high costs in

connection with these financing activities.  These costs were a foreseeable consequence of LP's

inability to access the funds in its working capital account.

## DEUTSCHE BANK'S TENDER OFFER

155.    On November 17, 2009, more than two years after the market collapsed, Deutsche

Bank AG (Deutsche Bank's parent company) announced that it commenced a cash tender offer

for up to $958,000,000.00 aggregate principal amount of outstanding Camber Master Trust,

Pivot Master Trust, and Capstan Master Trust securities.  Pursuant to that tender offer, Deutsche

Bank AG offered to repurchase the securities it underwrote at the following discounts to par:

| Security | Percentage of Par |
|---|---|
| Camber Master Trust Series 7 | 35% |
| Camber Master Trust Series 9 | 40% |
| Pivot Master Trust Series 1 | 40% |
| Pivot Master Trust Series 2 | 40% |
| Pivot Master Trust Series 4 | 40% |
| Capstan Master Trust Series 1 | 51% |
| Capstan Master Trust Series 3 | 51% |
| Capstan Master Trust Series 4 | 51% |

156.    The tender documents provide that, following tender:

the portion of the Credit-Linked Notes in respect of each series of Securities being exchanged will be distributed in-kind to the Bank, and the notional amount of the Basis Swap in respect of the series will be proportionally reduced, based on the amount of Securities of that series being exchanged (without any termination payment in respect thereof being paid or received by the relevant Issuer).  Upon receipt of the Credit-Linked Notes, the Bank intends to sell the Credit-Linked Notes to the respective issuers thereof in exchange for a corresponding proportion of the Collateral, following which the Credit-Linked Notes will be cancelled by the issuers thereof.  In addition, a corresponding proportion of the Portfolio Credit Default Swap will terminate (without any termination payment in respect thereof being paid or received by the relevant Credit-Linked Notes issuer).

In other words, despite the fact that Deutsche Bank AG offered to pay a maximum of between 35 percent to 51 percent to tender these auction rate securities, Deutsche Bank AG would receive collateral (either AAA-rated medium term notes in the case of the Camber Master Trust and Pivot Master Trust securities or "deposits or a payment obligation by [Deutsche Bank AG]" in the case of the Capstan Master Trust securities) worth 100 percent of the securities' face value after unwinding the complicated derivative transactions that underlie these securities.

157.    Pursuant to this tender offer, LP tendered its Camber Master Trust Series 7 and Pivot Mast Trust Series 1, 2, and 4 securities and received a total payout of $21,500,000 for securities with a par value of $55,000,000.  Assuming the accuracy of the representations in the tender documents, Deutsche Bank received collateral worth the full $55,000,000, pocketing $33,500,000 as the proceeds of its fraud with respect to LP's securities alone.

| Security | Par Value Held By LP | Tender Price |
|---|---|---|
| Camber Master Trust Series 7 | $10,000,000 | $3,500,000 |
| Pivot Master Trust Series 1 | $20,000,000 | $8,000,000 |
| Pivot Master Trust Series 2 | $5,000,000 | $2,000,000 |
| Pivot Master Trust Series 4 | $20,000,000 | $8,000,000 |

## CLAIMS FOR RELIEF

### Count I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder
### (Against Money Market One)

158.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 157 above.

159.    Money Market One knowingly, intentionally, and/or recklessly:  (a) employed a device, scheme, and artifice to defraud LP with respect to the sale of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust auction rate securities; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the foregoing securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).  These actions were intended to, and did, permit Money Market One to earn lucrative commission from LP's investment in the subject auction rate securities.

160.    Money Market One engaged in a series of fraudulent and deceptive acts and practices, including, but not limited to, knowingly, intentionally, and/or recklessly making false statements as to the nature, structure, and level of risks associated with the auction rate securities market in general, and the subject auction rate securities in particular.  Among other things, Money Market One falsely represented that the above auction rate securities were:  (a) liquid; (b) safe; (c) short-term investments; and (d) consistent with LP's investment objectives and parameters.

