UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X
In re Merrill Lynch Auction Rate    :    09 MD 2030 (LAP)
Securities Litigation               :
---------------------------------X
This Document Relates To:           :
No. 09 Civ. 9887 (LAP)              :
                                    :
LOUISIANA PACIFIC CORPORATION,      :    OPINION AND ORDER
                                    :
          Plaintiffs,               :
                                    :
          v.                        :
                                         ┌─────────────────────────────┐
MONEY MARKET 1 INSTITUTIONAL        :     │ USDC SDNY                   │
INVESTMENT DEALER; MERRILL LYNCH    :     │ DOCUMENT                    │
& CO., INC.; MERRILL LYNCH, PIERCE, :     │ ELECTRONICALLY FILED        │
FENNER & SMITH INCORPORATED; AND    :     │ DOC #: _____        │
DEUTSCHE BANK SECURITIES, INC.,     :     │ DATE FILED: 2/15/12         │
                                    :     └─────────────────────────────┘
          Defendants.               :
- - - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge:

          Plaintiff, Louisiana Pacific Corporation ("LPC" or

"Plaintiff"), brings this action alleging various state and

federal causes of action against Defendants Merrill Lynch & Co.,

Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated

("MLPFS"); and Money Market 1 Institutional Investment Dealer

("MM1").[1]  The action alleges that Defendants' activities related

to certain auction rate securities ("ARS") purchased by

Plaintiff ran afoul of the law.  Defendants Merrill Lynch & Co.,

_____

[1] This matter was transferred to this Court for coordinated
pretrial proceedings by the Judicial Panel on Multidistrict
Litigation ("JPML").  The JPML severed the claims relating to
ARS underwritten by Deutsche Bank Securities, Inc. and remanded
that portion of the case to the Northern District of California.

Inc. and MLPFS (together, "Merrill") are the underwriter for the initial offering of ARS at issue and its parent company. Defendant MM1 is Plaintiff's broker-dealer for the ARS at issue. Both the Merrill Defendants and MM1 move separately to dismiss under Federal Rule of Civil Procedure 12(b)(6). Defendant MM1 also moves to strike those portions of Plaintiff's First Amended Complaint ("Compl.") seeking punitive damages. For the reasons stated below, Defendant Merrill's motion to dismiss is GRANTED in its entirety and with prejudice. Defendant MM1's motion to dismiss is GRANTED in part with prejudice and DENIED in part. Finally, Defendant MM1's motion to strike is GRANTED.

I. BACKGROUND

The Court takes as true the following factual allegations in the complaint and draws all reasonable inferences in favor of Plaintiff. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008).

A.   Auction Rate Securities

In short, ARS are variable-rate debt instruments with interest rates set by way of periodic auctions in which potential buyers submit bids at various interest rates. (Compl. ¶¶ 21-26.) The highest bid accepted sets the interest rate for the ARS issuance as a whole – the "clearing rate." (Id.) Holders may sell ARS at these auctions, but auctions with

insufficient buy bids result in auction failure; then, prospective sellers are unable to sell ARS.  (Id.)

The details and operation of the ARS here are not materially different from the ARS described in other opinions in this Multidistrict Litigation.  The Court thus presumes familiarity with the ARS structure as previously discussed.  See generally In re Merrill Lynch ARS Sec. Litig. (Merrill III), No. 09 MD 2030, 2011 WL 536437 (S.D.N.Y. Feb. 9, 2011) (ARS practices disclosures); In re Merrill Lynch ARS Sec. Litig. (Merrill II), 758 F. Supp. 2d 264, 271 (S.D.N.Y. 2010) (ARS mechanics).

B.   Merrill's Conduct

In 2003 and 2004, MLPFS underwrote and acted as placement agent in private offerings of ARS tranches of collateralized debt obligations ("CDOs")[2] including six at issue in this matter: (1) Alesco Preferred Funding I, Ltd. ("Alesco I"); (2) Alesco Preferred Funding II, Ltd. ("Alesco II"); (3) Lakeside CDO I, Ltd. ("Lakeside CDO I"); (4) Lakeside CDO II, Ltd. ("Lakeside

---

[2] CDOs are a form of structured asset backed securities ("ABS"), whereby the issuer of a CDO raises money by selling various classes of notes, with each class typically having a different credit rating and interest rate.  (Compl. ¶ 46.)  "The issuer of the CDO typically uses the proceeds from the sale of the notes to acquire various types of" ABS, and cash flows from those underlying securities are paid out to the various tranches pursuant to a waterfall set out in the offering documents. (Id.)

CDO II"); (5) Cascade Funding CDO I, Ltd. ("Cascade Funding CDO I"); and (6) South Coast Funding V, Ltd. ("South Coast Funding V"). (Compl. ¶¶ 58-64.) These ARS could be purchased only by "Qualified Purchasers," as defined by the Investment Company Act of 1940, meaning that such purchasers are presumptively financially sophisticated. (Id. ¶¶ 56, 137; see also Merrill Memorandum of Law in Support of Motion to Dismiss ("Merrill Mem.") Exs. A-F (CDO ARS offering circulars); Exs. G-L (CDO ARS offering supplements).) Plaintiff made the following purchases through its broker, MM1: (1) on February 5, 2007, $3.7 million worth of Cascade Funding CDO I; (2) on April 4, 2007, $5 million worth of Lakeside CDO II; (3) on May 8 and June 8, 2007, $14.675 million worth of Lakeside CDO I; (4) on June 20, 2007, $2.2 million worth of South Coast Funding V; (5) on July 16, 2007, $20 million worth of Alesco I; and (6) on July 30, 2007, $10 million worth of Alesco II. (Compl. ¶ 140.)

MLPFS was the sole broker-dealer for those issuances. (Id. ¶ 66.) As broker-dealer, MLPFS selected the agent to conduct the auction; received and transmitted all buy, hold, or sell orders; participated in the preparation of ARS offering statements; and entered into remarketing agreements with other broker-dealers, including non-Merrill broker-dealers (such as MM1), who then sold those securities to their own eligible

customers, like Plaintiff here.  (Id. ¶¶ 7, 50, 66-68.)  MLPFS
received fees both for its underwriting and its broker-dealer
services.  (Id. ¶¶ 27-28, 52.)

MLPFS also participated as a buyer and seller in the
auctions for its own account in an effort to ensure that the
auctions would not fail.  (Id. ¶¶ 3, 29, 73.)  It placed bids –
called "support bids" – for one-hundred percent of the Alesco I,
Alesco II, Lakeside CDO I, Lakeside CDO II, Cascade Funding CDO
I, and South Coast Funding V securities auctions through July
2007.  (Id. ¶ 73; App. B.)  When placing the bids, MLPFS bid for
the entire notional value of the securities being auctioned.
(Id.)  Plaintiff alleged that the extent of this practice was
not fully disclosed to investors, and MLPFS knew that demand for
ARS absent its bidding was insufficient to feed the auctions.
(See id. ¶¶ 66-70, 73-74, 76-77, 169.)

The support bids cleared the auctions and established the
clearing rate in "a significant percentage" of the auctions.
(Id. ¶ 73.)  That clearing rate was lower than the rates
"otherwise would have been," meaning that Plaintiff earned less
interest on its ARS than it otherwise would have earned.  (Id.
¶ 84.)  Additionally, the support bids were undisclosed and
therefore "injected false information into the marketplace"
about the liquidity of these ARS.  (Id. ¶ 74.)  The consequences

5

related to these allegations constitute the primary injuries MLPFS allegedly caused here.  (See id. ¶¶ 74, 76-78, 83-86, 169.)

In August 2007, MLPFS discontinued its practice of submitting support bids, and the auctions for the six ARS here failed.  (Id. ¶ 8, 76.)  The market for these ARS "completely evaporated."  (Id.)  Because every auction for these securities has failed since August 2007, Plaintiff has been unable to sell the Merrill ARS currently held in its operating capital portfolio.  (Id. ¶ 11.)  Plaintiff claims it relied on the appearance of a liquid market (allegedly manufactured by MLPFS) when deciding to make its ARS purchases.  (Id. ¶¶ 10, 74, 77, 171.)  It says it never would have permitted MM1 to purchase the ARS for its account had it known the truth and that it now holds "toxic," "illiquid and significantly devalued" securities at a fraction of their par value.  (Id. ¶¶ 9, 11, 171.)

C.   SEC Order and Website Disclosure

In May 2006, following an investigation, the Securities and Exchange Commission ("SEC") reached a settlement with several investment banks that participated in the ARS market, including MLPFS.  (Id. ¶¶ 34-35.)  The SEC issued a cease-and-desist order

(the "SEC Order") on May 31, 2006.[3]  (Id. ¶ 34 and n.4.)  The SEC
Order concluded that the banks violated the securities laws by
intervening in ARS auctions without adequate disclosure.  (Id.)
The SEC determined that disclosures indicating that a broker-
dealer "may submit orders in Auctions for its own accounts" and
that it "might have an advantage over other bidders" were
inadequate.  (Id.)  The SEC Order enumerated several violative
practices, including bidding to prevent auction failures or to
affect the auctions' clearing rates but did not specify which
banks engaged in which practices.  (Id.; Stern Decl. Ex. N, at
6.)  Nevertheless, MLPFS was ordered to pay a larger penalty
than other banks because it was among the banks that "engaged in
more types of violative practices than" others.  (Compl. ¶ 35.)
The SEC Order required the banks to post their ARS practices on
their websites and provide all first-time purchasers and broker-
dealer purchasers with a written description of the bank's ARS
practices at or before the completion of each transaction.
(Id.)

---

[3] The Court takes judicial notice of the contents of the SEC
Order and the remedial disclosures Merrill subsequently placed
on its website.  (Declaration of Andrew W. Stern ("Stern Decl.")
Exs. N, P.)  The complaint incorporates these documents by
reference, so they are properly considered on a motion to
dismiss.  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir.
2006).

In August 2006, Merrill posted a document disclosing its
ARS practices on its website (the "Website Disclosure").  <u>See</u>
<u>Merrill II</u>, 758 F. Supp. 2d at 273-74 (discussing the same
disclosure).  The Website Disclosure states that "Merrill Lynch
may routinely place one or more bids in an auction for its own
account to acquire [ARS] for its inventory, to prevent an
auction failure . . . or an auction from clearing at a rate that
Merrill Lynch believes does not reflect the market for the
securities." (Stern Decl. Ex. P, at 16; <u>see also</u> <u>id.</u> at 15
("Merrill Lynch is permitted, but not obligated, to submit
orders in auctions for its own account either as a bidder or a
seller, or both, <u>and routinely does so</u> in its sole discretion.")
(emphasis added).)  It states that MLPFS's bids "are likely to
affect the clearing rate." (<u>Id.</u> at 16.)  The Website Disclosure
also discusses the risk of auction failures and the consequent
liquidity risk in the ARS market:

> Because of [MLPFS's ARS practices], the fact that an
> auction clears successfully does not mean that an
> investment in the securities involves no significant
> liquidity or credit risk.  Merrill Lynch is not
> obligated to continue to place such bids. . . .
> Investors should not assume that Merrill Lynch will do
> so or that auction failures will not occur.