161.     Money Market One knowingly, intentionally, and/or recklessly made false statements, and failed to disclose material facts, concerning the nature, structure, and risks associated with the subject auction rate securities.  Among other things, Money Market One failed to disclose: (a)  the speculative and risky nature of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, including but not limited to the fact that many of the CDOs had made significant investments in sub-prime securities; (b) that the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities were not backed by corporate bonds, but were based upon CDSs and other derivatives intended to provide insurance to Deutsche Bank's London office against various credit events; and (c) that there was only an appearance of liquidity in the market for auction rate securities that was entirely dependent upon the undisclosed practice of participating broker-dealers placing support bids in every auction.

162.     Money Market One engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the subject securities by repeatedly recommending that LP purchase securities that were not suitable to LP and were inconsistent with its investment objectives and goals.

163.     In furtherance of its fraudulent and manipulative acts and omissions, Money Market One made use, directly and indirectly, of the means and instrumentalities of interstate commerce.

164.     LP reasonably relied upon the misrepresentations and material omissions of Money Market One in connection with the purchase of the subject auction rate securities for LP's working capital account.  Had LP known that the representations of Money Market One were false and misleading, and that Money Market One had withheld material information, LP

never would have followed Money Market One's recommendations and purchased the subject

auction rate securities for its account.

165.    By reason of the foregoing, LP has suffered damages of at least $124,375,000, as

well as consequential damages.

**<u>Count II</u>**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder**
**(Against Merrill Lynch)**

166.    LP adopts and incorporates by reference herein the allegations set forth in

paragraphs 1 through 165 above.

167.    Merrill Lynch knowingly, intentionally, and/or recklessly:  (a) employed a device,

scheme, and artifice to defraud LP with respect to the sale of the auction rate tranches of the

Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South

Coast Funding V securities; (b) made untrue statements of material fact or omitted to state

material facts necessary in order to make the statements made not misleading; and/or (c) engaged

in acts, practices, or courses of business that operated as a fraud and deceit upon LP in

connection with the sale and purchase of the foregoing securities in violation of Section 10(b) of

the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

These actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of

dollars underwriting securities that it otherwise would have been unable to take to market, and/or

to earn substantial commissions on securities with respect to which it served as sole broker-

dealer.

168.    Merrill Lynch engaged in a series of fraudulent and deceptive acts and practices,

including, but not limited to, knowingly, intentionally, and/or recklessly omitting material

information regarding the nature, structure, and risks associated with the Alesco I, Alesco II,

75

Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities as set forth in paragraph 83, as well its manipulation of the market for those securities.

169.    Merrill Lynch engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them.  Merrill Lynch intentionally interfered with the natural interplay of supply and demand for these securities, preventing auction failures that would have resulted in the absence of its secret purchases.  Merrill Lynch thereby manipulated the market for these securities.  At all relevant times, Merrill Lynch knew (or was reckless in not knowing) that its conduct deceived LP and other buyers and holders of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.

170.    In furtherance of its fraudulent and manipulative acts and omissions, Merrill Lynch made use, directly and indirectly, of the means and instrumentalities of interstate commerce.

171.    In making its decision to purchase approximately $55,575,000 of Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, LP reasonably and justifiably relied upon the appearance of an efficient and liquid market created through Merrill Lynch's intentional use of the manipulative and deceptive devices described in this First Amended Complaint, and on the integrity of the marketplace and

the auction processes for these securities.  LP additionally relied upon Merrill Lynch's material omissions concerning the nature, risks, and characteristics of these securities.  Had LP known that Merrill Lynch had engaged in manipulative conduct to create the appearance of an efficient and liquid market, and that Merrill Lynch had withheld material information about the risks, liquidity, and demand for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, LP never would have permitted Money Market One to purchase the subject auction rate securities for its account.

172.    By reason of the foregoing, LP has suffered damages of at least $55,575,000, as well as consequential damages.

## Count III
### For Violations of Section 20(a) of the Exchange Act
### (against Merrill Lynch & Co.)

173.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 172 above.