(<u>Id.</u>; <u>see also</u> <u>id.</u> at 18 ("There may not always be enough
bidders to prevent an auction from failing in the absence of
Merrill Lynch bidding in the auction for its own account or

encouraging others to bid.  Therefore, auction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid.").)  Finally, the Website Disclosure states that MLPFS had conflicts of interest; "it would likely have an advantage over other bidders because Merrill Lynch would have knowledge of some or all of the other orders placed through Merrill Lynch in that auction . . . . Merrill Lynch's interests in conducting an auction may differ from [investors] who participate in auctions."  (Id. at 15-18.)

    D.   <u>MM1's Conduct</u>

From 1999 through August 2007, MM1 served as Plaintiff's broker-dealer and investment adviser.  (Compl. ¶¶ 127-28.)  As part of their relationship, Plaintiff provided MM1 with detailed investment guidelines and objectives indicating its desire to have relatively liquid investments to fund its ongoing business operations.  (<u>Id.</u> ¶ 128.)  As a result, Plaintiff specifically advised MM1 that speculative instruments, as well as structured finance products such as swaps, derivatives, and CDOs, all fell outside of Plaintiff's target investments.  (<u>Id.</u>)  Plaintiff's primary contacts at MM1 throughout this period were Senior Vice President Hal Johnson ("VP Johnson"), Vice President Will Longstreth, and Chief Executive Officer Lee Epstein ("CEO

Epstein"). (Id. ¶ 134.) Representatives of MM1, including these high-level officers, communicated with Plaintiff on a near-daily basis, recommending specific investments consistent with Plaintiff's investment strategy. (Id. ¶ 134-35.) MM1 represented that it had reviewed all relevant offering materials and that it understood the securities it was recommending. (Id. ¶ 135.)

Between February and July 2007, MM1 recommended the six ARS tranches of the various MLPFS CDOs described above in Part I.B., supra. (Id. ¶ 140.) As part of its recommendations, MM1 represented that it had reviewed the offering memoranda, was familiar with the securities, and that they were fully consistent with Plaintiff's investment goals. (Id. ¶ 135.) In late 2006, VP Johnson represented that ARS were "safe and liquid money market equivalents," that "there was virtually no risk of auction failure," and therefore, "auction rate securities should be considered as safe as cash." (Id. ¶ 138.) MM1 further represented that the Merrill CDOs paid higher rates of interest than other money market funds because they were private placements only available to a subset of the investing public. (Id. ¶ 137.) In reliance on MM1's representations, Plaintiff made the following ARS purchases: (1) on February 5, 2007, $3.7 million worth of Cascade Funding CDO I; (2) on April 4, 2007, $5

million worth of Lakeside CDO II; (3) on May 8 and June 8, 2007, $14.675 million worth of Lakeside CDO I; (4) on June 20, 2007, $2.2 million worth of South Coast Funding V; (5) on July 16, 2007, $20 million worth of Alesco I; and (6) on July 30, 2007, $10 million worth of Alesco II.  (Id. ¶ 140.)  On MM1's monthly account statements to Plaintiff, these investments were categorized as "CashEQ," signifying that they were cash equivalents.  (Id. ¶ 131.)  The same monthly account statements identified the "stated maturity date" for the Lakeside, Cascade, and South Coast securities as no longer than one month and for the Alesco securities as no longer than three months.  (Id.)

MM1 made further representations to Plaintiff during and after the ARS were purchased and auctions subsequently failed. On July 11, 2007, after Standard & Poors ("S&P") announced it would potentially downgrade some $12 billion in sub-prime mortgage-backed securities and in response to Plaintiff's inquiry, VP Johnson represented to Plaintiff that its investment portfolio had no sub-prime exposure.  (Id. ¶ 143.)  After the initial ARS auction failures in August 2007, Plaintiff had additional conversations with MM1 in which it assured Plaintiff that the Merrill ARS had no sub-prime exposure.  (Id. ¶ 148-49.) It was only after Plaintiff demanded from MM1 a complete list of the ARS CDOs' holdings that it became clear to Plaintiff that

all of the Merrill ARS had sub-prime exposure. (Id. ¶ 149.)
When Plaintiff pointed out the disparity between the actual
holdings and the ARS as characterized by MM1, MM1 then claimed
that the sub-prime exposure was irrelevant because "none of the
CDOs was in a state of default." (Id.) As late as December
2007, two months after the market for ARS completely evaporated,
CEO Epstein continued to advocate the ARS investments, stating
that "notwithstanding the market failure, the actual value of
the now illiquid auction rate securities in [Plaintiff's]
account exceeded their par value." (Id. ¶ 150.) Plaintiff also
learned that ARS were not the cash equivalents MM1 had promised
them to be and were instead long-term instruments with 30 to 40-
year maturities. (Id. ¶¶ 65, 142.)

Unbeknownst to Plaintiff at the time MM1 was recommending
the purchase of the Merrill ARS, MM1 had entered into a re-
marketing agreement with Merrill to create a distribution
channel for Merrill's products. (Id. ¶¶ 7, 50.) Pursuant to
the agreement, MM1 was paid commissions in return for placing
Merrill-underwritten securities with its investment clients,
including Plaintiff. (Id.) For the ARS at issue in this case,
MM1 was paid a commission each time an auction occurred, so long
as MM1's client purchased or held the security. (Id.) MM1
continues to earn these fees upon each Merrill ARS auction,

12

despite the fact that there is no ARS market and every auction since August 2007 has failed.  (Id. ¶¶ 145-46.)  MM1 never disclosed this arrangement to Plaintiff.  (Id. ¶ 7.)  Plaintiff claims that had it known the true nature and characteristics of the ARS securities, it would never have followed MM1's recommendation to acquire them for its working capital account. (Id. ¶ 142.)  Further, had MM1 responded truthfully to Plaintiff's July 11, 2007 inquiry regarding sub-prime exposure, Plaintiff would have been able to sell at least some of the Merrill ARS in the then-functioning market.  (Plaintiff's Memorandum of Law Opposing MM1 Motion to Dismiss ("Pl. MM1 Mem.") at 5.)

  E. Procedural History

  Plaintiff filed this suit in the Northern District of California.  On December 1, 2009, the Judicial Panel on Multidistrict Litigation ("JPML") transferred this action here for inclusion in coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  The JPML simultaneously ordered that "claims regarding" ARS underwritten by Deutsche Bank Securities, Inc. ("Deutsche Bank") be remanded to the Northern District of California.  By Order dated January 5, 2010, the Northern District of California clarified that claims "arising from" the Deutsche Bank-underwritten ARS would

13

proceed before it while claims "arising from" the Merrill-
underwritten ARS would proceed before this Court.  On February
11, 2010, this Court ordered that claims arising from the
Merrill-underwritten ARS as alleged against Defendant MM1 were
to proceed here.  Plaintiff filed its First Amended Complaint on
March 8, 2010.  On April 9, 2010, and April 26, 2010,
respectively, the Merrill and MM1 Defendants filed motions to
dismiss for failure to state a claim.  See Fed. R. Civ. P. 9(b),
12(b)(6), and the Private Securities Litigation Reform Act of
1995 ("PSLRA") (15 U.S.C. § 78u-4(b)(1)).  On April 26, 2010,
MM1 also filed its motion to strike.

II. DISCUSSION

    There are two separate motions to dismiss sub judice, and
they raise different substantive claims.  Therefore, the Court
first discusses Merrill's motion and then moves to MM1's motion.
First, it outlines the law governing the analysis of both
motions.

    A.   Legal Standard

    In assessing a motion to dismiss, the Court must accept all
non-conclusory factual allegations as true and draw all
reasonable inferences in the Plaintiff's favor.  Goldstein, 516
F.3d at 56.  To survive such a motion, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" Ashcroft v. Iqbal,
129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).  A pleading that offers
"labels and conclusions" or "a formalistic recitation of the
elements of a cause of action will not do." Twombly, 550 U.S.
at 555.  "Where a complaint pleads facts that are 'merely
consistent with' a defendant's liability, it 'stops short of the
line between possibility and plausibility of entitlement to
relief.'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S.
at 557) (internal quotation marks omitted).  For securities law
violation claims, the complaint also must meet the heightened
pleading requirements under Federal Rule of Civil Procedure 9(b)
and, for federal claims, the PSLRA, 15 U.S.C. § 78u-4(b).  ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.
2007).

    B.   Merrill's Motion to Dismiss

    Plaintiff asserts claims against MLPFS for market
manipulation and material misstatements or omissions under
section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder.  See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  It
also asserts a control-person liability claim against Merrill
Lynch & Co. under section 20(a) of the Exchange Act.  See 15
U.S.C. § 78t(a).  It finally asserts claims against Merrill

Lynch & Co. and MLPFS under California law and common law.
Merrill moves to dismiss all of these claims.  The Court
addresses them in the order outlined above.

     1.   Section 10(b) Claims

     To state a misrepresentation claim under section 10(b) and
Rule 10b-5, Plaintiffs must "allege that the defendant[s] (1)
made misstatements or omissions of material fact, (2) with
scienter, (3) in connection with the purchase or sale of
securities, (4) upon which the plaintiff relied, and (5) that
the plaintiff[s'] reliance was the proximate cause of its
injury." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,
552 U.S. 148, 157 (2008).  To make out a market manipulation
claim, the complaint must "allege (1) manipulative acts; (2)
damage (3) caused by reliance on an assumption of an efficient
market free of manipulation; (4) scienter; (5) in connection
with the purchase or sale of securities; (6) furthered by the
defendant's use of the mails or any facility of a national
securities exchange." ATSI, 493 F.3d at 101.  A failure on any
one of these elements necessitates dismissal. See, e.g., Good
Hill Partners L.P. v. WM Asset Holdings Corp., 583 F. Supp. 2d
517, 520-21 (S.D.N.Y. 2008).