174.    Merrill Lynch & Co. acted as a control person of Merrill Lynch with respect to all of the acts described herein.  By virtue of its position as the 100 percent shareholder of Merrill Lynch, its shared officers with Merrill Lynch, and its supervisory authority over all aspects of the business of Merrill Lynch, Merrill Lynch & Co. directed, participated in, and/or had knowledge of:  (a) Merrill Lynch's device, scheme, and artifice to defraud; (b) Merrill Lynch's untrue statements of material fact and/or its failure to state material facts necessary in order to make the statements made not misleading; and/or (c) Merrill Lynch's engagement in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.  Merrill Lynch & Co. had the power to influence and

control, and did influence and control, directly or indirectly, the decision-making of Merrill

Lynch, including the deceptive and manipulative devices and contrivances, as well as the

material omissions, described in this First Amended Complaint.

175.    Merrill Lynch & Co. had operational control, operational management, and

supervisory involvement over the day-to-day operations of Merrill Lynch and, therefore, had the

power to and did direct and/or influence the particular deceptive and manipulative devices and

contrivances and material omissions giving rise to the securities violations alleged herein.

176.    Merrill Lynch & Co. had the authority and the ability to prevent the deceptive and

manipulative devices and contrivances, as well as the material omissions, alleged herein, but did

not do so because the fraud enabled Merrill Lynch & Co. to earn extraordinary profits from the

perpetuation of the fraud in the form of higher fees, which were reflected on Merrill Lynch &

Co.'s financial statements.  Merrill Lynch & Co. was additionally motivated by the desire to

avoid the mark-to-market losses on its massive portfolio of CDO notes which would follow any

auction failure, the disclosure of that portfolio, any write down of its current period income

statement, and the drop in its common stock price that inevitably would follow any of the

foregoing.

177.    As detailed herein, Merrill Lynch violated Section 10(b) and Rule 10b-5 by the

manipulative and deceptive acts and contrivances, as well as the material omissions, alleged in

paragraphs 166-72.  By virtue of its position as a control person, the Merrill Lynch & Co. is

jointly and severally liable for those violations of the Exchange Act.

**<u>Count IV</u>**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder**
**(Against Deutsche Bank)**

178.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 177 above.

179.    Deutsche Bank knowingly, intentionally, and/or recklessly:  (a) employed a device, scheme, and artifice to defraud LP with respect to the sale of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust auction rate securities; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the foregoing securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).  These actions were intended to, and did, permit Deutsche Bank to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market; to earn substantial commissions on securities with respect to which it served as sole broker-dealer; to earn profits based on the spread between the interest paid under the basis swap and the collared interest rate potentially payable to holders of the auction rate securities; and/or to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

180.    Deutsche Bank engaged in a series of fraudulent and deceptive acts and practices, including, but not limited to, knowingly, intentionally, and/or recklessly omitting material information regarding the nature, structure, and level of risks associated with the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities as set forth in paragraph 123, as well as its manipulation of the market for those securities.

181.    Deutsche Bank engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them. Deutsche Bank intentionally interfered with the natural interplay of supply and demand for the Camber Master Trust and Pivot Master Trust securities, preventing auction failures that would have resulted in the absence of its secret purchases. Deutsche Bank thereby manipulated the market for these securities. Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then later the Capstan Master Trust securities, had it failed to create the false appearance of liquidity for the analogous Camber Master Trust and Pivot Master Trust securities. At all relevant times, Deutsche Bank knew (or was reckless in not knowing) that its conduct deceived LP and other buyers and holders of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities.

182.    In furtherance of its fraudulent and manipulative acts and omissions, Deutsche Bank made use, directly and indirectly, of the means and instrumentalities of interstate commerce.

183.    In making its decision to purchase approximately $90,300,000 of Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, LP reasonably and justifiably relied upon the appearance of an efficient and liquid market created through Deutsche Bank's intentional use of the manipulative and deceptive devices described in this First Amended Complaint, and on the integrity of the marketplace and the auction process for these securities.