     These two claims are interrelated here because Plaintiff's
market manipulation claims involve a failure to disclose fully

16

MLPFS's ARS market activities.  See In re Merrill Lynch ARS
Litig. (Merrill I), 704 F. Supp. 2d 378, 390-91 (S.D.N.Y. 2010),
aff'd, No. 10-1528, 2011 WL 5515958 (2d Cir. Nov. 14, 2011)
(discussing interrelated claims); see also Merrill Mem. at 24-26
(arguing that Plaintiff alleged no manipulative act because
disclosures were adequate).  And "nondisclosure is usually
essential to the success of a manipulative scheme."  Santa Fe
Indus., Inc. v. Green, 430 U.S. 462, 477 (1977).  The Court thus
addresses the legal elements common to both claims.  It begins
with an analysis of the alleged misstatements or omissions and
then turns to scienter.

        a.  Misstatements or Omissions

     A misstatement or omission claim must include allegations
of a material misstatement or omission.  ECA & Local 134 IBEW
Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d
187, 197 (2d Cir. 2009).  "[T]o be material, 'there must be a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the "total mix" of information made
available.'"  Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224,
231-32 (1988)).  "Therefore, the determination of whether an
alleged misrepresentation is material necessarily depends on all
relevant circumstances."  Id.

                              17

Plaintiff's misstatement and market manipulation claims predicated on purchases that followed the Website Disclosure fail because the Website Disclosure adequately disclosed MLPFS's ARS practices.  (See Stern Decl. Ex. P, at 15-16, 18.)  The Website Disclosure disclosed the "advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates[,] and the possibility that the auctions would fail if Defendants did not intervene in them."  In re Citigroup ARS Litig., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009) (involving similar disclosures); see also Merrill I, 704 F. Supp. 2d at 390-92, 396-97 (same disclosures as here).

Indeed, Plaintiff's misstatement and manipulation claims boil down to two basic points: (1) MLPFS's support bidding affected the clearing rate of the auctions and (2) MLPFS's ARS market activities created a false appearance of liquidity and thereby artificially inflated prices paid for ARS.  (Plaintiff's Memorandum of Law in Opposition to Merrill Motion to Dismiss ("Pl. Merrill Mem.") at 6.)  But the Website Disclosure was sufficient to apprise Plaintiff of MLPFS's activities.  See Merrill I, 704 F. Supp. 2d at 392.  It stated that MLPFS "may routinely" place bids in its own auctions and that it "routinely does so in its sole discretion."  (Stern Decl. Ex. P, at 15-16.)

18

It stated that MLPFS's bids "are likely to affect the clearing rate" (id. at 16) and would "cause lower clearing rates to occur" (id. at 17).  And it disclosed that auction failures are possible, that a cleared auction does not mean ARS have no liquidity risk, that there may be insufficient third-party demand, and that "auction failures are possible . . . if, for any reason, Merrill Lynch were unable or unwilling to bid." (Id. at 18; see id. at 16.)

The Court rejects Plaintiff's suggestion that these disclosures were inadequate because they used the word "may"; the disclosures explained exactly what MLPFS's ARS activities were, that MLPFS "routinely" bids, and the specific risk of auction failure were MLPFS, "for any reason," to stop bidding. (Stern Decl. Ex. P, at 15-16, 18.)  MLPFS affirmatively indicated that it may bid "to keep [an auction] from failing"; that it "routinely does so in its sole discretion"; and that its cessation of bidding alone would cause auction failure.  (Id.) Putting these statements, among others, together, no reasonable person could conclude that MLPFS's bidding was not keeping the auctions afloat.  Cf. Citigroup ARS, 700 F. Supp. 2d at 307 (concluding that similar disclosures apprised plaintiffs of consequences of defendant's auction market participation).  In light of the central allegation in this complaint – that MLPFS's

19

bidding affected clearing rates and disguised the liquidity of ARS – these disclosures are adequate.  See Merrill I, 704 F. Supp. 2d at 392 ("Corporations are not required to phrase disclosures in pejorative terms.").

Indeed, the Exchange Act "substitute[s] a philosophy of full disclosure for the philosophy of caveat emptor."  ATSI, 493 F.3d at 100 (quoting Santa Fe Indus., 430 U.S. at 476-77); see also ECA, 553 F.3d at 197.  The SEC Order is congruent; the agency's settlement requires disclosure of ARS practices, not cessation.  Thus, these disclosures relieve MLPFS of liability on Plaintiff's misstatement and market manipulation claims based on purchases made after the Website Disclosure.  See Merrill I, 704 F. Supp. 2d at 391 ("The market is not misled when a transaction's terms are fully disclosed."); id. at 390-92, 396; Citigroup ARS, 700 F. Supp. 2d at 307.  In this case, this conclusion means that MLPFS is not liable on Plaintiff's claims relating to its six purchases of Merrill-underwritten ARS tranches of the CDOs.  (See Compl. ¶¶ 140, 167, 171.)

Plaintiff makes three principal attacks on this reasoning. First, it contends that the Website Disclosure was "directed at retail customers," whereas Plaintiff was a "Qualified Purchaser."  (Pl. Merrill Mem. at 21; Compl. ¶¶ 56, 137.) Second, it argues that the Website Disclosure "makes no mention

of CDO notes." (Pl. Mem. at 21.) Finally, it argues that this conclusion is "at odds with the uniform conclusions" of the SEC, state regulators, and self-regulatory organizations. (Id. at 22.)

As to the first, Plaintiff's argument is self-defeating. Plaintiff, as a qualified purchaser, has a more sophisticated understanding of risks of the investments it makes and is better able to protect itself. See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-42 (2d Cir. 1997); Merrill III, 2011 WL 536437, at *7; see also 17 C.F.R. § 230.144A(a), (d) (defining "qualified institutional buyers" and limiting certain offerings to them). Not only was the Website Disclosure publicly available and widely disseminated, but it was also posted as a direct result of the SEC's investigation and the SEC Order, which was covered in the news.[4] See Merrill I, 704 F. Supp. 2d at 384-85; see also In re UBS ARS Litig., No. 08 Civ. 2967, 2010 WL 2541166, at *10-11 (S.D.N.Y. June 10, 2010); Stern Exs. N, O. Plaintiff had made investments in some $300 million worth of ARS prior to the purchases at issue here

---

[4] The Court takes judicial notice of such news articles as are submitted by all parties on these motions to the limited extent they are offered for the purpose of demonstrating the existence of information in the market and not for the truth of the matters asserted therein. See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

and had "moved in and out of these securities as needed to fund
its operational requirements." (Compl. ¶ 2.) Plaintiff cannot
now claim that its status as a sophisticated institutional
investor was a liability in the market.

For the same reason, the Website Disclosure's lack of a
specific reference to CDOs is unavailing. That the underlying
securities were CDOs does not make the ARS at issue so unique as
to negate the effect of the Website Disclosure. Moreover, the
Website Disclosure states as much, offering potential customers
a "general description" of MLPFS's ARS practices while
acknowledging that every offering is unique. (Stern Ex. P, at
2.) Whatever the underlying security, there is no dispute that
Plaintiff purchased the relevant ARS tranches of the CDOs
offered by MLPFS (Compl. ¶¶ 58-64, 140), and was therefore on
notice that MLPFS's ARS practices were implicated.

Finally, Plaintiff contends that this conclusion is "at
odds" with the conclusions of the SEC and other regulatory
organizations. (Pl. Merrill Mem. at 22.) In particular,
Plaintiff argues that the "legal conclusion" in the SEC Order
that "substantively identical" disclosures were legally
insufficient is entitled to Chevron deference and therefore
binds this Court. (Id. at 18.) For the reasons already
discussed in this ARS litigation, however, it is not at all

22

clear that the SEC Order is entitled to <u>Chevron</u> deference.  <u>See,</u>
<u>e.g.</u>, <u>Merrill III</u>, 2011 WL 536437, at *7 & n.3.  As in <u>Merrill</u>
<u>III</u>, Plaintiff cites no case in which a court accorded <u>Chevron</u>
deference to an SEC settlement, as opposed to an adjudication or
decision not to pursue an enforcement action on the merits.  <u>See</u>
<u>SEC v. Zandford</u>, 535 U.S. 813, 819-20 (2002) (SEC
interpretation, "in the context of <u>formal adjudication</u>, is
entitled to deference") (emphasis added); <u>United States v. Mead</u>
<u>Corp.</u>, 533 U.S. 218, 230-31 (2001).  Similarly, the March 14,
2008 no-action letter cited by Plaintiff, (Pl. Merrill Mem. at
20,) itself disclaims any legally binding effect.  (Declaration
of David L. Schwarz ("Schwarz Decl.") Ex. Q, at 4 ("This
response . . . does not represent a legal conclusion regarding
the matters discussed herein, or the applicability of any other
federal or state law, or rules of any self-regulatory
organization."))[5]  Most importantly, this Court need not and is
not reviewing the SEC's determination that the pre-SEC Order
disclosures were legally inadequate.

The Court need not resolve the <u>Chevron</u> matter, however,
because it rejects Plaintiff's threshold claim that the

---

[5] Indeed, the cases Plaintiff cites in its own papers compel the
same conclusion.  <u>See, e.g.</u>, <u>In re Sealed Case</u>, 223 F.3d 775,
780 (D.C. Cir. 2000) (stating that a "judicially unreviewable"
SEC no-action letter would not merit <u>Chevron</u> deference) (cited
in Pl. Merrill Mem. at 20 n.25).

disclosures available to Plaintiff at the time of its 2007 purchases were "substantively identical" to those before the SEC in 2006.  (Pl. Merrill Mem. at 20.)  Even assuming that to be a fair comparison of the individual offering materials described in the SEC Order and those in this case (and the Court makes no such finding), the Website Disclosure here is substantially more detailed and comprehensive than the disclosures that were the subject of the SEC Order: the Website Disclosure states that MLPFS "may routinely" place bids in auctions, that such activity may have the result of setting the clearing rate, and that its failure to place bids may result in auction failures and significant liquidity risks.  (Stern Decl. Ex. P, at 15-16 ("Investors should not assume that . . . auction failures will not occur.").)  The <u>Chevron</u> arguments are therefore not relevant to rebut the effectiveness of the disclosures available <u>in this case</u>.  Again, the SEC Order required disclosure of ARS practices, not cessation.  After the Website Disclosure was posted, Plaintiff was informed "that Defendants could engage in the very conduct of which Plaintiff complains."  <u>Citigroup ARS</u>, 700 F. Supp. 2d at 307.  The securities laws demand no more.

Moreover, given the sophistication of Plaintiff, the SEC Order itself was enough to disclose MLPFS's ARS market intervention, even without the subsequent Website Disclosure.