LP additionally relied upon Deutsche Bank's material omissions concerning the nature, risks, and characteristics of these securities.  Had LP known that Deutsche Bank had engaged in manipulative conduct to create the appearance of an efficient and liquid market, and that Deutsche Bank had withheld material information about the risks, liquidity, and demand for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, LP never would have permitted Money Market One to purchase the subject auction rate securities for its account.

184.    By reason of the foregoing, LP has suffered damages of at least $68,800,000, as well as consequential damages.

**Count V**
**For Violations of California Corporate Securities Law of 1968, Corp. Code §§ 25500, 25501, and 25504.1**
**(Against Money Market One)**

185.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 184 above.

186.    Money Market One directly or indirectly sold to LP and/or induced LP to purchase securities and/or aided and abetted the sale of securities to LP, from the State of California, by means of written and oral communications that contained untrue statements of material fact and that omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of California Corporate Code §§ 25400(d), 25401, 25500, 25501, and 25504.1.

187.    Money Market One knowingly, intentionally, and/or recklessly made false statements as to the nature, structure, and level of risks associated with the auction rate securities market in general, and the subject auction rate securities in particular.  Among other things, Money Market One falsely represented that the above auction rate securities were:  (a) liquid; (b) safe; (c) short-term investments; and (d) consistent with LP's investment objectives and

parameters.  Money Market One falsely claimed that the Merrill Lynch-underwritten securities were not exposed to any sub-prime market, when in fact the CDO's held significant quantities of sub-prime securities.

188.    Money Market One knowingly, intentionally, and/or recklessly failed to disclose material facts concerning the nature, structure, and risks associated with the subject auction rate securities.  Among other things, Money Market One failed to disclose:  (a) the speculative and risky nature of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, including but not limited to the fact that many of the CDOs had made significant investments in sub-prime securities; (b) that the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities were not backed by corporate bonds, but were based upon CDSs and other derivatives intended to provide insurance to Deutsche Bank's London office against various credit events; and (c ) that there was only an appearance of liquidity in the market for auction rate securities that was entirely dependent upon the undisclosed practice of participating broker-dealers placing support bids in every auction.

189.    At the time it made each of the statements, Money Market One knew, or had reasonable grounds to believe, that its material misrepresentations and omissions were false and/or misleading, and it acted willfully and with an intent to defraud in selling and/or inducing LP to purchase the relevant securities.

190.    By means of the material misrepresentations and omissions, and the other activities alleged in this First Amended Complaint, Money Market One provided material assistance to Merrill Lynch and Deutsche Bank in their violations of California Corporate Code § 25401.

191.    By reason of the foregoing, LP has suffered damages of at least $124,375,000, as well as consequential damages, and/or is entitled to rescission.

**<u>Count VI</u>**
**For Violations of California Corporate Securities Law of 1968, Corp. Code §§ 25500 and 25501**
**(Against Merrill Lynch)**

192.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 191 above.

193.    Merrill Lynch directly or indirectly sold to LP and/or induced LP to purchase securities from the State of California by means of written and oral communications that contained material omissions of fact, in violation of California law, as set forth in paragraph 83. These actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market, and/or to earn substantial commissions on securities with respect to which it served as sole broker-dealer.

194.    Merrill Lynch also engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities by effecting, alone or with one or more other persons, a series of transactions that created actual or apparent active trading in the subject securities, for the purpose of inducing the purchase or sale of the subject securities by investors such as LP.  Specifically, Merrill Lynch placed undisclosed support bids in every Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V auction.  In bidding for 100 percent of the outstanding issue in 100 percent of the auctions, Merrill Lynch created the false appearance of active trading legitimate third-party demand for these securities, as well as a liquid and efficient

market.  The purpose and effect of these support bids was to induce investors (such as LP) to purchase these securities.

195.    As the sole broker-dealer in all of the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, Merrill Lynch directly or indirectly sold to LP all of the Merrill Lynch-underwritten securities that LP acquired.