24

The SEC Order, which was publicized and available on the SEC's website, "highlighted the practice of auction dealer participation in ARS auctions." Merrill I, 704 F. Supp. 2d at 396.  It disclosed that MLPFS was in the "first tier" of respondents (meaning it had engaged in more violative practices than others) and explained that ARS broker-dealers placed support bids and prevented auction failure in doing so.  (Stern Decl. Ex. N, at 6-7, 9.)  It is not unreasonable to expect Plaintiff, a sophisticated institutional investor, to draw straightforward inferences from the SEC Order and understand at the time of purchase that MLPFS was engaging in the conduct of which Plaintiff now complains.  Armed with the information in the SEC Order, Plaintiff was on notice of all information that a diligent inquiry would have disclosed.  Plaintiff was also free to demand more information from MLPFS before purchasing the ARS. See Lazard Freres & Co., 108 F.3d at 1542; Merrill III, 2011 WL 536437, at *8.  This reasoning applies with even greater force considering Plaintiff's relevant ARS purchases occurred in 2007, well after both the SEC Order and subsequent Website Disclosure.

The omissions of which Plaintiff complains were adequately disclosed.[6]

     b.   Scienter

Even if MLPFS's adequate disclosure of its ARS practices were less clear, Plaintiff fails to allege that MLPFS acted with the requisite scienter.

"In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a <u>strong</u> inference that the defendant acted with the required state of mind.'"  <u>ECA</u>, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)).  "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity <u>to commit the fraud</u> or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  <u>ATSI</u>, 493 F.3d at 99 (emphasis added).  Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323 (2007).  "A complaint will survive . . . only if a reasonable person would deem the

---

[6] Given this holding, Plaintiff also fails to plead that its alleged reliance was reasonable.  "The market is not misled when a transaction's terms are fully disclosed."  <u>Merrill I</u>, 704 F. Supp. 2d at 390.

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

Here, Plaintiff's scienter allegations fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit. Among the complaint's scienter allegations are that MLPFS's motive was "to expand the potential customer base for Merrill Lynch's CDO products and, by extension, the size and volume of the CDOs that Merrill Lynch underwrote and the underwriting fees that it generated," to collect "approximately $700 million in CDO underwriting fees in 2006, and an additional $395 million in 2007," "to avoid taking substantial write downs on the value of its extensive portfolio of unsold CDO notes," and to avoid "reporting a massive loss on its current period income statement" and a "significant drop in the market price of its common stock." (Compl. ¶¶ 52, 57, 72, 86.)  But "[a]n allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient." Defer LP v. Raymond James Fin., Inc. (Defer I), 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009); see Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000).  The Court of Appeals has been clear that "similar allegations of a generalized motive that could be imputed to any for-profit

endeavor" are not concrete enough to infer scienter.  Defer I, 654 F. Supp. 2d at 217; see also Novak, 216 F.3d at 307. Indeed, Plaintiff alleges no concrete motive to defraud on the part of any individual, and it does not allege that MLPFS was particularly motivated to sell ARS, as opposed to any other product;[7] it only alleges that MLPFS earned substantial fees and was concerned for its bottom line.  (Compl. ¶¶ 43-45, 52, 57, 72, 86.)  These concerns amount to no more than a motive to "increase or maintain profit" that "could be imputed to any for-profit endeavor."  Defer I, 654 F. Supp. at 217.  These allegations are insufficient.

Plaintiff's scienter allegations also fall short of the recklessness standard because Plaintiff does not allege, as it must, conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." Defer I, 654 F. Supp. 2d at 219.  "For scienter purposes, the [Court of Appeals for the] Second Circuit distinguished

---

[7] Plaintiff asserts that the First Amended Complaint identifies a "specific corporate goal" above and beyond a general business motive, which it identifies as a motive "to resuscitate its flagging fixed income business through CDO underwriting."  (Pl. Mem. at 24-25; Compl. ¶¶ 43-35.)  Even assuming that this does not on its face constitute a generalized profit motive, Plaintiff fails to tie the accusation regarding MLPFS's use of CDO offerings to its specific use of ARS tranches and the alleged inadequacies of ARS practice disclosures which are at issue here.

misleading statements . . . from a defendant's allegedly
unlawful omissions . . . ."  In re Bank of Am. Corp. Sec.,
Derivative, & ERISA Litig., 757 F. Supp. 2d. 260, 325 (S.D.N.Y.
2010).  That said, an analysis of an omission allegation
typically focuses on the existence vel non of a duty to
disclose.  See id.  No one contests that a duty exists here; the
question is about the amount of disclosure made, which is a
question more akin to the analysis of alleged misstatements.
See Novak, 216 F.3d at 311 (stating that allegation that
defendant "knew facts or had access to information suggesting
that their public statements were not accurate" is sufficient).
It is possible for a complaint to allege scienter by way of
"circumstances indicating conscious behavior by the defendant"
absent allegations of a motive, "though the strength of
circumstantial allegations must be correspondingly greater."
Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal
quotation marks omitted).  For a corporate defendant such as
MLPFS, "pleaded facts must create a strong inference that
someone whose intent could be imputed to the corporation acted
with the requisite scienter."  Teamsters Local 445 Freight Div.
Pension Fund. v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir.
2008).

Plaintiff's allegations cannot carry this heavy burden.  As held in Part II.B.I.a., _supra_, MLPFS made adequate disclosures about its ARS practices.  The Website Disclosure was sufficient, and the SEC Order equally disclosed MLPFS's bidding to Plaintiff, a sophisticated institutional investor.  Additionally, Plaintiff does not allege that anyone at MLPFS either made knowing misstatements about the MLPFS ARS or knew that MM1 allegedly made statements to Plaintiff that contradicted the statements made by MLPFS.  In these circumstances, "recklessness cannot be inferred from the failure to disclose."  _See_ _Kalnit_, 264 F.3d at 143.  When adequate disclosures are made, it cannot be said that a defendant's conduct is "highly unreasonable and represents an extreme departure from the standards of ordinary care."  _Defer I_, 654 F. Supp. 2d at 219.

Indeed, the offering memoranda in this case, which are also incorporated into the complaint, state that (1) MPLFS could bid and would have the advantage of familiarity with existing bids, (2) MLPFS's participation presented a conflict of interest and could establish the clearing rate in auctions, (3) the securities would have "limited liquidity" and "a purchaser must be prepared to hold the Securities for an indefinite period of time," and (4) in the event of an auction failure, existing

holders of ARS "will not be able to sell all, and may not be able to sell any" of their ARS holdings.  (Stern Exs. A at vii, 14, 129; B at xiii, 15, 127; C at viii, 14, 122; D at viii, 16, 138; E at 19, 76, 161; F at x, 24, 215; G at 5-6, 11, 15-16; H at 5-6, 11, 15-16; I at 4, 8, 11, 20-21; J at 4, 8, 14, 18; K at 5-6, 11, 15; L at 7, 9, 15, 18-19.)  Assuming, arguendo, that these disclosures alone may have been inadequate (and the Court takes no view on the question), they at minimum indicate that MLPFS made some disclosures relating to the type of conduct alleged here.  That they may have been less robust than they could have been does not necessarily mean that MLPFS's conduct meets the substantially higher bar set for recklessness allegations.  See Novak, 216 F.3d at 312 (stating that recklessness is "not merely a heightened form of negligence" and instead "approximat[es] actual intent").

c.   Conclusion

Plaintiff has not alleged any actionable misstatement or omission.  It also has not alleged that MLPFS acted with the requisite scienter.  Plaintiff's section 10(b) claims against MLPFS therefore fail.  They are dismissed with prejudice because the claims cannot be remedied by further amendment of the complaint.

31

## 2.   Control Person Liability Claim

The dismissal of Plaintiff's section 10(b) claim against MLPFS mandates the dismissal of Count Three against Merrill Lynch & Co. because Count Three is a section 20 claim, dependent on the existence of a primary violation, which does not exist here.  Wilson v. Merrill Lynch & Co., Inc., et al., No. 10-1528, 2011 WL 5515958, at *16 (2d Cir. Nov. 14, 2011); see ATSI, 493 F.3d at 108.

## 3.   PSLRA Rule 11 Finding

The PSLRA requires courts "upon final adjudication of the action" to make specific Rule 11 findings.  15 U.S.C. § 78u-4(c)(1).  "[L]iability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers."  ATSI, 579 F.3d at 150 (internal quotation marks omitted).  Plaintiff's claims were not harassing or frivolous, and Merrill did not affirmatively allege any improper conduct or move for sanctions.  Therefore, the Court finds no basis to conclude that Plaintiff or its counsel violated their obligations under Rule 11(b).

## 4.   California State Law Claims

Plaintiff alleges violations of California securities status and common law fraud.  The Court addresses these claims in that order.

32

> a.   California Securities Laws

Plaintiff alleges violations of California Corporations Code sections 25400, 25401, and 25504.  The Court addresses the claims sequentially.

Plaintiff fails to state a claim against Merrill under California Corporations Code section 25400 because Plaintiff does not allege that it was injured in California from any conduct by Merrill in California.  See Cal. Corp. Code § 25400. Plaintiff is a Delaware corporation based in Nashville, Tennessee, and its only relevant contacts with California were its dealings with its broker, MM1.  (Compl. ¶¶ 13-14.) Moreover, Plaintiff does not allege that it communicated or interacted with anyone at Merrill in California regarding the Merrill ARS.  Absent such well-pled allegations of California-based conduct by Merrill, or allegations of an injury incurred by Plaintiff in California as a result of conduct by Merrill in California, Plaintiff cannot assert claims against Merrill under this statute.  See Norwest Mortg., Inc. v. Superior Court, 72 Cal. App. 4th 214, 224-25 (Cal. Ct. App. 1999) (non-California residents cannot assert California statutory claims for injuries allegedly "caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside California") (interpreting Diamond

_Multimedia Sys., Inc. v. Superior Court_, 19 Cal. 4th 1036, 1063
(1999) ("[S]ection 25400 regulates only manipulative conduct in
California.")); _see also, e.g._, _Churchill Vill., L.L.C. v. Gen._
_Elec. Co._, 169 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2000).
Because there is no claim under section 25400, there is no
liability for its violation (which is provided for by section
25500).  _See_ Cal. Corp. Code § 25500; _Diamond Multimedia_, 19
Cal. 4th at 1052.