196.    At the time it made each of the above material omissions and engaged in the manipulative and deceptive acts, practices, or courses of business described in this First Amended Complaint that operated as a fraud and deceit upon LP, Merrill Lynch knew, or had reasonable grounds to believe, that its material misrepresentations and omissions were false and/or misleading.  Merrill Lynch acted willfully and with an intent to defraud in selling or inducing LP to purchase the relevant securities.  Merrill Lynch thereby violated California Corporate Code §§ 25400(b) and (d), 25401, 25500, and 25501.

197.    By reason of the foregoing, LP has suffered damages of at least $55,575,000, as well as consequential damages, and/or is entitled to rescission.

## Count VII
### For Violations of California Corporate Securities Law of 1968, Corp. Code § 25504
### (Against Merrill Lynch & Co.)

198.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 197 above.

199.    Merrill Lynch & Co. acted as a control person of Merrill Lynch with respect to all of the acts described herein.  By virtue of its position as the 100 percent shareholder of Merrill Lynch, its shared officers with Merrill Lynch, and its supervisory authority over all aspects of the business of Merrill Lynch, Merrill Lynch & Co. directed, participated in, and/or had knowledge

of:  (a) Merrill Lynch's device, scheme, and artifice to defraud; (b) Merrill Lynch's failure to state material facts necessary in order to make the statements made not misleading; and/or (c) Merrill Lynch's engagement in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities. Merrill Lynch & Co. had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Merrill Lynch, including the statements and the conduct described herein, including the deceptive and manipulative devices and contrivances, as well as the material omissions, described in this First Amended Complaint.

200.    Merrill Lynch & Co. had operational control, operational management, and supervisory involvement over the day-to-day operations of Merrill Lynch and, therefore, had the power to and did direct and/or influence the particular deceptive and manipulative devices and contrivances, as well as the material omissions, giving rise to the securities violations alleged herein.

201.    Merrill Lynch & Co. had the authority and the ability to prevent the deceptive and manipulative devices and contrivances, as well as the material omissions, alleged herein, but did not do so because the fraud enabled Merrill Lynch & Co. to earn extraordinary profits from the perpetuation of the fraud in the form of higher fees, which were reflected on Merrill Lynch & Co.'s financial statements.  Merrill Lynch & Co. was additionally motivated by the desire to avoid:  the mark-to-market losses on its massive portfolio of CDO notes which would follow any auction failure, the disclosure of that portfolio, any write down of its current period income statement, and the drop in its common stock price that inevitably would follow any of the foregoing.

202.    As detailed herein, Merrill Lynch violated Sections 25401 and 25501 of the

California Corporate Securities Law by the misrepresentations, acts, and omissions alleged in

paragraphs 192 through 197.  By virtue of its direct or indirect control over Defendant Merrill

Lynch, Merrill Lynch & Co. is liable for those violations of California law pursuant to Section

25504 of the California Corporate Securities Law.

**<u>Count VIII</u>**
**For Violations of California Corporate Securities Law of 1968, Corp. Code §§ 25500 and**
**25501**
**(Against Deutsche Bank)**

203.    LP adopts and incorporates by reference herein the allegations set forth in

paragraphs 1 through 202 above.

204.    Deutsche Bank, directly or indirectly sold to LP and/or induced LP to purchase

securities from the State of California by means of written and oral communications that

contained material omissions of fact, in violation of California law, as set forth in paragraph 123.

These actions were intended to, and did, permit Deutsche Bank to earn tens to hundreds of

millions of dollars underwriting securities that it otherwise would have been unable to take to

market; to earn substantial commissions on securities with respect to which it served as sole

broker-dealer; to earn profits based on the spread between the interest paid under the basis swap

and the collared interest rate potentially payable to holders of the auction rate securities; and/or

to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

205.    Deutsche Bank also engaged in acts, practices, or courses of business that

operated as a fraud and deceit upon LP in connection with the sale and purchase of the Camber

Master Trust, Pivot Master Trust, and Capstan Master Trust securities by effecting, alone or with

one or more other persons, a series of transactions that created actual or apparent active trading

in the subject securities, for the purpose of inducing the purchase or sale of the subject securities

by investors such as LP.  Specifically, Deutsche Bank placed support bids in every Camber

Master Trust and Pivot Master Trust auction.  In bidding for 100 percent of the outstanding issue

in 100 percent of the auctions, Merrill Lynch created the false appearance of active trading

legitimate third-party demand for these securities, as well as a liquid and efficient market.

Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then

later the Capstan Master Trust securities, had it failed to create the false appearance of liquidity

for the analogous Camber Master Trust and Pivot Master Trust securities.  The purpose and

effect of these support bids was to induce investors (such as LP) to purchase the Camber Master

Trust, Pivot Master Trust, and Capstan Master Trust securities.

206.    Deutsche Bank directly or indirectly sold Pivot Master Trust and Capstan Master

Trust securities to LP as part of its initial placement of these securities.  In addition, in its

capacity as sole broker-dealer in all of the auctions for all of the Camber Master Trust, Pivot

Master Trust, Capstan Master Trust securities, Deutsche Bank directly or indirectly sold all of

the securities to LP that LP acquired at auction.

207.    At the time it made each of the above statements or omissions and engaged in the

acts, practices, or courses of business described in this First Amended Complaint that operated as

a fraud and deceit upon LP, Deutsche Bank knew, or had reasonable grounds to believe, that its

material misrepresentations and omissions were false and/or misleading.  Deutsche Bank acted

willfully and with an intent to defraud in selling or inducing LP to purchase the relevant

securities.  Deutsche Bank thereby violated California Corporate Code §§ 25400(b) and (d),

25401, 25500, and 25501.

208.    By reason of the foregoing, LP has suffered damages of at least $68,800,000, as

well as consequential damages, and/or is entitled to rescission.

**Count IX**
**For Common Law Fraud**
**(Against Money Market One)**

209.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 208 above.

210.    With the intent of inducing LP to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, Money Market One knowingly, intentionally, and/or recklessly made false statements of material fact; omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and concealed material information from LP.  These actions were intended to, and did, permit Money Market One to earn lucrative commissions from LP's investment in the subject auction rate securities.

211.    Among other things, Money Market One falsely represented that the above auction rate securities were:  (a) liquid; (b) safe; (c) short-term investments; and (d) consistent with LP's investment objectives and parameters.  Money Market One falsely claimed that the Merrill Lynch-underwritten securities were not exposed to any sub-prime market, when in fact the CDO's held significant quantities of sub-prime securities.

212.    Money Market One concealed or failed to disclose material facts concerning the nature, structure, and risks associated with the subject auction rate securities.  Among other things, Money Market One failed to disclose:  (a) the speculative and risky nature of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, including but not limited to the fact that many of the CDOs had made significant investments in sub-prime securities; (b) that the Camber Master Trust, Pivot Master

Trust, and Capstan Master Trust securities were not backed by corporate bonds, but were based upon CDSs and other derivatives intended to provide insurance to Deutsche Bank's London office against various credit events; and (c) that there was only an appearance of liquidity in the market for auction rate securities that was entirely dependent upon the undisclosed practice of participating broker-dealers placing support bids in every auction.

213.    In justifiable reliance upon Money Market One's material misrepresentations and omissions, and without knowledge of the truth, LP permitted Money Market One to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for its account.  Had LP known that the information provided and the statements made by Money Market One contained material misrepresentations and omissions, or had LP been aware of the material information that Money Market One concealed, LP would not have permitted Money Market One to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for its account.

214.    By reason of the foregoing, LP has suffered damages of at least $124,375,000, as well as consequential damages.

## Count X
### For Common Law Fraud
### (Against Merrill Lynch)

215.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 214 above.

216.    With the intent of inducing LP to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities, Merrill

Lynch knowingly, intentionally, and/or recklessly engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them. Merrill Lynch intentionally interfered with the natural interplay of supply and demand for these securities, preventing auction failures that would have resulted in the absence of its secret purchases. Merrill Lynch thereby manipulated the market for these securities. At all relevant times, Merrill Lynch knew (or was reckless in not knowing) that its conduct deceived LP and other buyers and holders of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities.