Plaintiff also fails to state a claim under section 25401
because, as discussed in Part II.B.1.a., _supra_, MLPFS made no
material misstatements or omissions in relation to these ARS.
Section 25401 makes it "unlawful for any person to offer or sell
a security in this state . . . by means of any written or oral
communication which includes an untrue statement of a material
fact or omits to state a material fact . . . ."  Cal. Corp. Code
§ 25401.  Plaintiff thus has no claim under section 25501 (which
provides for liability for violation of section 25401).  _See_
_Ins. Underwriters Clearing House, Inc. v. Natomas Co._, 184 Cal.
App. 3d 1520, 1526 (Cal. Ct. App. 1986) ("The test of
materiality under the California Corporations Code is the same
[as under federal securities law].").

Finally, Plaintiff fails to state a control person
liability claim under section 25504 because its underlying

claims for violations of California securities law fail.  <u>See</u>
Cal. Corp. Code § 25504 (providing for control person liability
predicated upon an underlying violation).

        b.    Common Law Fraud

The parties agree that the elements of common law fraud
essentially mirror those involved in the section 10(b) claims.
(Pl. Merrill Mem. at 40; Merrill Mem. at 38.)  Thus, for the
same reasons that Plaintiff's section 10(b) claims fail, this
claim fails.  <u>See, e.g.</u>, <u>In re 3Com Sec. Litig.</u>, 761 F. Supp.
1411, 1415 (N.D. Cal. 1990).

    C.   <u>MM1's Motion to Dismiss</u>

Plaintiff asserts claims against MM1 for market
manipulation and material misstatements or omissions under
section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder.  <u>See</u> 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  It
also asserts claims against MM1 under California law.  Finally,
it asserts claims against MM1 for common law fraud, negligent
misrepresentation, and breach of fiduciary duty.  MM1 moves to
dismiss all of these claims.  The Court addresses them in the
order outlined above.

    1.   <u>Section 10(b) Claims</u>

To state a misrepresentation claim under section 10(b) and
Rule 10b-5, Plaintiffs must "allege that the defendant[s] (1)

made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the Plaintiffs' reliance was the proximate cause of its injury." Stoneridge, 552 U.S. at 157.  To make out a market manipulation claim, the complaint must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  ATSI, 493 F.3d at 101.

These two claims are interrelated here because Plaintiff's market manipulation claim arises from MM1's purported failure to disclose the unsuitability of its recommended investments (the Merrill ARS).  (See Pl. MM1 Mem. at 9.)  That unsuitability is in turn a product of MM1's purported failure to disclose fully MLPFS's ARS market activities and consequent liquidity risks. (Compl. ¶¶ 46, 128-49.)  See Merrill I, 704 F. Supp. 2d at 390-91 (discussing interrelated claims).  And "nondisclosure is usually essential to the success of a manipulative scheme." Santa Fe Indus., 430 U.S. at 477.  Further, Plaintiff's claim of "unsuitability" is considered a subset of an ordinary 10b-5 fraud claim.  Brown v. E.F. Hutton Grp, Inc., 991 F.2d 1020,

1031 (2d Cir. 1993).   As such, a plaintiff asserting such a claim must show:

> (1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct.

Louros v. Kreicas, 367 F. Supp. 2d 572, 585 (S.D.N.Y. 2005) (quoting Brown, 991 F.2d at 1031).   An unsuitability claim is therefore similar to an ordinary 10b-5 claim but requires "(a) proof of the knowing purchase or recommendation of unsuitable securities, and (b) that the misrepresentations and omissions in question relate to the suitability of the securities, rather than that they be in connection with their purchase or sale." Louros, 367 F. Supp. 2d at 585.

Regardless of the particular theory of federal securities fraud on which Plaintiff makes it allegations, it must plead the fraudulent conduct with particularity, raising a plausible and not merely possible entitlement to relief.   Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 557).   In order to survive a motion to dismiss, Plaintiff must also meet the heightened pleading requirements under Fed. R. Civ. P. 9(b) and the PSLRA.

ATSI, 493 F.3d at 99.  A failure on any one of these elements necessitates dismissal.  See, e.g., Good Hill Partners, 583 F. Supp. 2d at 520-21.  The Court thus addresses the legal elements common to these claims.  It begins with an analysis of MM1's alleged misstatements or omissions, Plaintiff's reliance thereupon, and then turns to scienter.

      a.  Misstatements or Omissions

The Court adopts in full and incorporates by reference the section 10(b) and Rule 10b-5 misstatements and omissions analysis as alleged against Merrill in II.B.1., supra. Plaintiff alleges alternatively that MM1 misrepresented the liquidity risks associated with Merrill ARS securities (Compl. ¶¶ 128-51) and that CDOs were not an approved investment for Plaintiff's portfolio.  (Pl. MM1 Mem. at 10.)  Additionally, Plaintiff alleges that MM1 failed to disclose its re-marketing agreement with Merrill to create a distribution channel for Merrill's products.  (Compl. ¶¶ 7, 50.)  Plaintiff alleges that had it known "the true nature and characteristics of any of these securities, it would never have followed [MM1's] recommendations and acquired them for its working capital account."  (Id. ¶ 142.)  For the reasons below, the Court concludes that Plaintiff has failed to plead the alleged

material misstatements and omissions with sufficient
particularity to survive this motion to dismiss.

At the outset, the Court observes that the bulk of
Plaintiff's claim regarding MM1's recommendation of unsuitable
CDOs is not raised in the First Amended Complaint but rather in
Plaintiff's Memorandum of Law in Opposition to MM1's Motion to
Dismiss. (See Pl. MM1 Mem. at 10-13.) Apart from a fleeting
reference to MM1's alleged knowledge that the Merrill securities
"included CDO notes that were exposed to sub-prime mortgages,"
(id. ¶ 142,) and a casual inquiry into the sub-prime exposure of
its entire investment portfolio (id. ¶ 143,) the entirety of the
section of Plaintiff's First Amended Complaint titled "Money
Market One's Fraudulent Scheme" addresses MM1's alleged failure
to disclose adequately MLPFS's ARS practices and procedures.
(See generally id. ¶¶ 127-51.) For the reasons stated above in
II.B.1., supra, however, Plaintiff was on notice of both the SEC
Order and Website Disclosure regarding MLPFS's ARS practices
well prior to purchasing any of the Merrill ARS at issue in this
litigation. Plaintiff also concedes that it received the
relevant offering materials at issue in this case. (See id. ¶¶
68, 79, 100, 103.)

Plaintiff further fails to specify what precise
misstatements or misrepresentations occurred with respect to the

39

specific Merrill ARS at issue that overcome the conclusion that
the MLPFS ARS practices were adequately disclosed.  A securities
fraud complaint must specify "each misleading statement" that a
defendant is alleged to have made.  Merrill Lynch, Pierce,
Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81-82 (2006); PSLRA,
15 U.S.C. § 78u-4(b)(1).  In this Circuit, Fed. R. Civ. P. 9(b)
requires that fraud allegations include the who, what, when,
where and why of each statement alleged to be fraudulent.  See
Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.
1993); Defer I, 654 F. Supp. 2d at 214 (ARS complaint dismissed
under Rule 9(b) where it "fail[ed] to allege exactly who made
the misstatements and to whom, when . . . where, how frequently
and in what form").  Fraud allegations that are conclusory or
unsupported by factual assertions are not sufficient.  Luce v.
Edelstein, 802 F.2d 49, 54 (2d Cir. 1986).

     Plaintiff identifies the following relevant contacts with
MM1 personnel:  (a) a July 11, 2007 e-mail in which VP Johnson
stated generally that "[LPC's] investment portfolio . . . had no
sub-prime exposure" (Compl. ¶ 143); (b) a face-to-face meeting
in "approximately late 2006" between unidentified persons at LPC
("LP's Treasurer" and VP Johnson are the only identified
participants) in which VP Johnson is alleged to have made
general statements regarding the liquid nature of ARS (id. ¶

138);[8] (c) quarterly or semi-annual face-to-face meetings between unknown employees at LPC and MM1 during which no specific statements related to the Merrill ARS are described (id. ¶¶ 130, 137); (d) notations of "CashEQ" allegedly made on LPC's account statements referring to the Merrill ARS after they were already purchased (id. ¶ 131); and (e) dateless, unspecific statements attributed to no individual MM1 employee that MM1 had read and reviewed the relevant Merrill ARS offering materials and represented that they fell within Plaintiff's investment parameters (id. ¶ 135). Each of these suffers from a failure of particularity as required by the heightened pleading standards under Fed. R. Civ. P. 9(b) and the PSLRA.

Plaintiff alternatively fails to identify specific dates, specific speakers, specific listeners, and most importantly, fails to allege that the misstatements described were in any way associated with the particular Merrill ARS at issue in this litigation. For example, the July 2011 e-mail from VP Johnson is not alleged to relate specifically to the Merrill ARS at

---

[8] Plaintiff alleges that after this conversation, VP Johnson "forwarded [Plaintiff] a study of auction rate securities via e-mail that purported to substantiate his prior representations." (Compl. ¶ 138.) Plaintiff does not describe the substance of this alleged e-mail or study and does not identify a single misstatement included therein attributable either to VP Johnson or any other MM1 employee.

41

issue here and was made after four of the six ARS were already
purchased (for the same reason it does not specifically address
the "unsuitability" of the recommended ARS at issue here).
Similarly, the meeting in "approximately late 2006" is
unspecific and temporally remote from the purchases of relevant
Merrill ARS that began in February 2007 and continued through
July 2007.  Nor does Plaintiff identify the substance or
authorship of any statements made in the ARS "study" VP Johnson
is alleged to have sent Plaintiff after this meeting.  The
quarterly, semi-annual, or even "near daily" (id. ¶ 136)
meetings and/or communications between MM1 and Plaintiff are
also described without specificity as to the attendees,
speakers, questioners, and most importantly, specific securities
under discussion.  Plaintiff also alleges generally that
"auction rate securities were categorized as 'CashEQ'" on its
monthly MM1 account statements without specifically identifying
whether the Merrill ARS were so-identified.[9]  (Id. ¶ 131.)  Even
if the Court were to draw that inference and regard these
categorizations as misrepresentations, they came after Plaintiff

---

[9] Plaintiff concedes that MM1 had been its investment advisor
since 1999 and that it had made investments in some $300 million
worth of ARS prior to the purchases at issue here and had "moved
in and out of these securities as needed to fund its operational
requirements."  (Id. ¶¶ 2, 127-28.)  It is not at all clear,
therefore, to which ARS Plaintiff refers.

purchased the Merrill ARS at issue and are therefore not material to any alleged fraud in connection with their purchase. See, e.g., De Oliveira v. Bessemer Trust Co., 09 Civ. 0713, 2010 WL 1253173, at *4 (S.D.N.Y. Mar. 24, 2010) (granting broker's motion to dismiss where "ARS were listed under the 'cash and short term' category" on account statements and were therefore irrelevant to the securities fraud claim because such statements "must, necessarily, have occurred after the ARS purchase"). Finally, because it is without particularity and because of the availability of prior adequate disclosure of MLPFS's ARS practices, see II.B.1., supra, Plaintiff's account of vague and unattributed statements regarding MM1's review of the relevant offering materials is insufficient.  The lack of particularity in the allegations above is further illustrated by the fact that Plaintiff offers the exact same meetings and communications as evidence of MM1's misstatements and omissions as to the Deutsche Bank-underwritten ARS currently at issue in the California litigation.  See MM1 Reply Memorandum of Law In Support of Motion to Dismiss ("MM1 Reply Mem.") at 6 and n.7.