217.    Merrill Lynch also knowingly, intentionally, and/or recklessly concealed material information from LP, as set forth in paragraph 83. Merrill Lynch additionally concealed the manipulative and deceptive conduct described in the First Amended Complaint. Merrill Lynch's actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market, and/or to earn substantial commissions on securities with respect to which it served as sole broker-dealer.

218.    In justifiable reliance upon Merrill Lynch's market manipulation and material omissions, and without knowledge of the truth, LP permitted Money Market One to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast Funding V securities for its account. Had LP known that the information provided and the

statements made by Merrill Lynch contained material omissions, or had LP been aware of the material information that Merrill Lynch concealed, including but not limited to Merrill Lynch's market manipulation, LP would not have permitted Money Market One to purchase these securities for its account.

219.    By reason of the foregoing, LP has suffered damages of at least $55,575,000, as well as consequential damages.

**Count XI**
**For Common Law Fraud**
**(Against Deutsche Bank)**

220.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 219 above.

221.    With the intent of inducing LP to purchase the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, Deutsche Bank knowingly, intentionally, and/or recklessly engaged in acts, practices, or courses of business that operated as a fraud and deceit upon LP in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them.  Deutsche Bank intentionally interfered with the natural interplay of supply and demand for the Camber Master Trust and Pivot Master Trust securities, preventing auction failures that would have resulted in the absence of its secret purchases.  Deutsche Bank thereby manipulated the market for these securities.  Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then later the Capstan Master Trust securities, had it failed to create the false

appearance of liquidity for the analogous Camber Master Trust and Pivot Master Trust securities.
At all relevant times, Deutsche Bank knew (or was reckless in not knowing) that its conduct
deceived LP and other buyers and holders of the Camber Master Trust, Pivot Master Trust, and
Capstan Master Trust securities.

222.    Deutsche Bank also knowingly, intentionally, and/or recklessly concealed
material information from LP, as set forth in paragraph 123.  Deutsche Bank additionally
concealed the manipulative and deceptive conduct described in the First Amended Complaint.
These actions were intended to, and did, permit Deutsche Bank to earn tens to hundreds of
millions of dollars underwriting securities that it otherwise would have been unable to take to
market; to earn substantial commissions on securities with respect to which it served as sole
broker-dealer; to earn profits based on the spread between the interest paid under the basis swap
and the collared interest rate potentially payable to holders of the auction rate securities; and/or
to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

223.    In justifiable reliance upon Deutsche Bank's market manipulation and material
omissions, and without knowledge of the truth, LP permitted Money Market One to purchase the
Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for its account.
Had LP known that the information provided and the statements made by Deutsche Bank
contained material omissions, or had LP been aware of the material information that Deutsche
Bank concealed, including but not limited to Deutsche Bank's market manipulation, LP would
not have permitted Money Market One to purchase the Camber Master Trust, Pivot Master Trust,
and Capstan Master Trust securities for its account.

224.    By reason of the foregoing, LP has suffered damages of at least $68,800,000, as
well as consequential damages.

**Count XII**
**For Common Law Negligent Misrepresentation**
**(Against Money Market One)**

225.     LP adopts and incorporates by reference herein the allegations set forth in

paragraphs 1 through 224 above.

226.     With the intent of inducing LP to purchase the Alesco I, Alesco II, Lakeside CDO

I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust,

Pivot Master Trust, and Capstan Master Trust securities, Money Market One made false

statements of material fact; omitted material facts necessary to make the statements made, in

light of the circumstances under which they were made, not misleading; and concealed material

information from LP.  These actions were intended to, and did, permit Money Market One to

earn lucrative commissions from LP's investment in the subject auction rate securities.

227.     Among other things, Money Market One falsely represented that the above

auction rate securities were:  (a) liquid; (b) safe; (c) short-term investments; and (d) consistent

with LP's investment objectives and parameters.  Money Market One falsely claimed that the

Merrill Lynch-underwritten securities were not exposed to any sub-prime market, when in fact

the CDO's held significant quantities of sub-prime securities.