Finally, the Court turns to Plaintiff's allegation that MM1 made a material omission by failing to disclose that it had entered into a re-marketing agreement with Merrill for the Merrill ARS at issue.  Omissions are actionable under section

43

10(b) and Rule 10b-5 to the same degree as misstatements where such omissions are "material."  See, e.g., ATSI, 493 F.3d at 105.  The Court of Appeals recently reaffirmed that materiality exists where there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Plaintiff alleges that Merrill entered into re-marketing agreements with various broker-dealers such as MM1 in order to provide a "distribution channel" for "auction rate securities" and "paid commissions to these distribution partners" including "extraordinary upfront payments in order to incentivize members of the distribution channels to encourage their own clients to participate in the initial placement of the [Merrill ARS]." (Compl. ¶ 7.)  Plaintiff further asserts that "pursuant to these agreements, Merrill Lynch paid placement fees to any downstream broker whose customer acquired any of the Merrill Lynch-underwritten securities in the initial placement, as well as a portion of the commissions earned in connection with each successive auction." (Id. ¶ 50.)  These allegations, however, appear conjectural at best.  Plaintiff offers no specific

44

details of how this re-marketing agreement functioned apart from the general descriptions provided above.  Plaintiff provides neither specific payment amounts nor an approximate amount that would otherwise support its conclusory statement that such payments were "extraordinary" (or for that matter, "upfront").  Neither does Plaintiff provide any facts substantiating its claim that MM1 earned a portion of Merrill's commissions on each ARS auction.  In fact, Plaintiff points to no actual textual agreement of any sort between MM1 and Merrill.  Most importantly, Plaintiff provides no express explanation of how the agreement and alleged commissions operated in the specific context of the Merrill ARS at issue here.  The First Amended Complaint also leaves the Court to speculate as to how Plaintiff learned of the existence of these alleged agreements if it was not aware of them at the time of purchase.  Of course the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the Plaintiff's favor.  Goldstein, 516 F.3d at 56.  The allegations here present a close question.

Ultimately, even assuming these allegations are non-conclusory and therefore accepted as true, it does not appear that MM1's failure to disclose the existence of this arrangement is a material omission under the facts of this case.

45

Materiality exists where there is a "substantial likelihood"
that disclosure would significantly alter "the total mix of
information made available," Matrixx Init., Inc. v.
Siracusano, 131 S. Ct. 1309, 1318 (2011); Hutchison, 647 F.3d at
485 (international quotation marks omitted) (emphasis added),
not the total mix of information of which Plaintiff claims it
was subjectively aware, but the total mix of information made
available, cf. TSC Indus., 426 U.S. at 445 (observing that
materiality is governed by an objective standard).  The gravamen
of Plaintiff's claim regarding MM1's omission is that MM1 failed
to disclose its relationship with Merrill so that it could
receive "lucrative fees" for "further perpetrate[ing] the myth
of a vibrant, liquid [ARS] market." (Compl. ¶ 7.)  Implicit in
this allegation is the assertion that the disclosure of a re-
marketing agreement between Merrill and MM1 would have been
substantially likely to alter the extent or quality of knowledge
Plaintiff had regarding the content of and practices surrounding
the underlying Merrill ARS.  The Court rejects this contention.

    For the reasons already described in II.B.1. and this
section, supra, the Merrill ARS practices were adequately
disclosed to Plaintiff following the SEC Order and Website
Disclosure.  Plaintiff also concedes that it received the
relevant offering materials for the Merrill ARS at issue. (See

46

id. ¶¶ 68, 79, 100, 103.)  These facts are fatal to Plaintiff's
implicit claim that MM1's failure to disclose the alleged
Merrill agreement was a material omission likely to
significantly alter "the 'total mix' of information made
available" to it in connection with the purchase of the Merrill
ARS.  See Hutchison, 647 F.3d at 485.  Apart from concluding
that MM1 "withheld material information," (Compl. ¶ 164,)
nowhere in the First Amended Complaint does Plaintiff even
allege that knowledge of the alleged re-marketing agreement
itself would have affected its decision to purchase the Merrill
ARS.  Instead, Plaintiff repeatedly claims that it would have
acted differently had it known of Merrill's "market
manipulation" or "the absence of sufficient legitimate third-
party demand" or "the true facts about the nature, risks, and
liquidity" of the Merrill ARS.  (See, e.g., id. ¶¶ 9, 142, 171.)
These, however, are merely veiled allegations that MLPFS's ARS
practices were not already adequately disclosed – a contention
this Court has rejected.  See, e.g., Merrill I, 704 F. Supp. 2d
at 391 ("The market is not misled when a transaction's terms are
fully disclosed.").  For this reason, the Court concludes that
Plaintiff has failed to allege adequately that MM1 made a
material omission by failing to disclose its alleged re-

marketing agreement with Merrill.[10]  Any theory of market

manipulation advanced by Plaintiff fails for the same reason.

> b.  Reliance

Even if Plaintiff had adequately alleged the material

misstatements above, each of its theories of section 10(b) and

Rule 10b-5 fraud fails for lack of justifiable reliance.

Plaintiff is not entitled to a presumption of reliance here as

the allegations against MM1 do not primarily involve omissions,

and this Court has already held that MLPFS's participation in

the ARS market was fully disclosed to investors.  See Merrill I,

704 F. Supp. 2d at 398; II.B.1., supra.  To evaluate the

reasonableness of a plaintiff's reliance, courts consider a

variety of factors, such as:

> (1) The sophistication and expertise of the plaintiff
> in financial and securities matters; (2) the existence
> of longstanding business or personal relationships;
> (3) access to the relevant information; (4) the
> existence of a fiduciary relationship; (5) concealment
> of the fraud; (6) the opportunity to detect the fraud;
> (7) whether the plaintiff initiated the stock
> transaction or sought to expedite the transaction; and
> (8) the generality or specificity of the
> misrepresentations.

---

[10] For the same reasons, Plaintiff cannot allege, as it must,
that any reliance related to MM1's alleged failure to disclose
the existence of a re-marketing agreement with Merrill was the
proximate cause of its losses.  See, e.g., ATSI, 493 F.3d at
105.

Merrill I, 704 F. Supp. 2d at 399 (citing Brown, 991 F.2d at
1032).  As applied here, these factors weigh decidedly against
Plaintiff.

First, an investor "may not justifiably rely on a
misrepresentation if, through minimal diligence, the investor
should have discovered the truth." Starr ex rel. Estate of
Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 (2d Cir.
2005) (quoting Brown, 991 F.2d at 1032).  Notwithstanding its
advisee relationship with MM1, Plaintiff is a sophisticated and
long-time institutional investor and had at its disposal the
content of the SEC Order, the Website Disclosure, the individual
offering materials for the particular Merrill ARS at issue, as
well as various reports in the media.  See, e.g., Hunt v.
Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 730 (2d
Cir. 1998) (finding that in light of adequate disclosures, "no
reasonable investor could have been misled"); Merrill I, 704 F.
Supp. 2d at 401-03 (noting that, as here, plaintiffs could have
accessed the SEC Order, Website Disclosure, and offering
prospectuses with "minimal diligence"); In re Hyperion Sec.
Litig., 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14,
1995) (finding "investor's failure to read risks disclosed in
prospectus upon reliance on broker's oral statements
unreasonable"); see also Heliotrope Gen., Inc. v. Ford Motor

Co., 189 F.3d 971, 980-81 (9th Cir. 1999) (no duty to disclose information "that the market was aware of" from news articles and the like).  Plaintiff's failure to avail itself of the public information made available is similarly unreasonable.

Moreover, MM1's alleged misstatements contained a high level of generality, severely weakening Plaintiff's claim of reasonable reliance.  See, e.g., Ashland Inc. v. Morgan Stanley & Co., 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010), aff'd, 652 F.3d 333 (2d Cir. 2011) ("As a sophisticated institution contemplating the investment of tens of millions of dollars [in ARS], it was unreasonable for [plaintiff] to rely upon the highly general statements alleged as misstatements in this case."); In re UBS ARS Litig., 2010 WL 2541166, at *4 and n.5 (finding that a plaintiff's contention that defendant represented ARS to be "highly liquid and safe" was insufficient to establish material misrepresentation under Fed. R. Civ. P. 9(b) and the PSLRA).  As detailed above, MM1's alleged statements in this case contain a similar level of generality, and Plaintiff fails to tie any of them specifically to the particular Merrill ARS at issue.  Because this Circuit requires a minimum level of due diligence when investors are confronted with general statements such as these, Brown, 991 F.2d at 1032,

Plaintiff cannot establish that its reliance on the MM1 statements was reasonable.

Finally, even if Plaintiff had engaged in a minimum inquiry into the nature of these Merrill ARS, any of the alleged misstatements attributed to MM1 are rendered immaterial and therefore improperly relied upon in light of the existing Website Disclosure and disclosed offering materials, which bespoke caution.  See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor would consider them important in light of adequate cautionary language set out in the same offering."); Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976, 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) ("[A]n alleged misstatement is not actionable where investors were adequately warned of the relevant investment risks.")  Nor is it necessary that the cautionary language be contained in the same document or communication or derive from the same source.  See, e.g., Kemp v. Universal Am. Fin. Corp., 05 Civ. 9883, 2007 WL 86942, at *11 (S.D.N.Y. Jan. 10, 2007) (citing Halperin, 295 F.3d at 357) ("[C]autionary information need not be in the same document that contains the forward-looking statement, but must instead be

reasonably available to investors and affect the total mix of information."). This Court has already concluded that such information was readily available, and Plaintiff cannot now claim that such "cautionary language did not expressly warn of or did not directly relate to the risk that brought about [Plaintiff's] loss." Halperin, 295 F.3d at 359. Plaintiff has not adequately pleaded that it justifiably relied on any of the statements attributed to MM1.

    c.   Scienter

As a final matter, Plaintiff's section 10(b) and Rule 10b-5 claims fail as a matter of law because Plaintiff fails to allege MM1 acted with the requisite scienter. "In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" ECA, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99 (emphasis added). Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."