228.     Money Market One concealed or failed to disclose material facts concerning the

nature, structure, and risks associated with the subject auction rate securities.  Among other

things, Money Market One failed to disclose:  (a) the speculative and risky nature of the Alesco

I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, and South Coast

Funding V securities, including but not limited to the fact that many of the CDOs had made

significant investments in sub-prime securities; (b) that the Camber Master Trust, Pivot Master

Trust, and Capstan Master Trust securities were not backed by corporate bonds, but were based

93

upon CDSs and other derivatives intended to provide insurance to Deutsche Bank's London office against various credit events; and (c) that there was only an appearance of liquidity in the market for auction rate securities that was entirely dependent upon the undisclosed practice of participating broker-dealers placing support bids in every auction.

229.    At the time it made these material misstatements and omissions, Money Market One had a fiduciary relationship with LP and was therefore legally obligated to act with the highest good faith.  Money Market One repeatedly portrayed itself as a "trusted advisor" that exercised the highest degree of professionalism and care, and LP treated it as such.

230.    Money Market One failed to exercise reasonable care in recommending that LP purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for LP's account and/or in making representations concerning the securities that contained material misstatements and omissions.

231.    In justifiable reliance upon Money Market One's material misrepresentations and omissions, and without knowledge of the truth, LP permitted Money Market One to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for its account.  Had LP known that the information provided and the statements made by Money Market One contained material misrepresentations and omissions, or had LP been aware of the material information that Money Market One concealed, LP would not have permitted Money Market One to purchase the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for its account.

232.    By reason of the foregoing, LP has suffered damages of at least $124,375,000 as well as consequential damages.

### Count XIII
### For Common Law Breach of Fiduciary Duty
### (Against Money Market One)

233.    LP adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 232 above.

234.    By virtue of its close relationship with LP, its influence over the investment decisions made for LP's working capital accounts, and its 8-year role as a trusted investment counselor and advisor, Money Market One had a fiduciary relationship.  Money Market One was therefore obligated to act in LP's best interest and to avoid any actions that put their business interests in conflict with that of LP.  Money Market One additionally owed duties of loyalty, integrity, and due care, and was obligated to act with the highest good faith.  Thus, among other things, Money Market One owed a duty:  (1) to recommend a security only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) to inform LP of the risks involved in purchasing or selling a particular security; (3) to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; and (4) not to misrepresent any fact material to the transaction.

235.    Money Market One breached their duties of loyalty and good faith to LP by, among other things:  (a) recommending securities into LP's accounts that were inconsistent with LP's investment objectives and parameters; (b) making material misrepresentations concerning the nature, liquidity, and risk of auction rate securities in general, and the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities in particular; (c) failing to

disclose material information concerning the nature, liquidity, and risk of auction rate securities in general, and the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities in particular; and (d) failing to become sufficiently informed as to the nature of the auction rate securities that it recommended for LP's working capital account.

236.    By virtue of its actions, Money Market One breached the fiduciary duties that it owed to LP.

237.    As a direct and proximate consequence of the wrongful conduct of Money Market One, LP has suffered damages of at least $124,375,000, as well as consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LP prays for relief and judgment, as follows:

A.    Compensatory and consequential damages in an amount to be determined at trial;

B.    Rescission of LP's purchase of the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities;

C.    Disgorgement of all commissions or other compensation received by Money Market One for purchasing the Alesco I, Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO I, South Coast Funding V, Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities for LP's account, and the award of all such funds to LP;

D.    Punitive damages in an amount to be determined at trial;

E.    An award of all of LP's costs, expenses, and disbursements in prosecuting this action, including attorneys' and expert fees; and

F.    Such other relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff LP demands a jury trial on all issues so triable.

Dated: March 8, 2010

Respectfully submitted,

MARK C. HANSEN
DAVID L. SCHWARZ
KEVIN J. MILLER
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999


R. ALEXANDER SAVERI
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813


*Counsel for Louisiana Pacific Corporation*