52

Tellabs, 551 U.S. at 323.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324.

Here, Plaintiff's scienter allegations with respect to MM1's alleged misrepresentations fail because they reduce to little more than a motive to earn a profit.  While "personal gain may weigh heavily in favor of a scienter inference," Tellabs, 551 U.S. at 324, "[a]n allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient."  Defer I, 654 F. Supp. 2d at 217; see Novak, 216 F.3d at 307.  The Court of Appeals has been clear that "similar allegations of a generalized motive that could be imputed to any for-profit endeavor" are not concrete enough to infer scienter. Defer I, 654 F. Supp. 2d at 217; see also Novak, 216 F.3d at 307.  Indeed, Plaintiff alleges no concrete motive to defraud on the part of any individual at MM1 and does not tie any of the alleged misstatements at issue to the Merrill ARS themselves. Instead, Plaintiff appears to suggest that these statements were the product of MM1's general desire to maintain its fees.  (See, e.g., Compl. ¶ 50.)  These concerns amount to no more than a motive to "increase or maintain profit" that "could be imputed to any for-profit endeavor."  Defer I, 654 F. Supp. at 217.  For

53

the reasons described in II.B.1., supra, these allegations are insufficient.

A plaintiff who cannot make a scienter showing through motive and opportunity can still raise a strong inference of scienter through "strong circumstantial evidence," although "the strength of the circumstantial allegations must be correspondingly greater."  ECA, 553 F.3d at 198-99.  The Court of Appeals has held that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  Novak, 216 F.3d at 308 (emphasis added).  Recklessness is "not merely a heightened form of negligence," however, but instead "approximat[es] actual intent".  Id. at 312.  For a corporate defendant such as MM1, "pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  Teamsters Local 445, 531 F.3d at 195.

Plaintiff's scienter allegations fall short of the recklessness standard because Plaintiff does not allege, as it must, conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Defer I, 654 F. Supp. 2d at 219.  Plaintiff's allegations

attributing highly general statements regarding ARS liquidity
and sub-prime exposure to VP Johnson and other unidentified and
unspecified MM1 employees cannot carry this heavy burden.   See,
e.g., De Oliveira, 2010 WL 1253173, at *1-2, 5 (finding
insufficient scienter allegations where Plaintiff had
communicated an aversion to "any risky or long-term investments"
and where Defendant was alleged to have told Plaintiff that ARS
were "safe, cash-equivalent investments" and that it was
"inconceivable that such an auction would fail") (internal
quotation marks omitted).[11]  An adequate allegation of scienter
in the securities fraud context requires something

---

[11] The De Oliveira court found only one allegation of scienter
sufficient on its face—that Defendant represented ARS as short-
term investments but at all times "knew that ARS were not short-
term securities, but were in fact long term investments (with
maturities of over 25 years)."  De Oliveira, 2010 WL 1253173, at
*6 (internal citation omitted).   This is substantially similar
to the allegation in this case that the "stated maturity
date[s]" for the Merrill ARS on MM1's account statements
misrepresented the Merrill ARS as short term investments rather
than "30 to 40 year maturities that only paid short-term
interest rates." (Compl. ¶¶ 65, 131.)   Setting aside the fact
that the MM1 account statements were not forward-looking with
respect to the initial purchase of the Merrill ARS, see
II.C.1.a., supra, this Court agrees with the De Oliveira court
that such allegations independently fail for lack of loss
causation.   See De Oliveira, 2010 WL 1253173, at *6 ("These
allegations relate to the ARS auctions, not to their maturities.
Plaintiff has not alleged, nor is it likely that he could
allege, that it was the long-term nature of the ARS which
materialized to cause his loss.")

"approximating actual intent," and not merely a heightened form of negligence.  Novak, 216 F.3d at 312.  Plaintiff does not satisfy that burden here.

Regarding any alleged failure to disclose material facts, Plaintiff fails to allege with specificity exactly what MM1 knew about the nature of the Merrill ARS that was not already publicly available.  Instead, Plaintiff makes the conclusory allegations that MM1 "was aware that participating broker-dealers placed supporting bids in nearly every auction," that "there was no liquid market for auction rate securities, that broker-dealer bids cleared a significant percentage of auctions, and that the appearance of a market was entirely dependent upon broker-dealer participation." (Compl. ¶ 133.)  These allegations are unsupported by specific facts apportioning knowledge to specific MM1 employees or specifically relating to the Merrill ARS at issue.  Moreover, they are largely irrelevant in light of information already available in the ARS marketplace.  In these circumstances, "recklessness cannot be inferred from the failure to disclose."  See Kalnit, 264 F.3d at 143.  When adequate disclosures are made, it cannot be said that a defendant's conduct is "highly unreasonable and  . . . represents an extreme departure from the standards of ordinary care."  Defer I, 654 F. Supp. 2d at 219.

56

Insufficient scienter allegations are also fatal to
Plaintiff's alternative theory of 10b-5 fraud to the extent it
was raised in the First Amended Complaint.  Plaintiff's
"unsuitability" theory requires adequate allegations that
"the defendant knew or reasonably believed the securities were
unsuited to the buyer's needs" and "that, with scienter, the
defendant made material misrepresentations (or, owing a duty to
the buyer, failed to disclose material information) relating to
the suitability of the securities."  Louros, 367 F. Supp. 2d at
585 (citing Brown, 991 F.2d at 1031).  In light of this Court's
discussion of the materiality of MM1's alleged misstatements and
omissions, Plaintiff fails to allege in anything but the most
conclusory terms MM1's knowledge that the Merrill ARS were
unsuited to Plaintiff's needs.  Tellingly, Plaintiff attempts to
have it both ways on this point, alternatively claiming that MM1
"knew or reasonably should have known . . . the risks associated
with auction rate securities generally and with the specific
auction rate securities sold to LP in particular," (Compl. ¶
136,) while simultaneously stating that "[i]n reality . . .
Money Market One either did not read or did not understand the
offering materials before recommending that LP invest its
working capital in suitable securities," (id. ¶ 135.)
Plaintiff's own second allegation reveals the conclusory nature

of the first.  In any event, neither allegation satisfies
Plaintiff's own proposed framework for analyzing the knowledge
and scienter requirements of a 10b-5 "unsuitability" claim.
(See Pl. MM1 Mem. at 9.)  Because scienter requires more than
"merely a heightened form of negligence," Novak, 216 F.3d at
312, Plaintiff has failed to allege it adequately.

> d.   Conclusion

For the reasons states above, Plaintiff's section 10(b)
claims suffer from a lack of any actionable misstatement or
omission.  Plaintiff also has not adequately alleged its
justifiable reliance on MM1's alleged misstatements or omissions
or that MM1 acted with the requisite scienter.  A failure on any
one of these elements necessitates dismissal.  Good Hill
Partners, 583 F. Supp. 2d at 520-21.  Plaintiff's section 10(b)
claims against MM1 therefore fail and are dismissed with
prejudice because the claims cannot be remedied by further
amendment of the complaint.

> 2.   PSLRA Rule 11 Finding

The PSLRA requires courts "upon final adjudication of the
action" to make specific Rule 11 findings.  15 U.S.C. § 78u-
4(c)(1).  "[L]iability for Rule 11 violations requires only a
showing of objective unreasonableness on the part of the
attorney or client signing the papers."  ATSI, 579 F.3d at 150

(internal quotation marks omitted).  Plaintiff's claims were not harassing or frivolous, and MM1 did not affirmatively allege any improper conduct or move for sanctions.  Therefore, the Court finds no basis to conclude that Plaintiff or its counsel violated their obligations under Rule 11(b).

> 3.   California State Law Claims

>> a.   California Securities Laws

Plaintiff fails to state claims against MM1 for violations of Cal. Corp. Code §§ 25400 (private right of action under § 25500), 25401 (private right of action under § 25501), and 25504.1.

Plaintiff fails to state claims against MM1 under Cal. Corp. Code §§ 25400 (25500) and 25401 (25501) because, as discussed in Part II.C.1.a., <u>supra</u>, Plaintiff fails adequately to allege MM1's material misstatements or omissions in relation to these ARS.  Section 25400(d) makes it unlawful for a broker-dealer "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or

had reasonable ground to believe was so false or misleading."
Cal. Corp. Code § 25400(d).  Section 25401 makes it "unlawful
for any person to offer or sell a security in this state . . .
by means of any written or oral communication which includes an
untrue statement of a material fact or omits to state a material
fact . . . ."  Cal. Corp. Code § 25401.  While § 25500 "avoid[s]
the requirement of 'actual reliance'," Bowdon v. Robinson, 136
Cal. Rptr. 871, 878 (Cal Ct. App. 1977), both § 25500 and §
25401 are claims sounding in fraud and are subject to the
heightened pleading standard set forth in Fed. R. Civ. P. 9(b)
as well as the general requirement that the pleadings raise a
"plausible" and not merely possible claim for relief.  Iqbal,
129 S.Ct. at 1949.  For the reasons articulated above, Plaintiff
has not met this burden.  Moreover, to the extent Plaintiff
predicates its § 25500 and § 25401 claims on MM1's alleged
failure to disclose a remarketing agreement with Merrill,
Plaintiff's claim suffers the same failing as its federal claims
on the issue of materiality.  See II.C.1.a, supra; see also Ins.
Underwriters Clearing House, 184 Cal. App. 3d at 1526 ("The test
of materiality under the California Corporations Code is the
same [as under federal securities law].").

     Cal. Corp. Code § 25500 provides a private right of action
against § 25400 violators where a Plaintiff "purchases or sells

any security <u>at a price which was affected by such act or transaction</u>." Cal. Corp. Code § 25500 (emphasis added). Plaintiff argues that the value of these ARS was inherently tied to their liquidity and that had MM1 disclosed MLPFS's market participation and the possibility of market failure, it would not have purchased them at their offered value. (Pl. MM1 Mem. at 26.) To the extent, however, that Plaintiff predicates these claims on MM1's alleged failure to disclose MLPFS's market participation or the ARS subprime exposure, (<u>see</u> Compl. ¶¶ 187-88,) this Court has already determined that such facts were readily available in the marketplace. <u>See</u> II.B.1.a and II.C.1.a, <u>supra</u>. Plaintiff cannot therefore satisfy its own proffered minimum showing that the price it paid for the Merrill ARS was in any way "affected by" MM1's conduct. <u>See</u> Pl. MM1 Mem. at 26 (citing 1 Marsh & Volk, <u>Practice Under the California Securities Law</u> § 14.05(6) (2007)). Plaintiff thus has not pled its § 25400 and §25401 claims with sufficient particularity to survive MM1's motion to dismiss.

Finally, Plaintiff fails to state a material assistance liability claim under section 25504.1 because the underlying claims for violations of California securities law fail. <u>See</u> Cal. Corp. Code § 25504.1 (providing for joint and several

liability for material assistance predicated upon an underlying violation).

>    b.   Common Law Fraud

The parties agree that the elements of common law fraud essentially mirror those involved in the section 10(b) claims. (Pl. MM1 Mem. at 24; MM1 Mem. at 9.)  Thus, for the same reasons that Plaintiff's section 10(b) claims fail, this claim fails. See, e.g., In re 3Com Sec. Litig., 761 F. Supp. at 1415.

>    c.   Common Law Negligent Misrepresentation

The parties dispute the applicable law here.  Plaintiff proposes the use of California common law, while MM1 urges the use of New York common law.  (Pl. MM1 Mem. at 18-21, 23-24; MM1 Mem. at 10.)  MM1 further proposes that under applicable New York law Plaintiff's negligent representation claims are precluded by New York's Martin Act, N.Y. Gen. Bus. Law § 352 to § 359-h.  (MM1 Mem. at 10.)  The Court need not reach the choice-of-law issue here to decide MM1's motion to dismiss this claim, however, as the application of either the California or

New York common law of negligent misrepresentation requires dismissal for lack of reasonable (justifiable) reliance.[12]

In order to state a claim of negligent misrepresentation under California law, Plaintiff must allege: (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damages.  Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 70 Cal. Rptr. 3d 199, 213 (Cal. Ct. App. 2007). Similarly, under New York law Plaintiff must allege that: (1) the defendant had a duty, as a result of a special relationship, to give correct information, (2) the defendant made a false representation that he or she should have known was incorrect, (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose, (4) the plaintiff intended to rely and act upon it, and (5) the plaintiff reasonably relied on it to his or her detriment.  Hydro Investors, Inc. v. Trafalgar Power Inc., 227

---

[12] Though the Court does not reach the choice-of-law issue or the applicability of the Martin Act on MM1's motion to dismiss the common law negligent misrepresentation claim, the Court notes that it has already found in this litigation that the Martin Act preempts New York common law tort claims in the securities context.  See Merrill III, 2011 WL 536437, at *12 n.6.

F.3d 8, 20 (2d Cir. 2000).  For the reasons described above in II.C.1.b., supra (namely that Plaintiff is a sophisticated and long-time institutional investor and had access to the SEC Order, Website Disclosure, and individual offering materials for the Merrill ARS), Plaintiff cannot allege a justifiable or reasonable reliance on highly general MM1 statements notwithstanding its advisee relationship with MM1.  For that reason, Plaintiff's claim of negligent misrepresentation fails as a matter of both California and New York law.

> d.   Common Law Breach of Fiduciary Duty

Under California law,[13] a claim for breach of fiduciary duty requires the proving of three elements:  "1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage."  Pellegrini v. Weiss, 165 Cal. App. 4th 515, 524 (Cal. Ct. App. 2008).  California law makes clear that broker-dealers and financial advisors owe a general fiduciary

---

[13] This Court, as transferee of this action, applies the state substantive law, including choice-of-law rules, of the jurisdiction in which the action was filed.  See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 2003) (citing Van Dusen v. Barrack, 376 U.S. 612 (1964); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).  The Court adopts Plaintiff's California "comparative interest" choice-of-law analysis in full for the purpose of the breach of fiduciary duty claim.  See Pl. MM1 Mem. at 18-21.  Because of California's interest in protecting investors where transactions occur and because defendants are located within California, California's common law of breach of fiduciary duty applies.

duty to their clients.  See, e.g., Duffy v. Cavalier, 215 Cal.
App. 3d 1517, 1536 n.10 (Cal. Ct. App. 1989) ("[T]here is in all
cases a fiduciary duty owed by a stockbroker to his or her
customers."). The scope of this duty, however, depends on the
specific facts and circumstances presented, including "the
relative sophistication and experience of the customer; the
customer's ability to evaluate the broker's recommendations and
exercise an independent judgment thereon; the nature of the
account, whether discretionary or non-discretionary; and the
actual financial situation and needs of the customer." Id.
Where, as here, Plaintiff is a sophisticated institutional
investor with a history of trading in some $300 million worth of
ARS securities, MM1's fiduciary obligations to Plaintiff are not
as absolute as where a client is relatively unsophisticated.
See, e.g., Leboce, S.A. v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 709 F.2d 605, 607 (9th Cir. 1983) ("We have not
found nor has [Plaintiff] cited to us any California cases
imposing fiduciary duties on a broker in favor of an investor of
[Plaintiff's] sophistication and independence."). More recent
cases, however, have found that some minimal duty may extend to
even a sophisticated investor where a broker assumes a
"continuing obligation to advise his clients of information that
affects their securities." See, e.g., Caravan Mobile Home

Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561 (9th
Cir. 1985) (stating that brokers owed a fiduciary duty to
clients where they had "exercised continuing control over [the
client's] account or acted as investment advisors"); see also
Duffy, 215 Cal. App. 3d at 1536 n.10 ("To the extent there is
language in Leboce, Caravan, or any other federal case
purporting to interpret California law as not imposing any
fiduciary duty on a stockbroker unless he or she exercises
continuing control over the customer's account or acts as an
'investment counselor,' we are in disagreement with the federal
courts of appeals.").  In this case, Plaintiff describes MM1 as
its "broker-dealer and trusted financial advisor" and describes
an ongoing relationship in which it "made investments based on
Money Market One's recommendations." (Compl. ¶¶ 2. 127-130,
229.)  Accepting these allegations as true, Plaintiff has
sufficiently alleged the existence of at least some minimal
fiduciary duty under California law.

Plaintiff specifically alleges that MM1 breached its duty
to act "with the highest good faith" and to "exercise reasonable
care" by, without limitation, recommending investments
inconsistent with Plaintiff's instructions and investment goals,
failing to identify and communicate tangible market risks to
which Plaintiff's portfolio was exposed, representing ARS as

short-term liquid investments, and failing to disclose its re-marketing agreement with Merrill.  (Id. ¶¶ 229-237.)  The final required element of a breach of fiduciary duty claim, however, is that such breach proximately causes Plaintiff's damages.  See Pellegrini, 165 Cal. App. 4th at 524.  Of the specific breaches alleged by Plaintiff in the First Amended Complaint, this Court has already concluded that MM1's purported representation as to the ARS maturity dates and its alleged failure to disclose its re-marketing agreement with Merrill are not actionable because Plaintiff cannot, as it must, allege that these breaches proximately caused its stated losses.  See II.C.1.a, II.C.1.c. and n.11, supra; accord De Oliveira, 2010 WL 1253173, at *6 ("These allegations relate to the ARS auctions, not to their maturities.  Plaintiff has not alleged, nor is it likely that he could allege, that it was the long-term nature of the ARS which materialized to cause his loss.")  To the extent, however, that Plaintiff alleges that MM1 breached a fiduciary duty in recommending unsuitable investments with sub-prime exposure in light of its investment criteria, that the market for these securities failed as a result of their sub-prime exposure, and that MM1 failed adequately to respond to Plaintiff's inquiries into the ARS when it could still have sold some portion in a then-functioning ARS market, (Compl. ¶¶ 128, 135, 137-38, 140,

143, 148-49; Pl. MM1 Mem. at 5,) Plaintiff has stated a valid
claim.

A breach of fiduciary duty is not a claim sounding in
fraud, and the liberal pleading standard embodied in Fed. R.
Civ. P. 8(a) applies.  Because Plaintiff has therefore
sufficiently pled the existence of at least a minimal fiduciary
duty owed to it by MM1, alleged specific breaches of that duty,
and claimed concrete damages resulting from those breaches
(Compl. ¶¶ 2, 127-138, 229-237,) Plaintiff's claim survives
MM1's motion to dismiss.

D.   <u>MM1's Motion to Strike</u>

The parties appear to agree that punitive damages are not
available under with the Federal Securities Laws or the
California Corporations Code.  <u>See, e.g.</u>, Memorandum of Law in
Support of MM1's Motion to Strike ("MM1 Strike Mem.") at 1;
Plaintiff's Memorandum in Opposition to MM1's Motion to Strike
("Pl. Strike Mem.") at 1.  Because the Court has dismissed
Plaintiff's common law fraud and negligent misrepresentation
claims, punitive damages are not available as part of those
claims.  Therefore, the Court turns to Plaintiff's surviving
claim for common law breach of fiduciary duty.

California courts set a high bar for punitive damages in the context of non-fraud claims – in this case, on Plaintiff's claim for breach of fiduciary duty.  See, e.g., Scott v. Phoenix Sch., Inc., 175 Cal. App. 4th 702, 715-16 (Ct. App. 2009) (citations omitted) (noting that "[a] breach of fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages . . . [p]unitive damages are appropriate if the defendant's acts are reprehensible, fraudulent, or in blatant violation of law or policy . . . [p]unitive damages are proper only when the tortious conduct rises to levels of extreme indifference to plaintiff's rights, a level which decent citizens should not have to tolerate").  A claim for punitive damages requires sufficient allegations of "despicable conduct . . . that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon by ordinary, decent people."  Id.  Because the Court has already determined that Plaintiff fails to state a fraud claim and for substantially the same reasons already described above in II.C., supra, the Court finds that Plaintiff's pleadings do not meet this burden.  For these reasons, MM1's motion to strike those sections of the First Amended Complaint asserting punitive damages is hereby GRANTED.

CONCLUSION

For the foregoing reasons, Defendant Merrill's motion to dismiss [dkt. no. 12 in 09 Civ. 9887; dkt. no. 118 in 09 MD 2030] is GRANTED with prejudice.   Defendant MM1's motion to dismiss [dkt. no. 18 in 09 Civ. 9887; dkt. no. 141 in 09 MD 2030] is GRANTED in part with prejudice and DENIED in part. Defendant MM1's motion to strike [dkt. no. 23 in 09 Civ. 9887; dkt. no. 146 in 09 MD 2030] is GRANTED.   Pursuant to Rule 10.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, the Clerk shall send a copy of this order to the transferor court, the United States District Court for the Northern District of California, and to the Judicial Panel on Multidistrict Litigation.   See Patricia D. Howard, A Guide to Multidistrict Litigation, 124 F.R.D. 479, 485-86 (1989).


SO ORDERED.

Dated:      February 15, 2012
            New York, New York


LORETTA A. PRESKA
Chief U.S. District Judge

70